UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

EVERETT HADIX, *et al.*,

        Plaintiffs,

v.

PATRICIA L. CARUSO, *et al.*,

        Defendants.
_____/

Case No. 4:92-CV-110

Hon. Richard Alan Enslen

**OPINION**

      This Plaintiff's Motion was filed on September 14, 2005. The motion comes in the context of a prisoner class action in which this Court has made many findings of Eighth Amendment violations because of systemic failures to delivery adequate medical care. This includes findings since the adoption of the Prison Litigation Reform Act ("PLRA"), including findings of November 18, 1996, findings of February 18, 2000 and findings of October 29, 2002. At these past hearings, Plaintiffs have extensively documented failures to provide for the chronically ill, failures to provide staff supervision and ensure timely specialty referrals, and failures to provide necessary medications.

      This Court, because of the PLRA's preference for the least intrusive constitutional remedies, has in the past directed Defendants to self-remedy the constitutional violations. To assist in this process, the Court approved the appointment of Dr. Robert Cohen as a medical monitor in this case by Order of April 23, 2003. Dr. Cohen filed his First Report in July 2004. He filed his Second Report in January 2005. He filed his Third Report this September. His Third Report was deeply disturbing to this Court because it noted several cases of prisoners suffering premature and possibly avoidable deaths because of inadequate medical care. It also noted the extremely poor performance of one physician–Dr. Faghihnia. I am told that Dr. Faghihnia is no longer an issue because he is no

longer employed by the Department of Corrections.  While this may be true, the issue remains as to why Dr. Faghihnia's medical care was not effectively monitored such that it took Dr. Cohen to discover and document his deficient care.

>According to Dr. Cohen's Third Report:
>
>Although the crisis in MSP [medical service provider] staffing and severe deficiencies in quality of care w[ere] acknowledged by MDOC staff in March 2005, the actual full-time medical staff available to C-Unit, DWH and DWH ER decreased this spring, exacerbating a dangerous situation. The Regional Director for the Jackson Region, although based at Dwayne Waters Hospital, did not recognize these serious ongoing problems nor correct them. The CMS Deputy Medical Director, Dr. Austin, although responsible for supervising the MSP staff in the *Hadix* facilities, did not supervise the C-Unit or DWH staff.

(Third Report at 13.)  Dr. Cohen's reference to the C-Unit refers to a special unit which was opened in Spring 2003.  It houses approximately 60 prisoners who are too sick to live in general population. Its population includes prisoners with multiple chronic illnesses, including AIDS, Hepatitis C, and serious pulmonary and cardiac illnesses.  (*Id.* at 12.)   Although this special unit was opened in Spring 2003, no new medical staff was hired to staff it.  (*Id.*)  Correctional Medical Services ("CMS") has been responsible for staffing both Dwayne Waters Hospital ("DWH") and C-Unit, but according to Dr. Cohen, it was apparent to him from the beginning of 2005, that CMS could not provide adequate medical coverage to DWH and C-Unit.  (*Id.*)  Dr. Cohen has also been critical of CMS for failing to develop an effective program for MSP supervision.  (*Id.* at 2-3.)

Here are some of the examples of what happens in the absence of an effective programs of supervision: Patient 1, who is described at page 11 of the Third Report, died of neglect, a drug resistant staph infection and gastro-intestinal bleeding.  Dr. Cohen describes his death as caused by neglect because he was housed in segregation without appropriate medical care.

Patient 2, who is a patient with a bevy of health problems including AIDS, Hepatitis B, Hepatitis C, Sicca Syndrome (a chronic and extreme dryness of the mouth and esophagus which causes difficulty swallowing). His treatment was reviewed at pages 16 through 20 of the Third Report. Basically, he lost 10 percent of his body weight (down to 108 pounds) without any effective treatment from the chronic care clinic and received the wrong doses of anti-retroviral medication. From February 2004 to February 2005, he was not effectively treated for a number of serious medical conditions: (1) he was not consistently provided a proper pureed diet; (2) he was not treated for abdominal pain; (3) he was not treated for crumbled teeth; and (4) he was not treated appropriately for a painful rashes and lesions.

Patient 3 is a 29-year-old with HIV who waited five months for a simple diagnostic test for rectal cancer, as discussed at pages 20-23 of the Third Report. After the cancer was confirmed, patient 3 then waited another three months before any radiation therapy was begun. This particular problem, patients wanting a long time for cancer treatment, has been previously noted in the Court's prior findings. In fact, in January 2005, this Court discussed with Defendant's counsel the treatment of one of the named Plaintiffs in this case—whose treatment for cancer was also greatly delayed. (Plaintiffs' Attachment 3, Jan. 13, 2005 Transcript at 47-49.) It appears that such discussions have not been effective in prompting Defendants to remedy problems with care.

Another aspect of the deficient care is the failure of specialty referrals to take place in a timely manner. Patents 1, 2 and 3 also display shocking examples of delayed specialty referral care. Other examples include: Patient 4, who has a history of stroke and abnormal renal studies, and who was not seen on a nephrology consultation marked urgent for 4 and ½ months (Third Report, at 23-29); Patient 5, who has a history of HIV and low T-cell counts and weight loss, was delayed by over

3

three months in obtaining a consultation with an infectious disease specialist (*id.* at 30-32); Patient 6, who has Non-Hodgkin's Lymphoma, was treated at Foote Hospital for cancer which was blocking his kidneys and causing severe leg pain; his diagnostic evaluation for the leg pain had been greatly delayed (more than six months); he began complaints about pain in April 2004; consultations were delayed during the course of his evaluation until the Lymphoma was discovered; after his Lymphoma was discovered, officials at Foote Hospital were concerned that he might not get inpatient care if transferred back to Duane Waters Hospital and the care of CMS (*id.* at 32-41); Patient 8 was a patient with metastatic lung cancer; he had a CT performed that noted the lung mass (after a delay in the CT); when finally seen by an oncologist, treatment was not possible since the cancer had spread to his brain and liver (*id.* at 44-47); and Patient 9 had diabetes and severe hypertension; his renal function had deteriorated in the year prior to his death in May 2005; an urgent renal consultation was requested on March 31, 2005, but was not conducted before his death in May 2005 (*id.* at 51-52.).

These examples show the consequences of delayed consultations and treatment. Dr. Cohen in his Report indicates that 41 percent of the initial consultations and 45 of the follow-up consultations were not completed within the times requested by the referring physicians, according to MDOC statistics. (*Id.* at 9.) Another problem with consultations is that CMS apparently still delays consultations due to paperwork concerns which do not reflect on the necessity of care, such as consult forms not being typed or being incomplete. (*Id.* at 10.)

Another problems with the level of care is that the Chronic Care Clinics are not functioning in the places where they are needed most–at C-Unit and Dwayne Waters Hospital. The Third Report says the following:

4

> Based upon my review of patients in segregation in April and May, care for these patients is still very problematic. Patients with critical life threatening illnesses were completely ignored, treated inadequately. Patients with extreme pain and massive weight loss are not properly evaluated and treated. There seem to be many psychotic inmates in segregation, and they have significant medical problems but have difficulty expressing their medical needs. There is a significant problem with provider continuity.

(*Id.* at 12.) Dr. Cohen observes that there were staffing crises in March 2005, and the staffing levels on C Unit and DWH have since declined such that there is no longer the expectation that service providers can respond to nurse requests for patient evaluations. (*Id.* at 13.) More staffing of C-Unit is planned, but it unclear when the staffing will be provided given that the C-Unit has been understaffed for more than two years. (*Id.* at 14.)

Another chronic care issue is that the chronic renal unit has serious deficiencies. According to MDOC audits, in 40 to 50 percent of the cases audited, there were problems in treatment regarding treatment of hypertension and a failure to address ineffective dialysis. (*Id.* a 5.)

I think I have given a flavor of the chronic care problems. Specific case reviews indicating severe problems include: Patients 1, 2 , 3 and 4, noted above.

Another system with regular and systematic failures is the medical record system used. These deficiencies are related to the ongoing failure of a coordination between the SERAPIS (computer record system) and traditional paper records. (*Id.* at 7.) These problems are aggravated by the fact that DWH and C-Unit lack a SERAPIS terminal, and thus lack access to laboratory studies ordered in SERAPIS. One example of how this has contributed to deficient care is Patient 2, whose treatment contrary to FDA warnings would have been easily noticed on a computerized system. (*Id.* at 19-20.) Other examples of recording keeping which probably contributed to deficient care include Patients 4, 5 and 8.

5

In response to these various serious problems, Defendants have filed a Response requesting that the Court not grant any preliminary relief concerning the conditions. One of Defendants' challenges to a preliminary injunction, which is a real concern, is that the use of a preliminary injunction not interfere with the litigation framework for the upcoming hearing. In other words, this last phase of the case was designed to see if Defendants could self-remedy conditions with the help of Dr. Cohen. If an injunction is entered mid-stream, this will affect the record that is produced at the upcoming hearing because the record will reflect not just Defendants' attempts at self-remedy, but also the effect of the preliminary injunction.

Other concerns raised by Defendants concern both the accuracy of some of the information contained in the Third Report and the statistical significance of the problem cases noted by Dr. Cohen. In particular, Defendants have filed a thirty-three page response to the Third Report. (Defs.' Response, Attach. 1.) The response disagrees with many of the overall factual conclusions of Dr. Cohen, but agrees with many of the specific problems and problem areas identified by Dr. Cohen. For example, it is noted at page 5 that Defendants agree that more staffing is necessary for C-Unit and the dialysis program. (*Id.* at 5.) It is also noted that the acuity level at DWH has increased, which also affects care. (*Id.*) Defendants' plan to address temporary staffing crises involves referring more patients to community hospitals (*id.* at 6), though it is not known how such patients will be selected for referral. Defendants likewise agree that the chronic care system must be modified to require nursing review before chronic care doctor visits to make the visits more effective. (*Id.* at 7.) Defendants acknowledge that there have been training problems regarding the use of the SERAPIS system, but believe that this is a solvable performance issue. (*Id.* at 9.) Defendants also

6

admit that the percentages of failed referral use by Dr. Cohen in his Third Report are accurate, but disagree with his conclusions drawn from those statistics. (*Id.* at 10.)

However, the most interestingly aspect of Defendants' Response is that it involves response to many of the recommendations made by Dr. Cohen at end of the Third Report. Defendants in response agree, at least in principle, to many of the recommendations. While Defendants agree with some of the recommendations and the goal, they dispute whether they have the ability to control the result. The recommendations include important changes to the medical facilities and services provided including the establishment of a thirty-bed infirmary at Dwayne Waters Hospital. (*Id.* at 14-33.)

Defendants in their Response brief (not the attachment) have also filed the Affidavit of Dr. George Pramstaller. Dr. Pramstaller, the Chief Medical Officer for the MDOC, says in his Affidavit that while he is concerned about the problem cases he does not believe that the problem cases are representative of overall MDOC medical care. (Pramstaller Aff. ¶ 3.) Dr. Pramstaller also characterizes the cases selected as "brittle" meaning that bad outcomes may be expected because the prisoners are in grave medical conditions. (*Id.*)

Defendants have also provided the Affidavit of Richard Russell, an administrator for the Bureau of Health Care Services for the MDOC. Mr. Russell's Affidavit takes the position that the problem cases noted in Dr. Cohen's Report are not statistically significant. Mr. Russell comes to this conclusion because he numbered the total inmates served at the facilities at 1587 and in order to arrive at a valid statistical sample of the population to a 95% confidence level one would have to review at least 305 medical files. (Russell Aff. ¶ 15.) Since this was not done, Russell does not believe that Dr. Cohen's criticisms are necessarily representative of the care delivered to the class.

7

(*See* Russell Aff. ¶ 17.)  In saying so, though, Russell did not define the subclass of people in the *Hadix* class who had a need for urgent, acute or emergency care and he did not state whether the problems cases might be reflective of systemic problems in delivering care to this subclass of prisoners.  Paragraph 16 of Russell's Affidavit also assumes that the cases reviewed but not commented upon by Dr. Cohen lacked deficiencies.  This assumption does not appear valid from a complete reading of the Third Report.

Defendants' arguments are also answered in Plaintiffs' Reply.  Plaintiffs have attached the Declaration of Jerry Walden, M.D.  Walden reviewed 23 medical records of patients who died at the *Hadix* facilities in 2004.  (Walden Decl. ¶ 4.)  His review revealed a number of instances of failure to deliver appropriate medical care.  (*Id.*)  Examples included a cancer patient who was not given pain medication (*id.* at ¶ 5), a renal patient who was refused treatment and who was not given psychological care that might have prolonged his treatment and life (*id.* at ¶ 6), a patient with cirrhosis of the liver who was not given necessary medication over a four-day period and otherwise not treated appropriately for serious symptoms of liver failure (id. at ¶ 11.)  These are just a few examples listed by Dr. Walden, he lists several other problems cases from the 23 cases he surveyed.  Dr. Walden viewed these cases as reflective of a need to make significant changes in health care delivery at the *Hadix* facilities to prevent imminent harm to prisoner health.  (*Id.* ¶ 36.)  Dr. Walden also criticized the SERAPIS electronic medical record program on the ground that the program did not include a manual override feature for necessary changes.  (*Id.* ¶ 35.)  Overall, Dr. Walden's Declaration supports that the problems observed by Dr. Cohen are not simple anomalies, but are reflective of system-wide deficient medical care.

The same conclusion may be drawn from Mark Creekmore's Declaration. Creekmore is a researcher and lecturer in Psychology at the University of Michigan and in the past has provided testimony about valid programs for quality assurance in the delivery of medical care. Creekmore says that there are at least six types of case studies which can be used to gather and present data. (Creekmore Decl. ¶ 6.) Creekmore believes that Dr. Cohen's cases are reflective of "critical" incidents and illustrate complex medical problems and system failures in need of solution. (*Id.* at ¶ 11.) He also views the events reported upon as "sentinel" events which provide special insight into system failures. (*Id.*) It is noted that the CDC uses sentinel events, such as deaths, to study patient care. (*See* Pls.' Reply, Attach. 3.) The MDOC also uses such information in that mortality review is used as a peer review mechanism of each prisoner death under MDOC policy. (*See* Pls.' Reply, Attach. 4.)

At the present time, the prisoners at DWH, C-Unit, JMF and SMT are at a high level of clinical acuity. The majority of the prisoners are enrolled in chronic care clinics. This is almost twice the enrollment rate for other prisoners in the State (58 percent versus 35 percent); and, it is for this reason, that deficiencies noted are of such moment to the *Hadix* Class.

**LEGAL STANDARDS**

Under the Rule 65, the Court must consider four factors: (1) whether there is a strong likelihood of success on the merit; (2) whether there is proof of irreparable harm to the moving party without the injunction; (3) whether substantial harm to others will be caused by the injunction; and (4) whether the public's interest is favored by the issuance of the injunction. *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003); *Nightclubs, Inc. v. City of Paducah,* 202 F.3d 884, 888 (6th Cir. 2000); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). This evaluation

9

focuses on all four factors--rather than any particular factor. *In re De Lorean Motor Co.*, 755 F.2d 1223, 1228-30 (6th Cir. 1985).

## LEGAL ANALYSIS

### 1. Likelihood of Success on the Merits

Of course, prisoners have an Eighth Amendment constitutional right to medical care for serious medical needs during incarceration and jailers may not intentionally or recklessly deprive a prisoner of such necessary medical care. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994).

It is not disputed that the medical conditions of the referenced prisoners (which include cancer, liver failure, kidney failure, *etc.*) are serious medical conditions. *See also Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003) (listing factors pertinent to the seriousness of medical needs).

In assessing intentional and reckless violations, the history of violations may be important. Where information known to prison officials establishes an ongoing objectively unconstitutional condition, then such information satisfies both the objective and subject prong of the Eighth Amendment analysis. *Hadix v. Johnson*, 367 F.3d 513, 526 (6th Cir. 2004); *see also Farmer*, 511 U.S. at 846 n.9.

Furthermore, according to the Third Circuit:

> Where prison authorities deny reasonable requests for medical treatment . . . and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury,' *Westlake v. Lucas,* 537 F.2d 857, 860 (6th Cir.1976) (cited with approval in *Estelle,* 429 U.S. at 105 n. 11, 97 S.Ct. at 291 n. 11), deliberate indifference is manifest.

*Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

In the present case, the failure of the medical delivery system has long been known to Defendants. The Court documented those failures extensively in its 2002 Findings. The Court

10

appointed a Medical Monitor who has provided specific information to Defendants about the deficiencies of its system. Under these conditions, the failure to correct the deficiencies constitutes deliberate or reckless indifference to known serious medical needs in violation of the Eighth Amendment. Therefore, the first prong favors Plaintiff's Motion.

In saying so, I take full notice of the PLRA and its restrictions. Under 18 U.S.C. § 3626(a)(2), a preliminary injunction may not issue unless it is:

> . . . narrowly drawn, extend no further than necessary to correct the harm . . ., and [is] the least intrusive means to correct that harm. The Court shall give substantial weight to any adverse impact public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity . . . .

18 U.S.C. § 3626(a)(2).

The Court believes that the evidence presented dictates a finding of likelihood on the merits notwithstanding the PLRA limitations. Any injunction issued will respect the limitations of the PLRA.

### 2. Irreparable Injury

The observable consequence of the deficient medical care at issue have been avoidable death, illness, pain and aggravation of disease. As a matter of law, such injuries constitute irreparable injury.

### 3. Substantial Harm to Others

Before issuing a preliminary injunction, this Court must consider whether the injunction will cause substantial harm to others. In this case, this concern equates with the need to respect the comity and control of the Michigan Department of Corrections and the professional judgment of its doctors and administrators. The Court weighs these as very serious concerns and, for this reason, treads lightly in this area. However, I take notice that the precise injunction relief requested by Plaintiffs (to force Defendants to engage in cooperative planning and remedy with the Medical Monitor) is such that it

will respect the State's comity and not cause substantial harm.  Therefore, this factor does not weigh against the relief requested.

### 4.  Public Interest

It cannot be said enough that the Eighth Amendment prohibits cruel and unusual punishment. We are not a barbaric country.  We will not set aside idly while prisoners, on a regular basis, contract cancer, kidney disease, and other serious illnesses and are left untreated for lengthy periods of time. The public interest favors the immediate remedy of such conditions.

Therefore, I will issue a preliminary injunction without bond (due to Plaintiffs' indigence). My injunction will require Defendants to engage in cooperatively planning with Plaintiffs and Dr. Cohen to remedy the unconstitutional conditions discussed.  Defendants will be ordered to submit a remedial plan, within 30 days of my Order, for later court approval.  I will schedule further hearing upon receipt of the plan.

|  |  |
|---|---|
| DATED in Kalamazoo, MI:<br>October 19, 2005 | /s/ Richard Alan Enslen<br>RICHARD ALAN ENSLEN<br>SENIOR UNITED STATES DISTRICT JUDGE |