UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

EVERETT HADIX, *et al.*,

        Plaintiffs,

v.

PATRICIA L. CARUSO, *et al.*,

        Defendants.

_____/

Case No. 4:92-CV-110

Hon. Richard Alan Enslen

**OPINION**

     Say a prayer for T.S. and the others who have passed.  Any earthly help comes far too late for them.

I.    **BACKGROUND**

    **1. Procedural History**

     This Court held an evidentiary hearing regarding Plaintiffs' Motion to Reopen Judgment Regarding Mental Health Care and Issue a Preliminary Injunction on October 11-13, 2006.  Also considered during the hearing were two other motions by Plaintiffs, which will be determined later.  The Court has now received supplemental proofs and post-hearing briefs from the parties as to the Motion to Reopen.  Given the significance of the substantive issues, the Court now resolves the Motion without delay.

     A short primer on the history of mental health care at the *Hadix* facilities maybe necessary to understand the present controversy.  This suit was filed in the Eastern District of Michigan in 1980 to redress a variety of unconstitutional conditions, including inadequate mental health care, at certain designated Jackson, Michigan prison facilities operated by prison officials of the Michigan Department of Corrections pursuant to 42 U.S.C. § 1983.  In 1985, a Consent Decree was entered

by stipulation of the parties with the approval of United States District Judge John Feikens.  Section II.B of the Consent Decree pertained to mental health care for prisoners within the *Hadix* facilities.

Judge Feikens initially transferred enforcement of medical care and mental health care provisions of the Consent Decree to this Court by Order of June 5, 1992 pursuant to 28 U.S.C. § 1404(a).  *Hadix v. Johnson*, 792 F. Supp. 527, 528 (E.D. Mich. 1992).  The purpose of the Order was to promote uniformity and effectiveness of remedy in light of this Court's enforcement of a Consent Decree involving the same issues in a separate suit–*United States v. Michigan*, Case No. 1:84-cv-63.  *Id.  See also Hadix v. Johnson*, 228 F.3d 662, 665 (6th Cir. 2002) (discussing history of suit).

Mental health care at the facilities was routinely monitored by the Court until 2001.  On January 8, 2001, the Court granted Defendants' request to terminate enforcement of the mental health provisions of the Consent Decree effective upon ten days after the filing of an Updated CQI Monitoring and Data Validation document.  (Order of Jan. 8, 2001.)  The document was filed by Defendants on January 23, 2001.  (Dkt. No. 1437.)  Thus, the termination became effective in early February 2001.  Plaintiffs moved on September 8, 2006 to reopen the terminated provisions and for a preliminary injunction pertaining to mental health care.  The cause for the Motion was the tragic death of a Michigan prisoner, T.S., and other fatal cases in which inmates' deaths were attributable to delays or malfeasance in the provision of mental health care.

**2. Death of T.S.**

On August 6, 2006, Michigan prisoner T.S. died.  The basic circumstances of his death were discovered by medical monitor Dr. Robert Cohen, M.D. between August 7, 2006 and August 10, 2006, and conveyed to the Court by letter of August 14, 2006.  (Dkt. No. 2088.)  T.S. was a twenty-one-year-old male with a history of mental illness.  He was placed in the segregation unit at JMF (a

2

*Hadix* facility) beginning on August 2, 2003; he spent five days in two segregation cells at JMF locked in four-point restraints to concrete slab beds without any effective medical or mental health care. He was unlocked shortly before he died.

T.S.'s death was investigated by both the Michigan Department of Corrections and by Plaintiffs. The following account is taken from trial exhibits, including custody logs, overhead in-cell videotape and portable videotape of the events between August 2, 2006 and August 6, 2006. The basic road map for the events is Plaintiffs' Exhibit 106A, which provides a time log. There are some slight discrepancies as to time of certain events between the log book and the video time recordings (of some ten minutes); the Court utilizes the time log in Exhibit 106A as the best record of the time sequence of the recorded events. (*See also* Pls.' Ex. 42, at bates nos. 320947-320971 (custody log); Pls.' Ex. 106B (video excerpts); Pls.' Ex. 106C (complete hand-held video); Pls.' Ex. 106D (complete overhead video).)

T.S. arrived at JMF in March 2006 and was housed as a level II general population prisoner. (Pls.' Ex. 106A at 1.) On July 31, 2006, he was transferred by custody staff from general population to administrative segregation due to disobedience of custodial orders. On August 2, 2006, at 1239 hours he was placed in soft standing restraints (locking leather and vinyl restraints around his hands, feet and waist). (*Id.*) He then flooded his sink and was placed on "top of the bed restraints" at 1327 hours. (*Id.* at 2.) "Top of the bed restraints" are according to policy "the securing of <u>both</u> arms and <u>legs</u> to a bed . . . ." (Pls.' Ex. 42, MDOC Operating Procedure, bates no. 320597, emphasis in original.) Prisoners so secured are to be observed every 15 minutes and to be offered bathroom and water drinking breaks every two hours. (*Id.* at bates no. 320598.)

3

In practice, "top of the beds restraints" is a euphemism for chaining an inmate's hands and feet to a concrete slab. T.S.'s "bed" was composed of a concrete slab with four metal, arc-shaped handles emanating from the slab for the purpose of receiving the locking restraints. (*See* Pls.' Ex. 106-B.) Two of the handles, positioned in the longitudinal middle of the bed, were across from each other at the outside edges of the bed to receive the hand and waist restraints. (*Id.*) The remaining two handles were positioned across from one another at the outer edges of the foot of the bed to receive the feet restraints. (*Id.*) A small mattress pad was provided, but was not used for much of the restraint because T.S. removed it and/or because he urinated on the bed. (Pls.' Ex. 106A at 3-4.) For many hours of the restraint, T.S. was naked and laid in his own urine. (*Id.* at 4-9.) On one occasion, T.S. refused to cooperate with his restraint; this prompted five correctional officers to use a large plexiglass shield and place their weight upon T.S. while they locked him, screaming, to the slab with chains. (Pls.' Ex. 106B.) On August 5, 2006, T.S. was removed from his cell for one hour for treatment of a urine burn on his back at Duane Waters Hospital. (Pls.' Ex. 106A at 6.) Apparently, such treatment never occurred because T.S. urinated on an examination table at the hospital. (Op. & Decl. of Jerry Walden, M.D. ¶ 26; trial transcript ("T.T."), vol. 1, 131 (testimony adopting declaration).)

Much of the defiant and self-destructive behavior of T.S. is explained as a product of untreated mental illness. T.S. had a documented history of bipolar disorder, depression, hyperactivity disorder and suicide attempts. (Walden Decl. ¶ 3.) T.S. was seen on August 2, 2006 by an outpatient social worker, Francis Duffy.[1] (Pls.' Ex. 103, F. Duffy Dep. 53-54.) Duffy

---

[1]Duffy was an employee of the Michigan Department of Community Health assigned to work within JMF. (*See* Duffy Dep. 42.)

4

determined that T.S. was "floridly psychotic. Exhibiting symptoms consistent with his description of manic episodes prior to incarceration." (Duffy Dep. Ex. 10.)  Duffy thus referred T.S. to the "CSP"–*id*.–meaning the Crisis Stabilization Program that hospitalizes and treats mentally ill prisoners at the Huron Valley Men's Facility (a prison psychiatric hospital). (*See* Duffy Dep. 41 & 47.)  Duffy had no expectation that T.S. would be transferred immediately, though, since he planned to examine T.S. the following day. (*See* Duffy Dep. Ex. 10.)  The prior suicide attempts noted by Duffy referred to a series of suicide attempts in the Kalamazoo County Jail (T.S. stabbing himself in the stomach and attempting hanging); the hanging was attempted while T.S. was housed in the Kalamazoo Regional Psychiatric Hospital and nearly resulted in his death. (Walden Decl. ¶ 19.)

Duffy completed a referral form for T.S. on the morning of August 3, 2006 before examining T.S. again later in the day. (Duffy Dep. 71.)  The referral form was marked "Emergent" and noted that "Prisoner decompensated . . . in detention cell . . . Prisoner remained agitated . . . Associations loose, disintegrated.  Unable to determine if prisoner is responding to internal stimuli. . . ." (Duffy Dep. Ex. 9 at 1.)  Duffy also noted that T.S.'s psychiatric medications could not be changed due to the absence of an on-site psychiatrist. (*Id.* at 2.)

The same day Duffy received an email that the referral had been received. (Duffy Dep. 71.)  He later received an email that day that the referral had been approved. (*Id.* at 72.)  T.S. was not transferred that day, though.  Defendants blame the failure to transfer upon a "transfer coordinator" (secretary) at Huron Valley who failed to transmit the transfer order to JMF, together with the scheduled leave of the transferring psychiatrist on Friday, August 4, 2006 and Mr. Duffy's past reliance on email correspondence to affect transfer orders. (*See* Defs.' Resp., Dkt. No. 2177, at 5.)

5

The immediate consequence of the failure to transfer was that a psychotic man with apparent delusions and screaming incoherently was left in chains on a concrete bed over an extended period of time with no effective access to medical or psychiatric care and with custody staff telling him that he would be kept in four-point restraints until he was cooperative.  (*See* Pls.' Ex. 106B.)  At the time of these incidents, there was no on-site psychiatric coverage for JFM because the staff psychiatrist was on "an extended leave."  (Walden Decl. ¶¶ 40-41.)

T.S. was prescribed several medications, including psychotropic medications, while at JMF. (*Id.* at ¶ 45.)  These included Lithium (which is known to cause kidney failure if adequate hydration is not maintained and Lithium levels are not regularly and closely monitored, particularly when doses are changed); Seroquel (an antipsychotic medication, which exposes patients to risks of dehydration, tachycardia and impairment of temperature auto-regulation); Hydrochlorothiazide (which must be monitored to prevent electrolyte imbalance and which could also contribute to Lithium toxicity); Levothyroine (which manages hypothyroidism); Gemfibrizol (which manages hyperlipidemia, but may cause depression in some patients); and Atenolol (which can interfere with temperature regulation).  (*See id.*; Pls.' Ex. 114.)  T.S. also had multiple cardiac risk factors, including hypertension, obesity and hyperlipidemia. (Walden Decl. ¶ 2.)[2]

During T.S.'s restraint, the conditions at the institution were hot and humid.  Two of the days were designated "heat alert" days with heat index readings around 100 degrees.  (*Id.* ¶ 35; *see also* Pls.' Ex. 106B (depicting perspiring officers complaining about heat); Pls.' Ex. 243 (Accuweather

---

[2]In particular, Lithium is known to subject patients to risk of toxicity, electrolyte imbalance, delusion, tachycardia and death.  (T.T., vol. 1, 133-35.)  Lithium also increases urination even while a patient is dehydrating.  (*Id.*)  T.S.'s Lithium levels were not monitored for a prolonged period preceding his restraint and death.  (*Id.*)  This was not clinically appropriate. (*Id.*)

6

Temperature Chart).[3])  In Dr. Walden's opinion, dehyrdration severely affected T.S.'s health on

August 2-3, 2006.  (*Id.*)  Throughout the restraint, T.S. was offered water by officers and often

refused.  (*See* Pls.' Ex. 106A; Walden Decl. ¶ 27.)

On August 6, 2006 at 0610 hours, T.S. was moved to another cell, but "top of the bed

restraints" were continued. (Pls.' Ex. 106A at 8.) Four hours later, T.S. was taken to a shower. (*Id.*)

At the time, he was clearly weakened and needed assistance in rising and walking. (Pls.' Ex. 106B.)

After the shower, he was taken back to his cell *via* wheelchair and placed again in "top of the bed

restraints." (*Id.*) He was removed from the restraints at 1358 hours after prolonged "sleeping." The

prolonged "sleeping" was also the reason given by staff psychologist Allan Small for not examining

T.S. on August 6, 2006 on repeated occasions.  (Walden Decl. ¶ 29.)

At 1359 hours, T.S. fell face first onto the concrete floor.  (Pls.' Ex. 106A at 8; Pls.' Ex.

106B.) Custody staff then assisted T.S. to sit back onto the slab.  (*Id.*)  Some minutes later T.S. fell

off the toilet and laid on the floor until assisted by custody staff at 1457 hours.  (*Id.* at 9.)  At that

time, nurse Charles Boltjes attempted to take a pulse and/or blood pressure from T.S. in both arms.

(*Id.* & Pls.' Ex. 106B.)  Then T.S., in apparent concern for his declining health, asked Boltjes about

the readings and he responded, "It's faint, but I heard it."  (Pls.' Ex. 106B.)  No blood pressure,

pulse, temperature or other vital readings were ever recorded by Boltjes in connection with that visit.

(Walden Decl. ¶ 30.)  No emergency care was summoned even though Boltjes (as reflected in his

comment) had observed low cardiac output, which failure to summon emergency care was not

---

[3]Defendants' interior cell measurements of temperature were lower, but not so low that
heat, humidity, and hydration were not a significant concern for T.S. in the context of this
restraint.

7

clinically appropriate.[4]  (*See* T.T., vol. I, 134.)  One hour later Boltjes returned to pass medication

and found T.S. not breathing.  (Pls.' Ex. 106A at 9.)  C.P.R. was attempted, but was unsuccessful.

T.S. was then taken by ambulance to Foote Hospital and pronounced dead at 1655 hours.  (Pls.' Ex.

42 at bates no. 320853.)

The official incident report of the death contains one particular gross misstatement of fact.

The report stated in part that "[the prisoner] was taken off TOBR restraints at 1400 hours and

showed no visible health complications."  (Pls.' Ex. 42 at bates no. 320842.)  This conclusion is

directly contradicted by the videotape displaying T.S.'s declining physical state, which was obvious.

Dr. Walden concluded that the most likely cause of death for T.S. was dehydration and arrhythmia.

(Walden Decl. ¶ 43.)  Walden also opines that the death was entirely preventable had timely medical

and psychiatric care occurred.  (*Id.*)

Another striking feature of the care received by T.S. was that neither custody staff (who

checked on T.S. on regular intervals), nor psychological and nursing staff (who all saw T.S. in a state

of decline) took any action to summon emergency care when the need to do so was obvious.  As Dr.

Pramstaller, the Michigan Department of Corrections Medical Director, put it, "I think there were

opportunities for all the disciplines to have taken a more active role in advocating for the welfare of

Mr. T.S. and unfortunately that did not happen."  (T.T., vol. II, 244.)  Dr. Pramstaller testified later,

"I think in looking at the tapes in particular it was very apparent in the tapes that T.S. was having,

number one, mental deterioration, and number two, physical deterioration.  I thought that there was

---

[4]Plaintiffs refer to Boltjes' conduct as arguably constituting criminal negligence.  (Pls.'
Trial Br. 3.)  The Court agrees with that characterization.  While it is true that the medical
examiner has not announced an official cause of death, the delay in doing so suggests both that in
depth toxicology work is being performed and full consideration given to ascribing a manner of
death suggesting criminal liability.

8

ample opportunity for custody officers, for mental health professionals and for nursing to have intervened and brought in a psychiatrist, brought in a medical doctor, or just done something to intervene.  And that was not done."  (T.T., vol. II, 272.)

Similarly, Dr. Robert Cohen, M.D., the medical monitor in this suit and a person with extensive experience not only in medicine but in the supervision of psychiatric care, testified T.S.'s medical treatment records reflected that T.S. had experienced a progressive deterioration of his mental status in the five months preceding his death.  (T.T., vol. III, 577.)  Dr. Cohen noted that T.S.'s medications had been modified once he arrived at JMF, but that following the modifications of his medications on May 16, the next follow-up was scheduled to take place three months later. (*Id.*)  According to Dr. Cohen, this was too long an interval given the substantial medication changes ordered by the psychiatrist.  (*Id.*)  This treatment was, in his opinion, clinically inappropriate.  (*Id.*) He also opined that restraint beds and other forms of punitive restraints have predictable fatal consequences which have caused them not to be used in some correctional systems.  (*Id.*)  He further opined that T.S.'s medical condition needed careful medical monitoring during a heat wave–which did not occur.  (*Id.*)

### 3.  Department Restraint Policies

On the subject of restraint policies, T.S.'s death was reported widely in media and has caused Defendants to change some of its practices regarding the use of "top of the bed restraints." Defendants continue to assert that "top of the bed restraints" are useful in two instances: (1) to discourage prisoners who are not overtly mentally ill, but engaged in self-destructive behaviors such as cutting themselves or inserting foreign objects into bodily cavities; and (2) to discourage disruptive prisoners who present a threat to others and/or a threat of property damage. (Defs.' Resp.,

9

Dkt. No. 2177, at 22.)  No testimony was presented as to the frequency of these instances or the advantage of this approach over other correctional policies.

Nevertheless, Director Patricia Caruso has issued a Director's Office Memorandum, DOM 2006-13, dated October 23, 2006 and effective November 1, 2006.  (*Id.* Ex. G.)  Said Memorandum limits the use of "top of the bed restraints" to a six-hour period at prisons within the Jackson Complex (which includes the *Hadix* facilities).  (*Id.* at 1-2.)  At the end of such period, the prisoner, if still disruptive, is to be taken to a medical or psychiatric unit for medical or psychiatric treatment (if appropriate) or, if no treatment is necessary, is to be taken to a "hardened cell" where restraints other than "top of the bed restraints" may be used to address behavioral issues, if necessary.  (*Id.*) The policy, on its face, does not limit the number of times "top of the bed restraints" may be used in a calendar year or other period as to a single prisoner, nor does it specify a waiting period between the time of a prisoner's release from "top of the bed restraints" before a new round of "top of the bed restraints" may be reauthorized.  (*Id.*)  The policy does require a health evaluation of prisoners, by medical staff, before a prisoner is placed on "top of the bed restraints."  (*Id.*)

This change in policy has been judged insufficient by both Dr. Cohen, the medical monitor, and Dr. Robert Griefinger, Defendants' expert witness.  Dr. Cohen testified that, for the purposes of the ethical standards of the American Medical Association, "torture refers to the deliberate, systematic or wanton administration of cruel, inhumane, and degrading treatments or punishments during imprisonment or detainment." (T.T., vol. III, 575.)  This is significant because physicians are required by their ethical standards to "oppose and must not participate in torture for any reason. Participation in torture includes, but is not limited to, providing or withholding any services, substances, or knowledge to facilitate the practice of torture." (*Id.* )  Dr. Cohen classified the use

10

of "top of the bed restraints" or other forms of restraints for punitive reasons as "torture" within that definition. (*Id.* at 578-79.) Dr. Cohen favored the total discontinuation of the practice because any use of the practice is likely to contribute to future prisoner deaths. (*Id.*) Dr. Griefinger, similarly, testified that it was unethical for a physician to provide medical clearance for any form of punitive restraints. (*Id.* at 500.)

**4. The Case of P.H.**

Dr. Cohen began the hearing with testimony concerning another prisoner death associated with inadequate psychiatric and medical care. P.H. died on August 17, 2006 at Duane Waters Hospital of congestive heart failure and suffered from end-stage heart and liver disease. (T.T., vol. I, 15.) His death was a foreseeable complication of untreated hyperthyroidism, a serious medical condition which caused P.H.'s deadly complications. (*Id.*) P.H. refused to take his medication for hyperthyroidism because he suffered multiple delusions that he was being poisoned and if his condition improved he would be sent to another institution to be injured or killed. (*Id.*)

P.H. was examined by Allan Small (the psychologist who was also assigned to care for T.S.'s week-end care) on January 19, 2005. (*Id.* at 15-16.) Small noted that P.H. expressed concerns about JMF staff colluding with staff from another facility to "silence him," but did not schedule P.H. for any follow up visit or other treatment. (*Id.*) One month later Small saw P.H. again about complaints that mail room staff were secretly collaborating against P.H. (*Id.* at 17.) At this time, Small believed that P.H. may have been suffering paranoid delusions, but did not schedule follow up care because P.H. refused care. (*Id.*)

Come May 2005, P.H. was seen by the JMF lead psychologist (David Arend) with more complaints about secret mail room plots. Arend assessed P.H. as illogical, but not mentally ill. (*Id.*)

11

That same day, P.H. was admitted to Duane Waters Hospital with multiple life threatening conditions; he had thyrotoxicosis (a high level of thyroid hormone in the blood) which in turn caused atrial fibrillation, ischemic heart disease, and congestive heart failure. (*Id.* at 18-19.) P.H. was on several medications for his heart, blood pressure and thyroid, but refused treatment of the root cause, hyperthyroidism, because of paranoia. (*Id.*) He had a significant weight loss of 40 pounds (132 pounds after weight loss). (*Id.*)

This hospital visit led to a psychiatric visit with Dr. Wilanowski. She noted paranoid delusions on P.H.'s behalf which caused him to refuse treatment, and also fantastical thinking that he would receive a large settlement against the MDOC. (*Id.* at 19-20.) Dr. Wilanowski was hopeful that antipsychotic medication, Xyprexia, might relieve his symptoms so that he could be persuaded to treat his hyperthyroidism. (*Id.*)

Over the next year, P.H.'s medical condition deteriorated drastically without any improvement in his paranoid thinking. (*Id.* at 20-21.) P.H. saw an endocrinologist in May and August 2005, but the endocrinologist (who asked to see P.H. for further treatment) was not accommodated by Dr. Ivens of Correctional Medical Services ("CMS"), the company that arranges and pays for specialist services, because Dr. Ivens wanted the case managed without the specialist referral. (*Id.*)

For the next ten months, P.H. had multiple hospitalizations and consistently refused treatment for the hyperthyroidism. (*Id.* at 22.) By June 2006, his death seemed imminent and Dr. Mathai demanded from mental health staff that they determine whether P.H. was competent to continue to refuse medical care. (*Id.*) In response, Dr. Wilanowski prepared a standard form indicating that P.H. was not competent to refuse medical care on June 15, 2006. (*Id.*) That form was sent to Lansing for

approval and sat idle, notwithstanding that the form dealt with a life-threatening emergency. On July 17, 2006, Defendants finally relented and sent the form onto the Attorney General's Office, who then petitioned the probate court for an order authorizing medical treatment. A hearing was not set until August 2006, by which time P.H. was in St. Joseph's Hospital in Ann Arbor. He was transferred back to DWH on August 15, 2006 and died there two days later without treatment. (*Id.* at 24-25.)

Dr. Cohen concluded from this medical chart that neither medical staff nor psychological staff effectively managed the case, and their delay was exacerbated by the failure to treat an emergency request for treatment as such. (*Id.*) According to Dr. Cohen, the toxic goiter that resulted in heart and liver failure which killed P.H. could have been cured in days had treatment been timely ordered. (*Id.*) Dr. Cohen found the psychological and psychiatric's staff indifference to P.H.'s condition particularly troubling. (*Id.* at 26.)

**5. Other Cases of Treatment Failure**

Plaintiffs' expert Dr. Walden also prepared an expert report on July 10, 2006. Although mental health care was not an explicit or implicit objective of that report, nevertheless it is significant that Dr. Walden discovered many instances of medical treatment failure which were causally related to inadequate psychological and psychiatric services at the *Hadix* facilities. Many of these cases pertain to inmates with treatable illness, who declined treatment, and were not offered psychological counseling though the conditions warranted it. Patient 15 received medical advice that he was in need of a second dialysis graft (for treatment of kidney failure). He refused. There is no record of counseling to encourage care (which is the standard of care for dialysis patients who tend to suffer from depression and die if care is neglected). (Pls.' Ex. 1B at 9; *see also* Second Report of Dr. Robert Cohen, M.D., at 7.) Defendants have provided a record that patient 15 was seen by

13

Psychological Services Unit ("PSU") L.L.P. Kevin Tolsma on August 17, 2006.  The disposition was "TNR"–treatment not required.  Patient 15 was not seen by a psychiatrist or given counseling according to the notation.  (Russell Proffer, Ex. F.)[5]

Also not counseled was patient 41, who was diagnosed with lung cancer and refused heart catheterization which was the prerequisite for his cancer treatment.  At the time, the tumor had not spread and was likely treatable.  (Pls.' Ex. 1B at 16.)  There is no record of services for patient 41 between July 7, 2006 and September 2, 2006.  (Russell Proffer, Ex. F.)

Other cases of failure to provide or document mental health counseling regarding medical issues include: patient 102, who needed surgery for a resistant staph infection and refused such, Pls.' Ex. 1B at 26, 44; patient 87, who suffered from heart failure and did not take his heart medication, and also did not follow up his physician's recommendation for a prostate biopsy, *id.* at 39; patient 1, a diabetic with juvenile onset diabetes, a history of many insulin reactions and poor blood sugar management who died of renal failure without counseling, *id.* at 6, 48; patient 86 refused surgery for a brain tumor after meeting with Dr. Faghihnia, a physician with a history of poor client communication, *id.* at 79-80; Third Report of the Associate Monitor 27-29; and patient 83, a patient with concerns about neurosurgery for arteriovenous malformation, *id.* at 78-79; T.T., vol. 1, 123. None of these cases were referred for service between July 7, 2006 and September 2, 2006.  (Russell Proffer, Ex. F.)

Also remarkable in Dr. Walden's Report is the history of recent suicides and related deaths occurring in the absence of effective mental health care.  Patient 156 killed himself after coming off

---

[5]The Court understands that Russell's Proffer was tracking a slightly later time period then that of Dr. Walden's Report.  However, the document is still very informative in that it shows whether or not the prisoners were referred for new service in the later time frame.

of suicide watch and expressing the frustration that his medications no longer worked and he needed to "silence the voices." (Pls.' Ex. 1B at 53.) An effective drug for patient 156, Geodon, was not available to the prescribing psychiatrist because it had been apparently left off the CMS formulary as a cost-cutting measure. (*Id.*; T.T., vol. I, 125.) Patient 133 killed himself by overdosing on medication after learning that his children and former wife had died in an automobile accident. Dr. Walden suspects that the "system" knew of the accident and failed to provide timely counseling. (*Id.* at 40.)

Patient 165 died of cancer. He was found lying in his feces, after having lost 60 pounds on a "hunger strike." (T.T., vol. I, 124-25.) He was treated as a malingerer without psychological examination, but was discovered to have suffered from a fatal brain tumor which caused delirium. (*Id.*) Patient 165 needed coordinated medical and mental health care. The same was true of patient 229. Patient 229 spent two weeks in four-point restraints. (Pls.' Ex. 1B at 73-74.) Like T.S., he was on multiple psychotropic medications. (*Id.*) As Dr. Walden concluded less than one month before T.S. died,

> Here is another patient who would profit from medical teaming with psychiatry. He should not be in a general ward and should be in DWH or a unit where he can be monitored daily by both psych and medicine. In hospitals today, restraint orders have to be written daily and justified each day. Such a need is absolutely critical.

(*Id.*)

### 6. Inadequate Psychological/Psychiatry Staffing

Another factor in the recent spate of delinquent care is the absence of available staff to provide necessary services. JMF currently houses 1,452 prisoners, including a segregation unit. (R. Russell Proffer, Ex. D, Arend Memo at 1.) All but 219 of those prisoners are assigned to the JMF

PSU; the others are assigned to the Department of Mental Health Outpatient Mental Health Team ("OPMHT").  (*Id.*)

After Dr. Weller took medical leave, JMF was left without an onsite psychologist for a seven week period.[6]  (Rushbrook Mem., Pls.' Ex. 5H, at 1.)  When some coverage was restored to JMF on August 8, 2006, this was accomplished by sharing the psychiatrist assigned to the RGC (Reception and Guidance Center) facility.  (*Id.* at 1-2.)  The RGC services themselves are crucial because they provide beginning services to prisoners entering the Michigan prison system.

Defendants have filed the Proffer of Richard Russell to demonstrate the provision of services to JMF inmates while Dr. Weller was on leave.  The Proffer does say psychiatric services were available during Dr. Weller's leave.  (Russell Proffer ¶ 7.)  However, once the Affidavit and attachments are examined and understood, they demonstrate quite the contrary.  Exhibit F shows 21 evaluations between July 7, 2006 and September 9, 2006; each of these being conducted by the three PSU limited license psychologists–Small, Arend and Tolsma.  (Russell Proffer, Ex. F.)  Of those 21 evaluations, only five were referred for services after the initial evaluation.  (*Id.*)  The complaints ranged between anxiety, paranoia, self-injury and suicide.  (*Id.*)  Only one case, a suicide case on July 28, was referred to the Crisis Stabilization Program, meaning that the inmate would be transferred to the Huron Valley facility for hospitalization and further care.  (*Id.*)  Two cases, dated August 25 and August 28, were marked as "PSU" meaning they would receive further services from the PSU limited license staff.  (*Id.*)  Two other cases, dated August 15 and August 23, were marked as "OPT,"

_____

[6]The Rushbrook Memorandum also asserts that the "prisoner . . . was not in administrative segregation; he was in an observation cell located in the segregation unit . . . ." (Rushbrook Mem. at 1.)  Whatever metaphysical distinction was intended by that remark is unimportant; T.S. was treated by staff as a malefactor and was told that his restraints would continue until he was cooperative.

16

meaning they would receive services from the Community Mental Health limited license staff.  (*Id.*) Cases which did not receive service included: July 7, patient on hunger strike; July 24, patient comment "suicidal"; July 31, patient comment "self-injury threats"; August 9, patient comment "self-injury"; and August 14, patient comment "paranoia."  (*Id.*)

The general impression the document gives is that PSU staff were fulfilling rote paperwork requirements in seeing patients, but would not provide actual services except in rare cases.  This is exceptional given that the Court knows from extensive past experience of proofs, regarding the mental health care at the *Hadix* facilities, that a very significant percentage of prisoners at this facility (which is largely housed with ill inmates due to its proximity to Duane Waters Hospital) experience significant mental illness on a regular basis and would benefit from regular treatment.

Perhaps one reason for the reluctance to provide services at JMF is that the PSU staff are professionally ill-equipped for the tasks designated them.  For example, Allan Small is a limited license psychologist. (Pls.' Ex. 105, A. Small Dep. 6-7.)  This means that he must be supervised by a fully licensed psychologist.  (*Id.*)  The fully licensed psychologist that supervises Small and all other PSU staff is the regional director.  (*Id.*)  Small is more directly supervised by another psychologist–Marie Alcala-Cardew, who works at the Parnall facility and supervises other PSU staff. (*Id.*)  Alcala-Cardew is also a limited license psychologist.  (*Id.* at 14.)   According to Small, his contacts with the regional director are limited to email correspondence (mostly about reporting) and he had only one face-to-face meeting with the regional director in the last year.  (*Id.*)

The OPMHT staff has similar "qualifications."  For instance, Francis Duffy is a limited license psychologist and is the most senior member/unit chief of his service team. (Pls.' Ex. 103, Duffy Dep. 7, 13.)  The supervision of PSU and OPMHT staff contradicts the legal requirements of

17

the Michigan statute. Michigan Compiled Laws section 33.18111(2) requires that a limited license holder practice under the supervision of a license holder. As the record shows, limited license holders were not supervised with the exception of the formality of a reporting relationship to a distant boss who saw them once a year.

Furthermore, the absence of qualified staff to perform advanced tasks had real documented consequences as noted above. P.H.'s case was not treated emergently and it became so due to prolonged avoidance of the case by ill-equipped staff. Similarly, T.S., and others, did not receive regular psychiatric care, blood testing for psychiatric drugs, and modification of their medications, which grossly affected those patients' outcomes. The failure to transfer T.S. in a timely way, though argued as an "isolated" problem, was not necessarily so. (*See* R. Russell, T.T., vol. II, 318.) Soon after Richard Russell discovered the non-transfer of T.S., he tracked other cases in August 2006 and found that the new cases were benefitted by the new tracking policy which worked to ensure that the transfer occurred timely. (*Id.*) Russell could not say how regular transfers were before the change in policy. (*Id.*)

### 7. Systemic Nature of Constitutional Violations

Plaintiffs' Expert, Mark Creekmore, Ph.D., also testified persuasively at the hearing regarding "root cause analysis" and other factors pertinent to whether observed constitutional violations are indicative of the level of care at *Hadix* facilities. His testimony was that certain sentinel events, especially including deaths, are important in analyzing the quality of services provided by an organization because they suggest what are typical responses of the system to a given set of events. (T.T., vol. III, 537.) This kind of analysis becomes particularly important when statistical records are shown to be flawed. Dr. Creekmore concluded that the statistics kept by the

18

Department were not sufficient to permit a systemic analysis of the service system and for continuous quality improvement.  (*Id.* at 536.)  Dr. Creekmore also discussed the use of policy, flow charts and other communication strategies to avoid service "silos"–cases in which service was provided by service providers who were unaware of important facts because those facts were communicated to others but not to them.  (*Id.* at 543-44.)  These comments were specifically directed at the current division of labor between physicians, nurses, psychiatrists, psychologists and other health care staff.  (*Id.*)

Another subject noted by Dr. Creekmore was the prevalence of missed appointments.  (*Id.* at 554.)  This suggested to Dr. Creekmore that staff's time was not being effectively managed, and that patient outcomes were being adversely affected by delays in treatment caused by a failure to manage care effectively.  (*Id.*)  Such a system unnecessarily expends resources treating a significant illness which could have been avoided by prompt treatment.  (*Id.*)  Although some of these observations were directed to medical care, the general concepts are applicable to the evidence of mental health care treatment on this record.  The failures of staff to effectively treat T.S. and other mentally-ill patients signify a systemic failure of the mental health system to provide effective treatment.

## II.   LEGAL STANDARDS FOR PRELIMINARY INJUNCTION

The present Motion asks for relief under both Federal Rule of Civil Procedure 65(a), Rule 60(b)(6), and 18 U.S.C. § 3626(a).  The Court begins by examining the general requirements for a preliminary injunction under Rule 65.

The Court must consider four factors:  (1) whether there is a strong likelihood of success on the merits; (2) whether there is proof of irreparable harm to the moving party without the injunction;

(3) whether substantial harm to others will be caused by the injunction; and (4) whether the public's

interest is favored by the issuance of the injunction.  *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th

Cir. 2003); *Nightclubs, Inc. v. City of Paducah,* 202 F.3d 884, 888 (6th Cir. 2000); *Basicomputer*

*Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).  This evaluation focuses on all four factors--rather

than any particular factor.  *In re De Lorean Motor Co.*, 755 F.2d 1223, 1228-30 (6th Cir. 1985).

## III.    PRISON LITIGATION REFORM ACT ("PLRA") STANDARDS

Under 18 U.S.C. § 3626(a)(2), a preliminary injunction may not issue unless it is:

. . . narrowly drawn, extend[s] no further than necessary to correct the harm . . ., and [is] the
least intrusive means to correct that harm.  The Court shall give substantial weight to any
adverse impact public safety or the operation of a criminal justice system caused by the
preliminary relief and shall respect the principles of comity . . . .

18 U.S.C. § 3626(a)(2).  Although much was made of the enactment of the PLRA at the time, its actual

standards are consistent with traditional norms of non-interference with state regulation of prisons.

However, such norms and standards must, as the statute recognizes, give way to constitutional

standards to prevent ongoing violations, including those under the Eighth Amendment.

## IV.    RULE 60(b) STANDARDS

Federal Rule of Civil Procedure 60(b) provides in pertinent part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal
representative from a final judgment, order, or proceeding for the following reasons: (1)
mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which
by due diligence could not have been discovered in time to move for a new trial under Rule
59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation,
or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been
satisfied, released, or discharged, or a prior judgment upon which it is based has been
reversed or otherwise vacated, or it is no longer equitable that the judgment should have
prospective application; or (6) any other reason justifying relief from the operation of the
judgment.  The motion shall be made within a reasonable time, and for reasons (1), (2), and
(3) not more than one year after the judgment, order, or proceeding was entered or taken.  A
motion under this subdivision (b) does not affect the finality of a judgment or suspend its
operation. . . .

Fed. R. Civ. P. 60(b).

**V.**     **LEGAL ANALYSIS**

   **1. Evidentiary Objections**

   Defendants seek to exclude some of the opinion testimony of Drs. Walden and Cohen pertaining to the adequacy of mental health treatment of *Hadix* prisoners.  Defendants base this argument upon the holding in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), the District Court's gatekeeping role under Federal Rule of Evidence 702, and the fact that neither physician is a licensed psychiatrist.

   Although this argument might have some validity as to a physician with little or no practice in areas concerned with mental health (*e.g.*, an orthopaedic surgeon), it does not track well given the experience and training of Doctors Walden and Cohen.  Both physicians have prolonged histories as primary care physicians (Walden, a family doctor, and Cohen, an internist).  In that capacity, both doctors regularly see patients experiencing some degree of mental illness and are required to make professional judgments as to whether to treat such illness, treat the illness in consultation with a specialist, or refer for specialist care.  Furthermore, Doctors Walden and Cohen have both worked as correctional medical officers and in that role have supervised psychological care teams.  Put simply, their training as physicians and their work experiences make them more than qualified to offer the opinions offered during the recent hearing.  (*See* T.T., vol. I, 7-14 (Cohen); T.T., vol. I, 113-21 (Walden).)

   Furthermore, even to the extent that the opinions relate to the need of various patients to have psychological and psychiatric care, the opinions are still admissible.  The closest similar case is *Walker v. Soo Line R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000).  In that case, the Seventh Circuit

upheld the use of the testimony of a physician about psychiatric matters because the physician was the head of a team which included psychologists and the physician could give proper testimony based on her work experience and discussions with other team members. *Id.* The experiences of Drs. Walden and Cohen similarly qualify them to offer their opinions. Also supporting this result are the decisions in *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 389 (6th Cir. 2000); and *Dickerson v. Cardia & Thoracic Surgery of E. Tenn.*, 388 F.3d 976, 982 (6th Cir. 2004). The cases cited by Defendants, including *Smelser v. Norfolk So. Rwy. Co.*, 105 F.3d 299 (6th Cir. 1997), deal with disparate factual scenarios and do not support exclusion of expert testimony in this instance.

### 2. Relief under Rule 60(b)(6)

Defendants maintain that three cases demonstrate that Rule 60(b)(6) relief cannot be granted after termination of a portion of a consent decree–*Vasquez v. Carver*, 18 F. Supp. 2d 503, 513 (E.D. Pa. 1998), *aff'd*, 181 F.3d 85 (3d Cir. 1999); *Inmates of Suffolk County Jail v. Rouse*, 129 F.3d 649 (1st Cir. 1987); and *Hawaii County Green Party v. Clinton*, 124 F. Supp. 2d 1173 (D. Haw. 2000). With all due respect, only one of those cases, the *Hawaii Green Party* case, stands for the propositions cited. The Court does not view that case as persuasive authority which should be relied upon in this instance because of the differing factual circumstances present herein and because of the controlling law of the United States Supreme Court and the Sixth Circuit Court of Appeals.

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994) is the case usually cited in the context of Rule 60(b)(6) relief from a prior judgment. In *Kokkonen*, the Supreme Court held that a stipulation for dismissal of an entire action which did not retain jurisdiction for enforcement of a settlement agreement could not later justify Rule 60(b)(6) relief to obtain enforcement of the settlement agreement. *Kokkonen*, 511 U.S. at 378-79. It did so in part because it viewed the doctrine

of ancillary jurisdiction, as pertaining to a dismissed diversity suit, as an insufficient basis for federal jurisdiction given that the ancillary claim (breach of settlement) was unrelated to the dismissed claim (breach of agency).  *Id.* at 380-81.  The Court also distinguished cases in which the district court had retained jurisdiction by a term of the judgment for the purposes of settlement enforcement, or "incorporated the terms of the settlement agreement in the order."  *Id.* at 381.

It is apparent upon even causal inspection of the *Kokkonen* ruling that the hard stop it intended for settlement enforcement of dismissed cases does not apply in this instance.  First of all, this is not an instance in which all jurisdiction was previously abandoned by a complete dismissal of the case.  Rather, the Court has continued Consent Decree enforcement of medical health and fire safety provisions to prevent further constitutional violations under 42 U.S.C. § 1983.  Second, the Consent Decree, which was a settlement agreement, was expressly part of the judgment (though not part of the partial termination order).

The decision in *Inmates of Suffolk County Jail v. Rouse*, 129 F.3d 649, 662 (1st Cir. 1987) in fact recognized that renewed unconstitutional conditions as to a terminated decree would warrant a "new round of proceedings."  The question of whether that "new round of proceedings" should be initiated under Rule 60(b)(6) or by separate action is a discretionary issue which presents itself both to the moving counsel and to the district court saddled with such a motion.  The answer to that question, of course, depends upon the context.  When a suit is *finally terminated* and Rule 60(b)(6) relief would be inconsistent with the usual rules of process and fair adjudication, then courts should routinely turn such requests aside.  However, in the present case, wherein enforcement is on-going and the terminated Consent Decree provisions have a decided impact on the future termination of live Consent Decree provisions, Rule 60(b)(6) relief is not only possible, but it is necessary for the

23

District Court to fulfill its constitutional and statutory role. In particular, many of the repeated and recurrent problem cases noted by Drs. Cohen and Walden concern the cracks between medical care and mental health care. Without a system that effectively addresses both areas, Eighth Amendment constitutional health care violations will continue as a by-product of unconstitutional mental health care.

Furthermore, in the present case, Consent Decree enforcement has been transferred from the Eastern District to prevent inconsistent adjudications as to the Jackson facilities. Any attempt to fracture the lawsuit by forcing separate actions on related topics would do a grave disservice to both prisoners and administrators by forcing them to function under multiple enforcement regimes. In a word, the equities of this suit demand Rule 60(b)6) relief. The scope of such relief will be determined in addressing Plaintiffs' requests for preliminary injunctive relief.[7]

### 3. Preliminary Injunctive Relief

Plaintiffs have made four requests as part of their Motion: (a) the elimination of punitive mechanical restraints, including, but not limited to "top of the bed restraints;" (b) the requirement that Defendants maintain psychological and psychiatric staff levels sufficient to reliably deliver necessary psychological and psychiatric services; (c) the requirement that Defendants institute daily rounds by a psychiatrist in the segregation unit; and (d) the requirement that Defendants develop protocols for appropriate coordination of medical and mental health care, and meetings between psychological, psychiatric and medical care providers to coordinate care for prisoners.

---

[7]One of those requests, the request for a limitation on punitive restraints, does not absolutely depend upon the re-opening of the mental health provisions. This is because, given the nature of the relief, it may be properly ordered as part of this Court's jurisdiction over the medical care provisions.

### a. Use of Punitive Restraints at *Hadix* facilities

This topic is interesting because it raises not only the typical Eighth Amendment issues regarding provision of medical and mental health care to prisoners, but also the concept of when punitive treatment in prison crosses the bloody line of torture so as to be prohibited by the Eighth Amendment as an illegal act of punishment. A brief review on the history of torture in the United States is, therefore, helpful. The review will be presented after another summary of the relevant Eighth Amendment mental health/medical care standards.

"Deliberate indifference to serious medical needs" violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Eighth Amendment standard has both objective and subjective components. *Id.* Thus, to be liable, a defendant must know of and disregard an excessive risk to prisoner health or safety. *Farmer*, 511 U.S. at 837. However, in an injunctive case, proof of the subjective component is straightforward:

> In this case, we are concerned with future conduct to correct prison conditions. If these conditions are found to be objectively unconstitutional, then that finding would also satisfy the subjective prong because the same information that would lead to the court's conclusion was available to the prison officials.

*Hadix v. Johnson*, 367 F.3d 513, 526 (6th Cir. 2004). Likewise, deliberate indifference to serious psychological needs violates the Eighth Amendment. *Clark-Murphy v. Foreback*, 439 F.3d 280, 292 (6th Cir. 2006);[8] *Gleason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990).

---

[8]*Clark-Murphy* involved a large number of MDOC staff members who, according to the estate, caused the decedent-prisoner's death by failing to emergently treat his medical and psychiatric conditions and exposing him to hot temperatures while on psychotropic drugs. This death occurred significantly before T.S.'s death. This death and lawsuit and the regular discussions in the *Hadix* suit about the risks of dehydration of such patients provided Defendants with ample notice in advance of T.S.'s death of such risks.

Regarding torture, the Eighth Amendment, which prohibits "cruel and unusual punishments," was ratified as part of the Bill of Rights (the first ten Amendments) on December 15, 1791 when so ratified by the State of Virginia (after ratifications of other states such that two-thirds of the states had then ratified the Bill of Rights in accordance with Article V of the Constitution).  The turn of phrase "nor cruel and unusual punishments inflicted" was borrowed from the English Bill of Rights of 1689, which meant to prohibit the imposition of punishments which were not statutorily authorized or otherwise clearly excessive.  *Gregg v. Georgia*, 428 U.S. 153, 169-70 (1976).  The drafters and adopting states, at the time, were primarily concerned with banning barbarous methods of execution and torture once practiced in England and then practiced in other countries such as France and Spain.  *Id.*  Indeed, Patrick Henry objected before the Virginia Assembly to the language of the original Constitution for its failure to contain a torture prohibition.  *Id.* at 169-70 & n.17.

While this was so, it was arguable from the beginning as to what exactly was prohibited by the Eighth Amendment.  The backdrop to the Amendment was the Act of April 30, 1790, which established the first set of legislated punishments for various offenses against the United States. Session II, ch. 9, 1 Stat. 112-19.  The Act allowed such punishments as the use of the pillory for perjury, limited to one hour (section 18), and capital punishment (hanging) for murder and treason, (sections 4, 30 & 33).[9]  *Id.*  The Act included grisly provisions allowing post-mortem dissection of murderers by surgeons and denial of clergy to murderers (to ensure their damnation) (sections 4 and 31).  *Id.*  This first penal code was enacted after the proposal of the Bill of Rights.  *See Harmelin v. Michigan*, 501 U.S. 957, 980 (1991) (discussing history of statute).

---

[9]A pillory was a locking wooden framework, with holes for the head and hands, used to retrain offenders and expose them to public ridicule.

This legacy was confronted by the Supreme Court in 1878 in the case of *Wilkinson v. State of Utah*, 99 U.S. 130 (1878), which was asked the question of whether a sentence issued under a Utah statute which gave a convicted murderer the choice between hanging, shooting and beheading was unconstitutional when the statute was later amended by another statute which authorized execution but did not specify a method of execution.  The *Wilkinson* Court said that,

> Difficulty would attend the effort to define with exactness the extent of the constitutional provision which provides that cruel and unusual punishments shall not be inflicted; but it is safe to affirm that punishments of torture, such as those mentioned by the commentator referred to, and all others in the same line of unnecessary cruelty, are forbidden by that amendment to the Constitution. . . .

*Wilkerson*, 99 U.S. at 135-36.  The *Wilkinson* Court did not, however, set aside the Utah sentence.

Some eleven years later, a district court in Georgia considered without amusement a county jail keeper who was receiving federal prisoners and, on more than one occasion, shackled a prisoner by the neck to the cell grating.  Judge Speer found that the unlawful act was cruel and unusual punishment and subjected the prisoner to an unreasonable risk of death; thus, he held the jailer in contempt.  *In re Birdsong*, 39 F. 599, 600 (D. Ga. 1889).  Here is how he said it:

> This principle of the common law is of force in this country as in England, and thus we see that neither this court, nor, indeed, the highest court in the land, would assume, even after full hearing, to exercise the power to chain up by the neck a prisoner for disorderly conduct, even the most atrocious, and even though committed in the actual presence of the court.  Had any judge of America done with the most degraded convict what this jailer admits he did with the person of this prisoner, his impeachment would be inevitable.  Well, may a jailer arrogate to himself powers which are withheld from the courts? . . . .  The proposition is unworthy of any intelligent mind trained in the letter or the philosophy of the law.  But we are not left in the determination of this question to the consideration of those great fundamental principles announced for the protection of the individual against unlawful punishments and penalties.  The authorities are equally clear in their denial of the power exercised by the jailer with this prisoner.  At common law it was not lawful to hamper a prisoner with irons, except to prevent an escape. 'Otherwise,' it is declared, (1 Russ. Crimes, 420,) 'notwithstanding the common practice of jailers, it seems unwarrantable and contrary to the mildness and humanity of the laws of England by which jailers are forbid to put their

27

prisoners to any pain or torment.' Sir Edward Coke, perhaps the most erudite of English lawyers, certainly profoundly versed beyond any in the principles of the common law, although noted for his harshness and severity to prisoners, declared that 'by the common law it might not be done.' 2 Inst. 381. In consonance with the spirit of the ancient law, the statute of 4 Geo. IV., c. 64, Sec. 10, subsec. 12, provides that no prisoner shall be put in irons by the keeper of any prison except in case of urgent and absolute necessity. 4 Bac. Abr. 479; Encyclopaedia Britannica, tit. 'Prison Discipline.' And by the same act the jailer was provided power to punish prisoners for disorderly conduct, and for profane cursing and swearing; but the broad intelligence and humane spirit of parliament limited the maximum penalties for such conduct to close confinement in the refractory or solitary cells, and a diet of bread and water only, for any term not exceeding three days. . . .

[This punishment] was, in fact, punishment by the pillory, but a pillory where the links of the trace chain and the padlock encircling the bare neck of the prisoner were substituted for the wooden frame. This punishment was abolished in England in 1837. 7 Wm. IV., and 1 Vict. c. 23. It was done away with in France in 1832, and in this land of humanity and lawful methods it was forbidden by the act of congress of February 28, 1839, (5 St. at Large, 322;) and yet the jailer testified that this was his usual method for the punishment of refractory prisoners,- a method which called imperatively for the ruling of the court declaring it illegal. . . . . We declare, however, that there is not, nor has there been at any time in the history of the state, any law of any character which will justify or condone the act of chaining for hours a prisoner by the neck, in a standing position, as a means of punishment for any offense whatever. . . .

Much has been said as to the character of the individual who was punished. This is not a question of individuals. . . . If the jailer is judge, jury, and executioner, can it be predicted with certainty what will be the character or color of the next victim of the chain and padlock? It is a rule we are considering,- a rule for the protection of the unfortunate as well as of the vicious. The constitution forbids a cruel or unusual punishment, and there is no syllable relative to the character or color of the victim in that matchless charter for the preservation of right and the prohibition of wrong. In consideration of the premises, and to emphasize its judgment that an unwarrantable and illegal punishment has been inflicted on this prisoner, and to protect this and other prisoners, the court assesses a penalty of $50, with costs, against the jailer. . . .

*In re Birdsong*, 39 F. at 600-03.

In *Weems v. United States*, 217 U.S. 349 (1910), the Supreme Court reached a similar holding. It held that a punishment inflicted in the Islands of the Phillipines, 15 years of hard labor *in candena* (meaning leg and hand irons) for a fraud offense was "cruel and unusual punishment"

banned by the Eighth Amendment.  The *Weems* decision was subsequently explained by the Supreme

Court in *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) (plurality opinion), a post-World War II case,

which held unconstitutional the World War II punishment of denaturalizing a soldier for desertion.

*Trop* held that punishments aside from fines, imprisonment and execution are constitutionally

suspect exercises under the Eighth Amendment.  *Trop*, 356 U.S. at 100.  It further said of the *Weems*

holding:

> The Court recognized in that case that the words of the Amendment are not precise, and that
> their scope is not static.  The Amendment must draw its meaning from the evolving standards
> of decency that mark the progress of a maturing society.

*Trop*, 356 U.S. at 100-01.

This progress has not stopped with *Trop* since numerous Supreme Court decisions have

relied upon evolving social standards in measuring the constitutional propriety of severe

governmental sentences and punishments.  *See, e.g., Roper v. Simmons*, 543 U.S. 551 (2005)

(holding that execution of those 18 years or younger at the time of their offense offends evolving

Eighth Amendment standards); *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that execution of

the mentally ill violates contemporary Eighth Amendment standards); *Woodson v. North Carolina*,

428 U.S. 280 (1976) (plurality decision) (holding that mandatory death penalty statutes for certain

offenses violated evolving Eighth Amendment standards).

More recently the principles of *Birdsong* and *Weems* were applied by the Eighth Circuit to

prohibit disciplinary corporal punishment by state corrections officers.  *Jackson v. Bishop*, 404 F.2d

571 (8th Cir. 1968) prohibited the use of the strap (whipping) as a prison disciplinary method by the

State of Arkansas.  The words of the decision are worthy of repetition:

. . . . The federal courts, including this one, entertain a natural reluctance to interfere with a prison's internal discipline. This is true with respect to federal institutions, . . ., as well as to state prisons, . . . .

However, the courts, including this one, have not hesitated to entertain petitions asserting violations of fundamental rights and, where indicated, to grant relief. In *Glenn v. Ciccone*, which we have just cited, this court clearly indicated that 'a factual showing of cruel and unusual punishment in violation of the Eighth Amendment' would support interference by a federal court. 370 F.2d at 363. We have made a like statement in many other cases. . . . Although the Eighth Circuit cases just cited concern a federal institution, the principle, of course, has equal application to a state penitentiary. . . . .

This takes us then to a consideration of the meaning and scope of the Eighth Amendment's proscription of the infliction of 'cruel and unusual punishments.' . . . .

*In Kemmler*, 136 U.S. at 446-447, 10 S. Ct. at 933, the Court describes, as within the constitutional prohibition, punishments which are 'manifestly cruel and unusual, as burning at the stake, crucifixion, breaking on the wheel, or the like' and, as cruel, those which 'involve torture or a lingering death.' And it said that the word 'cruel,' as used in the Eighth Amendment, 'implies there something inhuman and barbarous,- something more than the mere extinguishment of life.' 136 U.S. at 447, 10 S. Ct. at 933. In *O'Neil v. Vermont*, supra, 144 U.S. at 339-340, and 364, 12 S. Ct. 693, Mr. Justice Field, in dissent (joined by Justices Harlan and Brewer, 144 U.S. at 370-371, 12 S. Ct. 693), advanced the thought that the Amendment's 'inhibition is directed, not only against punishments of the character mentioned, but against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged.' He went on to say that although a state has the power to whip for petty offenses, 'repulsive as such mode of punishment is,' the increase of such punishment by accumulation for multiple offenses could be both unusual and cruel. . . . .

In summary, then, so far as the Supreme Court cases are concerned, we have a flat recognition that the limits of the Eighth Amendment's proscription are not easily or exactly defined, and we also have clear indications that the applicable standards are flexible, that disproportion, both among punishments and between punishment and crime, is a factor to be considered, and that broad and idealistic concepts of dignity, civilized standards, humanity, and decency are useful and usable. We recognize that some of these utterances by the Court were made in concurrence or dissent or in the approach, evidently now superseded, through the Fourteenth Amendment's due process clause rather than jointly through the Fourteenth and Eighth Amendments. All this, however, strikes us as of no import because we read and ascertain in the totality of the language used the basic attitude of the entire Court to the Eighth Amendment.

With these principles and guidelines before us, we have no difficulty in reaching the conclusion that the use of the strap in the penitentiaries of Arkansas is punishment which, in this last third of the 20th century, runs afoul of the Eighth Amendment; that the strap's use, irrespective of any precautionary conditions which may be imposed, offends contemporary concepts of decency and human dignity and precepts of civilization which we profess to possess; and that it also violates those standards of good conscience and fundamental fairness enunciated by this court in the *Carey* and *Lee* cases.

Our reasons for this conclusion include the following: (1) We are not convinced that any rule or regulation as to the use of the strap, however seriously or sincerely conceived and drawn, will successfully prevent abuse. The present record discloses misinterpretation and obvious overnarrow interpretation even of the newly adopted January 1966 rules. (2) Rules in this area seem often to go unobserved. Despite the January 1966 requirement that no inmate was to inflict punishment on another, the record is replete with instances where this very thing took place. (3) Regulations are easily circumvented. Although it was a long-standing requirement that a whipping was to be administered only when the prisoner was fully clothed, this record discloses instances of whippings upon the bare buttocks, and with consequent injury. (4) Corporal punishment is easily subject to abuse in the hands of the sadistic and the unscrupulous. (5) Where power to punish is granted to persons in lower levels of administrative authority, there is an inherent and natural difficulty in enforcing the limitations of that power. (6) There can be no argument that excessive whipping or an inappropriate manner of whipping or too great frequency of whipping or the use of studded or overlong straps all constitute cruel and unusual punishment. But if whipping were to be authorized, how does one, or any court, ascertain the point which would distinguish the permissible from that which is cruel and unusual? (7) Corporal punishment generates hate toward the keepers who punish and toward the system which permits it. It is degrading to the punisher and to the punished alike. It frustrates correctional and rehabilitative goals. This record cries out with testimony to this effect from the expert penologists, from the inmates and from their keepers. (8) Whipping creates other penological problems and makes adjustment to society more difficult. (9) Public opinion is obviously adverse. Counsel concede that only two states still permit the use of the strap. Thus almost uniformly has it been abolished. It has been expressly outlawed by statute in a number of states. See for example, N.D. Cent. Code § 12-47-26 (1960); S.D. Code § 13.4715 (1939). And 48 states, including Arkansas, have constitutional provisions against cruel or unusual punishment. Ark. Const. art. 2, § 9.

We are not convinced contrarily by any suggestion that the State needs this tool for disciplinary purposes and is too poor to provide other accepted means of prisoner regulation. Humane considerations and constitutional requirements are not, in this day, to be measured or limited by dollar considerations or by the thickness of the prisoner's clothing. . . .

The district court's decree is vacated and the case is remanded with directions to enter a new decree embracing the injunctive relief heretofore granted but, in addition, restraining the

Superintendent of the Arkansas State Penitentiary and all personnel of the penitentiary system from inflicting corporal punishment, including the use of the strap, as a disciplinary measure.

*Jackson v. Bishop*, 404 F.2d 571, 577-81 (8th Cir. 1968) (Judge Blackman) (some citations omitted).

*See also Nelson v. Heyne*, 491 F.2d 353 (7th Cir. 1974) (prohibiting the use of paddling and the medically unsupervised use of tranquilizers as to juvenile inmates); *Hudson v. McMillan*, 503 U.S. 1 (1992) (holding that the use of excessive and malicious force against a prison inmate may violate the Eighth Amendment even though the force did not cause physical injury).

This brings us to the present situation–whether the use of mechanical in-cell restraints as a disciplinary method and/or control mechanism by officers of the Michigan Department of Corrections at the *Hadix* facilities violates the Eighth Amendment. The Court finds that it does. In making this finding, the Court is persuaded by the reasoning in *Jackson*. Each of the arguments against whipping applies with equal force to punitive restraint mechanisms, a practice prohibited by the common law. Those mechanism only frustrate the process of correction and impose unreasonable duties upon correctional officers attempting to maintain that regime. Those mechanisms, much more so than whipping, pose a deadly risk to the persons restrained because it subjects those persons to a known unreasonable risk of heart attack, dehydration and asphyxiation as testified by the medical monitor and Plaintiffs' expert witness. The risk can no longer be overcome by medical monitoring because correctional physicians now recognize that punitive restraints are a form of torture which cannot be ethically facilitated by physician services, including facilitative medical monitoring. Such was the testimony of three of the four physicians who testified during the hearing, with the exception of Dr. Pramstaller.

This position also represents a consensus of the medical community, as demonstrated by its new ethical rules which were motivated by recent attention to the untoward Abu Ghraib scandal involving detainee abuse. Furthermore, the President recently approved, on October 17, 2006, the Military Commission Act of 2006, PL 109-366, 120 Stat. 2600. That Act governs treatment of unlawful foreign combatants held at Guantanamo Bay, Cuba and provides procedures for those persons' trial and detention. The Act provides, at section 949s, that,

> Punishment by flogging, or by branding, marking, or tattooing on the body, or any other cruel or unusual punishment, may not be adjudged by a military commission under this chapter or inflicted under this chapter upon any person subject to this chapter. The use of irons, single or double, except for the purpose of safe custody, is prohibited under this chapter.

120 Stat. 2600, 2617. If the punitive use of irons is to be prohibited as to foreign unlawful combatants, then *a fortiori* its use should be prohibited within *Hadix* facilities out of deference to those inmates' constitutional rights.

Defendants have argued in their papers that their own six-hour policy provides a sufficient remedy which should be approved. This argument is wholly unconvincing. The substitution of six hours of evil for unlimited evil, though an improvement, does not win the day. The six-hour policy is limited to restraint beds and does not prohibit the use of other dangerous restraint devices at the end of the six-hour period. It does not contain restrictions on the use of cumulative periods of restraint and it does nothing to prevent death within the first six hours. Further, the fact that physicians regard such treatment as torture and will not facilitate it means that the process could only be continued by either forsaking medically necessary examinations or commissioning medical officers to violate their professional ethical rules. The Court will do neither.

The Court finds that the Defendants' practice constitutes torture and violates the Eighth Amendment. Its cessation is required immediately to prevent further loss of life, loss of dignity and damage to both inmates and correctional officers. The Court finds that this prohibition is favored by all of the Rule 65(a) factors such that a preliminary injunction supporting the prohibition should enter. The Court further finds that this prohibition is compliant with the PLRA provisions of 18 U.S.C. § 3626(a) for limited injunctive relief. Although this injunction does not permit choice as to punitive restraints, the PLRA does not require this flexibility because such options are constitutionally prohibited. The prohibition will be worded to make its terms clear to Defendants and not to infringe upon any legitimate uses of mechanical restraints, and to otherwise comply with the PLRA provisions.

What legitimate uses of mechanical restraints will be permitted in *Hadix* facilities? The use of in-cell restraints for punitive reasons, correction, to prevent in cell "disruption," in cell "destruction of property," or "observation other than by physicians or psychiatrists" is prohibited. Restraints may still be used for transportation of prisoners, for movement of prisoners between secure locations, for the safe provision of services to prisoners, and for temporary emergency reasons such as to quell a riot or to provide emergency officer or prisoner safety. Restraints may be used to arrest prisoners engaged in escape or other crime, such as assault. Restraints may also be used by medical and psychiatric staff to prevent self-harm, injury to staff, and interference with treatment, provided that the medical staff supervises the use of the restraints by daily physician orders and monitors the conditions of patients regularly and around the clock to ensure that patient health is not unduly compromised.

This prohibition does not prevent the Director from protecting prisoner health, which may be accommodated by delivery of self-destructive and mentally-ill prisoners to doctors.  It also does not prevent the Director from protecting life and property, which may be accommodated by the delivery of destructive inmates to secure living quarters without furniture or fixtures.  Both of those contingencies are already part of the existing Director's Office Memorandum.

### b. Psychological and Psychiatric Staffing Levels

The evidence showed that patients with serious psychological and psychiatric needs were not timely seen, were not provided services consistent with clinical standards of care, and in many cases the failures of service caused tragic patient consequences, including death.  Defendants' arguments that the staffing levels were only temporarily low ignores both fact and logic.  The staffing levels themselves appear inadequate given that staffing is not effectively supervised by a full-license psychologist and given that the present level of staffing does not reliably result in the provision of necessary services to emergent and other serious cases.  The provisions made for staff absence put the burden of those absences on the prisoner population.  The use of distant doctors to continue psychiatric medications without patient interviews, blood testing and regular patient visits is clinically inappropriate and highly dangerous to the prisoners served.  Overall, the record supports Rule 60(b)(6) relief and a Rule 65(a) injunction.  Specifically, each of the Rule 65(a) factors favors the issuance of the injunction.

Because of the PLRA's insistence upon giving Defendants' maximum flexibility in meeting constitutional requirements, the Court will order only that Defendants maintain staffing necessary to provide prisoners with routine and emergency access to psychiatric and psychological services on a daily basis.  Defendants will be permitted to file with the Court a staffing plan, within 45 days,

compliant with the Court's Opinion and Preliminary Injunction for approval. The plan should identify how many additional staff members are necessary to provide required services, and should specify the qualifications of those persons. The plan must include additional staffing to ensure full-time psychiatric coverage at JMF and a substitute psychiatrist for periods of leave. It must also include adequate staffing to ensure daily psychologist rounds in segregation, and that those rounds are not limited due to staff leave. It must further include additional staffing to ensure that limited license staff are properly supervised. Additionally, the plan should identify its means and methods for hiring and retaining the necessary staffing level. The ordering of such plan is compliant with the PLRA provisions of 18 U.S.C. § 3626(a) for limited injunctive relief. The relief is limited, tailored to the constitutional violations, and is addressed in a fashion to permit Defendants choices between possible staffing options.

### c. Requirement of Daily Rounds in the Segregation Unit

Plaintiffs have wisely requested daily psychologist rounds in the segregation unit. This request is supported by the record evidence that mentally ill prisoners, including T.S., are often housed in segregation and often have psychiatric needs which will not be accommodated without those rounds due to lack of movement and prisoner inability to request care. Segregation is also physically demanding and places prisoners with mental illness at heightened risk of mental decompensation and conflict with correctional officers. These phenomena are well known in the corrections community. The failure to take corrective action in light of the observed clear failures of mental health care in the segregation unit warrants a finding of both an Eighth Amendment violation and a need for injunctive relief. As such, the Court finds that the requested injunction should issue because the request is favored by each of the Rule 65(a) factors. Without such relief,

36

prisoners will continue to be hidden in segregation without access to necessary and sometimes life-saving care.

In order to accommodate the Director's need for flexibility and choice in the implementation of this requirement, though, the Court will order its implementation as part of the "plan" explained above. Defendants should explain, when they explain how the new staffing will be provided, when a psychologist or psychiatrist will be available for segregation rounds. However, given the necessity of those rounds to save human life, the Court urges Defendants to make this a priority in their scheduled planning. The ordering of such plan is compliant with the PLRA provisions of 18 U.S.C. § 3626(a) for limited injunctive relief. The relief (like the other relief described in this Opinion) is limited and tailored to the constitutional violations, and is addressed in a fashion to permit Defendants flexibility in meeting constitutional requirements and not to unduly intrude upon State operation of the prison system.

### d. Require Protocols for Medical/Mental Health Staff and Interdisciplinary Meetings

Cases like T.S., P.H. and others listed by Dr. Walden, show that there are a large number of complicated cases with interdisciplinary problems that unfortunately are being regularly mistreated and/or ignored by staff. The phenomenon is now a regular feature of the system. Cases which can be described by the disciplines as either medical or mental health are described by the competing disciplines as within the ken of the other, and no attempt is made to coordinate care. Rather, unless the patient is very active in seeking care (which is often times impossible due to mental limitations), the patient simply falls into the black hole between the disciplines with predictable results–suffering, aggravation of symptoms, aggravation of the costs of treatment, and sometimes death. Therefore, the Court finds that this pattern and practice of non-treatment and uncoordinated treatment

constitutes an Eighth Amendment violation because it routinely deprives patients of necessary services for serious medical and mental health needs.  Remedy is necessary and one will be ordered which allows Defendants maximum flexibility and minimal intrusiveness consistent with the requirements of 18 U.S.C. § 3626(a).  The below described remedy meets this requirement.

Because of the seriousness of the violation, the Court also approves the issuance of a preliminary injunction to address the chronic failure identified above.  Because the regular Eighth Amendment violations cause irreparable harm, including unnecessary pain and aggravation of injury, the Court further determines that each of the Rule 65(a) factors favors the issuance of relief.  The substance of this Injunction will require the development of a plan that insists upon coordination of care between the disciplines.  Also, given that the case of T.S. and other cases of patient care, demonstrated widespread provider indifference to patient care, the Court will also order that Defendants require staff to attend, as part of their meetings, a training, the content of which should be approved by Dr. Cohen, the medical monitor, to redress such indifference.  Part of this training should include instruction about the care providers' role in insuring that patients are treated humanely by custody staff and insuring that patients' medical and mental health care is timely provided by them and is not delayed by administrators of the Director and/or administrators and staff of CMS.

Here is the basic message: You are valuable providers of life-saving services and medicines. You are not coatracks who collect government paychecks while your work is taken to the sexton for burial.  If a patient does not receive necessary medical or psychological services, including medicines and specialty care, it is not his problem, it is your problem, a problem that must be solved at lunch, nights or weekends, if necessary.  If someone in the bureaucracy, including CMS, is stopping you

from providing necessary services in a timely way, or stopping the patient from obtaining necessary specialist care or medicine, you should pester the malefactors until they respond and the services are provided.   If they still won't relent, you are to relay their names, including correct spellings and addresses at which they may be arrested, to the medical monitor so those persons may be held in contempt and jailed, if necessary.  The days of dead wood in the Department of Corrections are over, as are the days of CMS intentionally delaying referrals and care for craven profit motives.

## VI.   <u>CONCLUSION</u>

An Order shall enter granting Plaintiffs' Motion to Reopen Judgment Regarding Mental Health Claims and Issue a Preliminary Injunction.  The Preliminary Injunction shall order the remedies sought by Plaintiffs, including a ban on punitive restraints at the *Hadix* facilities, a requirement that Defendants assess staffing needed to provide routine and emergency access to both psychiatric and psychological services and plan to do so emergently, a requirement that the new staff implement daily psychologist rounds in the segregation unit, and a requirement that Defendants develop protocols for appropriate coordination of medical and mental health care and require staff attendance of coordination and training meetings.

"The degree of civilization in a society can be judged by entering its prisons."  Attributed to Feodor Mikhailovich Dostoyevsky, *Respectfully Quoted: A Dictionary of Quotations*, no. 1527 (Library of Congress 1989).

God bless T.S. and the others.  There lives were short, but their legacies may be long.

 /s/ Richard Alan Enslen
DATED in Kalamazoo, MI:          RICHARD ALAN ENSLEN
     November 13, 2006             SENIOR UNITED STATES DISTRICT JUDGE
