UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

EVERETT HADIX, *et al.*,

        Plaintiffs,

v.

PATRICIA L. CARUSO, *et al.*,

        Defendants.

_____/

Case No. 4:92-CV-110

Hon. Richard Alan Enslen

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

      Step on a man's foot once, and a polite apology will do.  Do it twice, and a profuse apology is in order.  Do it thrice, and you have left the land of apology and entered the arena of self-defense.

**I.  FACTUAL FINDINGS**

    **A.  Hearing Process**

1.    Hearing was held in this matter on October 11-13, 2006 to receive proofs regarding three motions by Plaintiffs.  After hearing, which could not accommodate all of the parties' proofs, the Court issued a scheduling Order, on October 16, 2006, to receive additional proofs (exhibits, *de bene esse* depositions and other proffers).  Said Order required the filing of all proofs regarding Plaintiffs' Motion to Reopen Judgment Regarding Mental Health Claims by October 31, 2006.  Those proofs were duly filed and the Motion resolved by the Court's Opinion, Order and Preliminary Injunction of November 13, 2006.  The balance of the supplemental proofs, regarding Plaintiffs' Motion for Further Relief and Motion for Order to Show Cause, were to be filed by November 17, 2006.  That date was subsequently extended on November 17, 2006 due to the request by Defendants and in recognition of the demands

of the briefing.  The revised date was set for November 21, 2006.  The supplemental briefing and exhibits were then timely filed by parties.[1]

**B.  A Brief Explanation of Terms**

2.     This case involves a long history and a department of state government, the Michigan Department of Corrections ("MDOC"), in love with acronyms and other linguistic short-hands.  The basic terms are as follows: "CMS" refers to Correctional Medical Services, the for-profit company hired to provide medical staff for the MDOC, including specialty services staff, who are, generally speaking, independent contractors.  "DWH" refers to the Duane L. Waters Hospital, the in-patient care facility at the MDOC, which facility was recently "demoted" in its licensing to a Health Care Center, though the reference to hospital has persisted in practice.  DWH also contains an infirmary for convalescence of hospital patients.  The "*Hadix* facilities" refers to the set of prison facilities, including DWH, which were part of the former Central Complex of the State Prison of Southern Michigan ("SPSM-CC") at Jackson, Michigan and/or were created to provide services in connection with those prison facilities.   "RGC" refers to the Charles Egeler Reception and Guidance Center, a *Hadix* facility which receives new prisoners into the MDOC system.[2]   "JMF," a *Hadix* facility, refers to the Southern Michigan Correctional Facility.[3]  JMF also houses a dialysis unit for providing dialysis services and a "C-Unit," a unit for convalescence and care of infirm dialysis patients and others.  "Parnall," a *Hadix* facility, refers to the Parnall Correctional Facility.  The G. Robert Cotton Correctional Facility and Cooper Street Correctional Facility are also at Jackson, but are not *Hadix* facilities.  "SERAPIS" refers to the

---

[1]Least the effort be misunderstood, the documents and exhibits filed fill some five full-sized litigation boxes.

[2]This facility is also often referenced as "Egeler."

[3]JMF refers to its honorary title, the Josephine McCallum Facility.

2

ambulatory electronic medical record system used by the MDOC, the implementation of which has been a painfully slow process in its completion.  "CCC" refers to Chronic Care Clinics, which are medical clinics used at *Hadix* facilities to regularly deliver care to chronically-ill prisoners.

### C.  Consent Decree and Violation Histories

3.      This suit was filed in the United States District Court for the Eastern District of Michigan in 1980 to redress a variety of unconstitutional conditions, including inadequate mental health care, at certain designated Jackson, Michigan prison facilities operated by prison officials of the MDOC pursuant to 42 U.S.C. § 1983.  In 1985, a Consent Decree was entered by stipulation of the parties with the approval of United States District Judge John Feikens.

4.      Section II.A of the Consent Decree pertained to medical care for prisoners within the *Hadix* facilities.   The section promised to each *Hadix* prisoner "medical services consistent with contemporary professional health care standards."  (Consent Decree § II.A.1.)  The Decree further promised a fully-licensed hospital, medical screening,  regular access to health care unimpeded by custodial staff, and staffing and new procedures sufficient to fulfill those promises.  (*Id.* at § II.A.1-5.)  In addition to other important matters, including special diets and medicines, the Decree also promised that quality assurance audit processes would be used to insure proper health care access, adequate care and supervision of care providers.  (*Id.* at § II.A.6-12.)

5.      Judge Feikens initially transferred enforcement of the medical care provisions of the Consent Decree to this Court by Order of June 5, 1992 pursuant to 28 U.S.C. § 1404(a).  *Hadix v. Johnson*, 792 F. Supp. 527, 528 (E.D. Mich. 1992).  The purpose of the Order was to promote uniformity and effectiveness of remedy in light of this Court's enforcement of a Consent Decree involving the same

issues in a separate suit–*United States v. Michigan*, Case No. 1:84-cv-63.  *Id.  See also Hadix v. Johnson*, 228 F.3d 662, 665 (6th Cir. 2002) (discussing history of suit).

6.     Despite the success of the Decree in fostering improved conditions as to many aspects of the Decree, the provision of health care has remained both a troubled and troubling aspect of the Decree. Progress in this suit was delayed between 1996 and 1999 due to appeals involving the interpretation and constitutionality of section 802 of the Prison Litigation Reform Act ("PLRA"), P.L. 104-134, codified at 18 U.S.C. § 3626.  In December 1999, after such delay, the Court conducted a compliance hearing.  The result of that hearing was a February 18, 2000 set of Findings of Fact and Conclusions of Law, which determined that certain provisions of the Decree should be terminated, but found constitutional violations as to other portions requiring self-remedy by Defendants.  (*See* Feb. 18, 2000 Findings of Fact & Conclusions of Law; Feb. 18, 2000 partial termination Order; Oct. 29, 2002 Findings of Fact & Conclusions of Law ("2002 Findings") at 1.)

7.     Another evidentiary hearing was held in May 2002, which charted the progress of such self-remedy.  The 2002 Findings following that hearing filled 266 pages and discussed hundreds of cases of inadequate or neglected medical care.  Of particular concern in those Findings were the following failures: (a) the failure of the health care system to provide timely access to care to patients with urgent and emergent serious medical problems (2002 Findings ¶¶ 217 & 324); (b) the failure of the system to provide timely access to specialty care, which failures include the delaying of surgery of a lung cancer patient for over a year and the repeated failure to transport another patient to chemotherapy appointments (with one exception), which failures caused death in both cases (2002 Findings ¶¶ 728, 729 & 860); and (c) the failure of the system to provide a readable, comprehensive and current medical record to care providers (2002 Findings ¶¶ 790-867).

8.     As a consequence of these and other Eighth Amendment violations, the Court enjoined Defendants to comply with the instructions for remedy in Section XIII of the Findings.  (Order & Inj., Oct. 29, 2002.)   Phase one of the medical remedy was the appointment of a medical monitor.  (*Id.* at ¶¶  1437-38.)  After interview of candidates, Robert Cohen, M.D., was appointed medical monitor pursuant to an Order of this Court authorizing independent monitor F. Warren Benton to so appoint him.[4]   (Order of Apr. 21, 2003.)   This appointment was to be followed by the development of a remedial plan by the Monitor and the parties.  (*See* 2002 Findings ¶ 1440.)  However, the requirement of a remedial plan was later vacated, not because it was inappropriate, but it was contained in the same paragraph which required a heat-related remedy as to which the parties came to an agreed resolution which involved vacating that paragraph.  (*See id.* at ¶ 1442; Order of June 6, 2003.)[5]  However, apart from those technical details, there continued at the time a mounting crisis in health care, which has fully consumed the resources of the parties, the Court and the Medical Monitor in seeking solution.  We have been bailing, not sailing.

### C.  Medical Status Reports and Preliminary Injunction Plan

9.     Dr. Cohen's first medical Status Report was filed with the Court on July 13, 2004.  The second was filed on January 13, 2005.  The third was filed on September 12, 2005.  The basic

---

[4]The Court wishes to express its enduring gratitude to Dr. Cohen for accepting this difficult appointment and for persevering in the midst of the systemic problems in the *Hadix* health care system.

[5]There was much else on the parties' plates at the time.  The Findings related to not only medical care, but also heat-related injury and fire safety.  The heat-related injury and fire safety aspects were appealed.  Those appeals, after remand and substantive modifications, resulted in the entry of a heat-related injury plan and also, eventually after further findings, in an amended fire-safety plan.  (*See* Order of June 6, 2003; Order of June 19, 2003; and Am. Fire Safety Inj. of Aug. 21, 2006.)  The fire safety appeal and amendment process in particular shows that the wheel of the law, though it grinds slow, grinds fine.

similarity between all three was extensive commentary on gross failures of care, inadequate care, and preventable injury, disease, and loss of life.  The Court also received emergency correspondence concerning systemic failures (collapse of pharmacy and the death of T.S.), which are discussed further. (Letter of June 2, 2006, Dkt. No. 2035; Letter of Aug. 14, 2006, Dkt. No. 2088.)

10.     In particular, the Third Report noted a "crisis" in medical service provider staffing as of March 2005, which was exacerbated by the discharge of a delinquent doctor, Dr. Faghihnia.  Another problem was that additional physician responsibilities were being placed upon the medical staff with the transfer of "C-Unit"–a unit for treatment of dialysis patients and other chronically-ill patients too sick to live in general population–to the *Hadix* facilities.  (Third Report at 13 (Dkt. No. 1897 and also received as Pls.' Ex. 5A).)

11.     Problem cases noted in the Third Report included, by way of example: patient 1, a patient who died of an untreated staph infection and gastro-intestinal bleeding while housed in administrative segregation (*id.* at 11); patient 2, a patient with HIV, Sicca Syndrome (chronic extreme dryness of the mouth and esophagus causing difficulty swallowing) and excessive weight loss (down to 108 pounds), who did not receive a pureed diet, and was not treated for abdominal pain, crumbled teeth and painful lesions (*id.* at 16-20); and patient 3, a 29-year-old cancer/HIV patient whose rectal cancer treatment was delayed by eight months due to delay in a simple diagnostic test and delay in referral for radiation (*id.* at 20-23).  The Third Report included specific comments on 10 patients of 23 files surveyed, including dialysis patients, diabetics, and cancer patients, whose treatment were all grossly deficient and deemed representative of the facility care.

6

12.     During the later Preliminary Injunction hearing discussing the Third Report, Dr. Cohen also reported to the Court another instance of a prisoner death (A.R.) caused by grossly negligent care. In that case, a brittle diabetic was grossly over-prescribed insulin by his physician and no in-patient care or endocrinologist consultation was ordered to monitor the diabetic's blood sugars and care. (Hr'g Tr. of Oct. 19, 2005 at 21.)   The patient asked for a glucometer to self-monitor his blood sugars, which request was not granted, and then predictably died overnight of hypoglycemia, causing heart failure.  (*Id.)*  The medical staff also took some 20 minutes to respond to the emergency and the patient was not effectively treated by on-duty medical providers before the Emergency Medical Technicians arrived.  (*Id.*; *see also* Order of Dec. 16, 2005, explaining case in greater detail.)

13.     As a consequence of these and other failures, which the Court found to be violations of the Eighth Amendment, the Court granted Plaintiffs' Motion for a Preliminary Injunction, which Injunction required Defendants to propose a corrective plan for Court approval.  (Prelim. Inj. of Oct. 19, 2005; *see also* Am. Prelim. Inj. of Nov. 23, 2005.)  The Plan was timely filed by Defendants. (Plan re Prelim. Inj. of Oct. 19, 2005.)  The Plan was some twenty pages in length and required, among other things, the following: (1) regular physician rounds in segregation (Plan 2); (2) the audit of medical care for chronically-ill prisoners in segregation and other selected cases as part of the quality assurance process (*id.* at 3); (3) the establishment of an infirmary at DWH for patients needing infirmary care with 24-hour nurse and physician staffing (*id.* at 3-4); (4) establishment of a Unitary Medical Record System including all laboratory studies, all medications, complete with a link between SERAPIS and the pharmacy computer system, and an expansion of SERAPIS to include all clinical areas (*id.* at 6); (5) automatic renewals of all chronic medications (*id.* at 9); (6) refinement of the job description of the Jackson Medical Director to include more active medical

service provider, dialysis and CMS oversight (*id.* at 11); (7) autopsies for all prisoner deaths (*id.*); (8) better communication, follow-up and monitoring regarding CMS referrals for specialty care (*id.* at 12-13); (9) monthly staff meeting regarding the Dialysis Program (*id.* at 14); and (10) enhanced staffing of service providers to meet the increased demands of the expanded clinical responsibilities at the *Hadix* facilities (*id.* at 19-20).

14.     This Court held a hearing regarding such Plan on January 11, 2006. The next day, the Court approved the Plan with some important modifications including: (1) selected paragraphs were stricken as factually inaccurate; (2) the SERAPIS computer system, or equivalent system, was to be applied to pharmacy and laboratory records of prisoners at DWH and C-Unit; (3) monthly reports were required to specify the timeliness of specialty consultations, which were to be delivered in a timely way; (4) a full-time nephrologist or internist was to be added to the C-Unit; (5) all patients in segregation were to be medically reviewed within one week; and (6) Dr. Cohen was authorized to consult with a nephrologist to obtain specialty review of patient files as necessary. (Order of Jan. 12, 2006.) The language of the Plan document, which was drafted together by the parties and Dr. Cohen, expresses the parties' consensual understandings and relationship at the time. It did not express exact deadlines nor precise formulas for accomplishing certain objectives because the parties were working cooperatively at that time.

15.     Defendants failed to timely appeal either the Preliminary Injunction or the Order approving and implementing the Plan.

### D.  Possible Successes, Fiascos and Administrative Responses

16.     Not all of the news about prisoner treatment at the *Hadix* facilities has been adverse. Defendants have implemented the December 2005 Plan and other beneficial programs since then,

and are now reporting certain measures of systemic improvement as a consequence of those changes. (Defs.' Tr. Br. 1-5.)  For example, they have reported hemoglobin a1c averages for diabetic patients that show the percentage of patients in good control exceeding community averages for diabetic patients in good control.  (*Id.* at 5; Craig Hutchinson, M.D., Dep. 5-6.)  How much of this improvement is due to health care as opposed to dietary control or the general facility layout itself (*i.e.,* prisoners have assigned diets and must walk distances to obtain food and services) is not known, though the numbers are positive nevertheless.  Three other positive developments have also coalesced to the benefit of diabetic care: (1) the opening of the DWH infirmary described above; (2) a pilot program to provide glucometers to inmates to self-test their blood sugars; and (3) Defendants' recent decision to provide endocrinology consults to brittle diabetics who were not benefitting from standard internist care.  (*See* Defs.' Tr. Br. 3; Hutchinson Dep. 101.)  In the Court's judgment, these improvements are not only helpful, but essential to ensure adequate medical care to diabetic patients.

17.     In part, the DWH infirmary was intended to address out-of-control diabetic patients such as A.R., who needed medical monitoring, especially at night, to guard him from deadly hypoglycemia reactions due to both a change in his insulin regime and poor control generally.  Self-use of glucometers by able diabetic patients is the standard of care in the community for important reasons.[6] *See* Am. Diabetes Assoc., Standards of Med. Care in Diabetes (Position Statement), *Diabetes Care* 27 (Suppl. 1): S15–S35 (A.D.A. 2004.)  Diabetics who are unsure whether they are experiencing the onset of hypoglycemia need to check their blood sugars emergently (in a matter of a few minutes when blood sugars are precipitously low) to determine whether to treat the hypoglycemia with

---

[6]Diabetic patients who are unable to provide for their own well-being because of mental defect or disease present a separate problem, and one probably requiring long-term hospitalization or other extensive remedies.

glucose (sugared food stuffs) before they lose their capacity for self-treatment (unconsciousness). The testing is also required to avoid unnecessary self-treatment, which would otherwise expose them to hyperglycemia (which has long-term negative health consequences and short-term consequences when extreme) and fluctuations in blood sugar which would otherwise complicate their treatment.[7] This testing is particularly important at p.m. hours before the patient sleeps–since a hypoglycemic reaction at night is likely to go untreated and, if severe enough, may cause death.

18.    In the Court's judgment, the fact that self-monitoring is only now becoming available is an admission of past error, though Defendants are to be commended nevertheless for their corrective actions.  They are also to be commended for having determined that endocrinologist consultations are necessary for some diabetic patients and will be made available.  This is important because certain brittle diabetics, particularly type 1 diabetics whose long-term insulin regimes become ineffective over time and type 2 diabetics who are insulin dependent and experiencing difficulty with their regimes, often need specialist assistance to accomplish safe and effective treatment.

19.    The infirmary beds at DWH were added in January 2006.  (Defs.' Tr. Br. 3.)  According to Defendants, this unit has greatly assisted patients returning from hospitalization.  (*Id.*)  Defendants are also now adding some 28 beds to C-Unit (dialysis patient unit), which beds are scheduled to be completed in mid-December 2006.  (*Id.*; Barbara Hladki *De Bene Esse* Dep. 34.)  Defendants anticipate that this will benefit care in C-Unit.  (*Id.*)

_____

[7]Of course, the other component to this issue is that diabetic patients are provided and allowed to store adequate food stuffs in their living quarters, and emergency food stuffs are available to custody officers to provide to prisoners suffering hypoglycemia.  Special care must also be given to the treatment of diabetics in administrative segregation, many of whom simply cannot be safely housed there.  Those who can be safely housed, particularly those who are insulin dependent, will require hyper-vigilance on the part of staff to prevent deadly outcomes.

20.     Defendants also report success in maintaining HIV patents in *Hadix* facilities at a 73 percent full suppression rate.  (Hutchinson Dep. 4.)  In the opinion of Dr. Craig Hutchinson, M.D. this rate compares favorably with the state's overall rate of 81 percent given that the sickest of the HIV patients are channeled to the *Hadix* facilities.  (*Id.*)  Plaintiffs have challenged this assertion.  In particular, as noted by Plaintiffs' counsel and Dr. Hutchinson, the number does not represent prisoners housed at C-Unit and Duane Waters Hospital (areas where the sickest inmates are located).  (*Id.* at 51.)  So, it is impossible to say whether the overall rates at the *Hadix* facilities represent a quality healthcare response.

21.     Defendants also report the results of a prolonged experiment regarding their "pill lines"–lines to deliver medicines to certain inmates.  They experimented with calling inmates to the "pill line" by "pod" instead of by "block" (the larger housing unit).  (Defs.' Tr. Br. 3.)  This experiment did not work and complicated the ability of patients, including diabetics, to get to the food hall to eat their meals.  (*Id.*)  They then tried calling inmates two "pods" at a time to the pill line, and found that this approach was far better.  (*Id.* at 4.)  They now plan to physically modify the pill delivery facilities to allow more inmates to line up inside (out of the inclement weather).[8]  (*Id.*)  There was no plan, however, to speed delivery by use of more dispensing lines.  The reason this ready solution was not proposed is obvious from the record as explained below: Defendants are grossly under-staffed for nursing care.  (*See also* Debbie Roth Dep. 67-68.)

22.     Another bit of news qualifies as both a fiasco and a belated success.  The fiasco part of the story began on May 31, 2006 when Dr. Robert Cohen, M.D., the medical monitor, was visiting the

---

[8]This is a significant issue because infirm patients, when made to wait extended periods of time in the cold, will (out of concern for self-preservation) be discouraged from timely receiving and using life-saving medicines.

11

*Hadix* facilities for a routine inspection.  (Pls.' Ex. 5(B) at bates no. 322330; Trial Testimony ("T.T."), vol. III, 584.)  Prisoners then informed him that medication refills due since May 26, 2006 had not been filed.  According to Dr. Cohen, nothing was being done to address the debacle because when the pharmacy computer system was checked, it reported the unfilled orders as filled.  (*Id.*) Dr. Cohen determined that this problem was not exactly recent in that it affected some prescription refills as early as May 19, 2006.  (*Id.*)  He also reported that as of the morning of June 1, 2006 pharmacy staff was, after deliberation, making no efforts to cure the problem.  (*Id.*)  The cause of the delay was the loss of pharmacy staff (retirement of a pharmacist), a failure of the SERAPIS computer system, and the delayed implementation of a new private pharmacy system for chronic medications.  (*Id.*)  Some effort was, however, being made by health care staff to fill some prescriptions through the local Walgreen's pharmacy, though "no rapid effective solution to this critical problem had been formulated or implemented."  (*Id.*)

23.     Based on Dr. Cohen's discussions with senior staff on the afternoon of June 1, 2006, he requested that the new outside remote vendor (PharmaCorr, Inc.) attempt to provide early and emergency refills of the chronic care medications.  (*Id.*)  Because of the grave concern and the life-saving nature of the medicines involved, Dr. Cohen asked that daily reports be provided to help him and Department staff ascertain that all refills were being provided and the extent of the delays.  (*Id.* at 322329-322331.)  Dr. Pramsteller has shared these concerns in his testimony that certain chronic medications (*e.g.*, cardiac medications, HIV medications, *etc.*) cannot be interrupted without creating "a big problem" (*i.e.,* predictable bad outcomes).  (*See* Pramsteller *De Bene Esse* Dep. 23.)

24.     These events later caused the depositions of the Jackson Medical Complex Director of Nursing, Debbie L. Roth, and the Jackson Medical Complex Administrator, Barbara Hladki, to be

taken.  Ms. Hladki was deposed on September 21, 2006.  Ms. Roth was deposed on September 29, 2006.  As of the dates of their depositions, they were not fully aware of the crucial role that Dr. Cohen had played in restoring pharmacy services to many prisoners.  (Hladki Sept. 21, 2006 Dep. at 48-50; Roth Dep. 24-28.)  They were also not too keen to give Dr. Cohen credit for acting emergently until confronted with the timing of his correspondence and the sequence of the events. (*Id.*)

25.    The happy part of this fiasco was the early recruitment of PharmaCorr.  This was happy for a variety of reasons.  First of all, the Court has every reason to believe that PharmaCorr will function like other reliable commercial remote pharmacy services–fill and place orders consistent with the standards of care in the community.  That is, the prescriptions will be regularly filled by PharmaCorr staff with computer programs used to ensure that orders are provided timely and the ordered prescriptions are not contra-indicated either by patient health or drug interactions.  Indeed, Barbara Hladki has already testified that her initial experience with PharmaCorr has been one which has improved automatic refills of chronically needed medicines.  (Hladki Sept. 21, 2006 Dep. 31.)

26.    Such improvement, though, is not without some complications in that Defendants do not anticipate that PharmaCorr will be connected to the SERAPIS medical records system until middle to late January 2007.  (Defs.' Tr. Br. 2, 15.)  Until then, Defendants cannot fully insure that pharmacy care meets community standards.   Furthermore, Dr. Cohen expressed reservations at the time of hearing that the system had not yet obtained the functionality necessary to alert care providers about chronic medication orders requiring automatic renewal, which is an essential part of an operative pharmacy system.  (T.T., vol. III, 585.)

27.     Returning to the fiasco category, a brief comment is warranted as to the case of P.H.   P.H. died of complications of treatable hyperthyroidism after his care was neglected for over a year because Defendants perennially ignored both his need for medical care and the care for paranoia which was causing him to refuse medical treatment.   Rather than simply repeat the Court's earlier discussion of the case in its November 13, 2006 Opinion, the Court now adopts that discussion here by reference. Defendants have sought to add to that record with testimony of Bency Mathai, M.D., the physician who was responsible (together with the mental health team) for sending the paper work to Lansing to seek probate court appointment of a medical guardian to approve care on P.H.'s behalf.   (Mathai *De Bene Esse* Dep. 7-16.)   Dr. Mathai's account makes clear (consistent with Dr. Cohen's previous account) that she acted promptly and in the best interest of P.H.   However, this testimony does nothing to excuse any subsequent delay caused by others in Lansing who received the paper work.   (*Id.*)   Nor does such testimony attempt to excuse or defend the very prolonged delay in medical treatment and psychological treatment caused by other providers that occurred prior to Dr. Mathai's consultation with P.H.   The Court understands that the guardianship proceedings were intended to expedite treatment, but those proceedings did not begin until P.H. had been effectively delivered to the probate court system on the precipice of death.

28.     The other certain fiasco that Dr. Cohen "discovered" during a routine visit was the August 6, 2006 death of T.S.   This death was reported to the Court by letter of August 14, 2006.   (Dkt. No. 2088.)   The Court has already commented extensively upon that death and the grossly defective medical and mental health care which promoted it.   (*See* Op. of Nov. 13, 2006.)   Rather than repeat those words again, the Court adopts them here by reference with two brief additions.   The first is due to the recently released autopsy of T.S., which the parties have presented by Stipulation to become part of the evidentiary record.   (Stip. of Nov. 17, 2006; attach. A & Order of Nov. 21, 2006 granting

14

Stip.)  The Autopsy Report, which was based in part on a Toxicology Report recently completed, gave the cause of death (consistent with Dr. Walden's prior opinion) as complications of hyperthermia and dehydration.  (*Id.*) The complications likely caused an electrolyte imbalance that not irregularly causes heart arrhythmia and failure.  (*Id.*)

29.     Second, in advance of T.S.'s death, the Department of Corrections had announced a "case management" system to monitor medically high-risk inmates in administrative segregation. (Defs.' Tr. Br. 4.)  As Defendants put it, that system "is not fool proof."  (*Id.*)  "Fool" is the operative word in that sentence, as applied to all care T.S. received prior to his death, including from custody, medical staff and psychological staff.  Since the death of T.S., Defendants have taken steps to communicate a need for custody staff, medical staff and mental health staff to share information to protect patient welfare. (Defs.' Tr. Br. 4 & Ex. B.)  At the same time, however, this effort must be conducted consistent with standards of medical confidentiality.

30.     Defendants have also made a case management effort which is directed to prevent the lapse and failure of services in critical cases (*e.g.,* cancer treatment, cardiac treatment, *etc.*).  (*Id.*)  It is not explained how this system will reliably function, however, when many of the impediments which has caused a lack of service in the past (failure of transportation, unavailable specialists and indifferent and overworked providers) continue unabated.[9]

31.     Defendants have announced in their Trial Brief another recent attempt to study and reform their health care efforts.  Exhibit C to the Trial Brief is a Request for Proposal–meaning that Defendants were seeking a bid as to a two-phase study of their health care system, with phase one to be completed

---

[9](*See also* B. Mathai Dep. 60-62, commenting on the administrative segregation health "vetting" process.  Interestingly, Dr. Mathai speculated that custody officers would not have listened to physicians' orders regarding the custodial treatment of T.S.  If this is true, then the entire system is doomed to failure.)

15

by April 1, 2007 and phase two to be completed six months later.  Defendants represent that they intend to employ the National Commission on Correctional Health Care (and any subcontractor it selects) to perform such study.  (Defs.' Tr. Br. 5 & Ex. C.)  At this point, it would be speculative to predict either any success or improvement as a consequence of a distant study, particularly when such studies in the past have only served to cut timber and line file drawers.

### E.  The Specialty Care Debacle Continued

32.     Perhaps the most remarkable testimony the Court received at the last hearing involved the dialogue between Dr. Pramsteller, the Michigan Department of Corrections Medical Director, and Dr. Cohen, the medical monitor.  Both were curious to know whether the rather tentative remedy in their Plan to fix specialty care delays, monthly reporting to the Court of delay numbers, had resulted in any improvement.  The sheer numbers provided established that 30 to 40 percent of the specialty care was being provided outside of the time deemed medically necessary.  (T.T., vol. III, 589.)  Dr. Pramsteller and Dr. Cohen, in order to assess the harm of such delay, randomly picked six cases of delayed specialty care from a list of such cases.  (*Id.* at 589, 593.)  In two of those cases, the delay did not threaten any imminent harm, though in one of those cases it may have caused prolonged pain.  (*Id.* at 589-90.)  In the remaining four cases, the delay was presenting the prospect of unnecessary death and grossly unnecessary suffering.  In the case of D.R., a patient with blood in the urine, it took medical staff 40 days to perform testing (IVP x-ray), which showed that one of his kidneys was blocked and not functioning due to a kidney stone, and his treatment was further delayed for several weeks after the test was performed.  (*Id.* at 590-91.)

33.     Another patient C.W.S., a 50-year-old with coronary artery disease, had a stent in his left main coronary artery, the most dangerous place for blockage.  (*Id.* at 591.)  He had been using nitroglycerin and, because of increasing frequency of chest pain with activity and at rest, had increased nitroglycerin

16

usage to several times per day.  (*Id.*)  He had chest pain radiating to his neck and arm with heavy substernal pressure.  (*Id.*)  This is the basic medical school definition of an impending heart attack.  (*Id.*)  Defendants' response was to schedule a 30-day consult.  (*Id.*)  C.W.S. had needed the consult immediately.  (*Id.* at 591-92.)  When he was finally seen, after more than 30 days, testing showed a 70-percent blockage of the left coronary artery with stenosis in the right coronary artery as well.  In Dr. Cohen's opinion, the patient was fortunate to have survived the prolonged delay in treatment.  (*Id.* at 593.)  The patient was referred directly by the cardiologist for emergency coronary artery bypass surgery.  At the time of the review by Drs. Cohen and Pramstaller, the surgery had taken place and the patient had returned to JMF.  Remarkably, on the day of their review, physician staff at JMF were unaware that C.W.S. had surgery, and were not aware that he had returned to their facility.

34.     J.F. was the third adverse delay case.  He was a patient with end stage renal disease who was complaining about rectal bleeding and displayed two abnormal polyps during a barium enema on June 21, 2005. (*Id.*)  He was scheduled for a colonoscopy in two months, but, according to the chart, custody cancelled his appointment.  (*Id.*)  He was then not seen again for the condition until the delay was discovered by medical staff on April 21, 2006 and his colonoscopy appointment rescheduled for July 24, 2006.  (*Id.*)  No attempt was made by providers to schedule the case emergently notwithstanding the past delay and real prospect of cancer.  (*Id.* at 594.)  Eighteen days after the colonoscopy took place, on August 11, 2006, the results were reported as high grade dysplasia, an abnormal, non-cancerous but possibly pre-cancerous lesion.  (*Id.*)  No follow-up was ordered despite the medical risk.  (*Id.*)

35.     D.U. was the last adverse case studied.  D.U. had complained of a mole which was increasing in size on his back on June 25, 2005.  He kited repeatedly and was then seen on July 8, 2005 and diagnosed with a "melanocystic skin mole" which the doctor (who no longer works for Defendants) determined should be "watched closely," but no biopsy was ordered.  (*Id.* at 595.)  Follow-up was

ordered in two months, at which time (September 8, 2005) the doctor determined that the "mole" should be surgically removed within two weeks. As of October 10, 2005, this had not occurred. The patient saw a nurse on that date and complained that the growth had persisted for a long period of time, and he was told to use a hot compress. (*Id.*) An October 14, 2005 appointment to remove the "mole" was cancelled by a medical provider and rescheduled for October 21, 2005, which also did not occur. (*Id.*) The patient was seen by a physician assistant ("PA") and told the PA that he had family history of cancer. (*Id.*) This resulted in another request for surgical excision which was ignored. (*Id.*)

36.     By January 20, 2006, the "mole" was seen by medical staff and was then a black-red mass measuring .5 by .7 inches square in the interscapular area with irregular margins. It was noted to be bleeding. On January 30, a physician performed a wide excision of the lesion and ordered follow-up care and testing. (*Id.* at 596.) A February 7, 2006 pathology report showed malignant melanoma. Thereafter, Dr. Fatu (staff physician) attempted to obtain the patient's immediate referral to the University of Michigan melanoma clinic for cancer treatment, but the attempt was somehow administratively derailed while the patient was sent to an oncologist instead of a melanoma treatment center. (*Id.*) The required urgent standard of care–a sentinel node biopsy–which is used to determined if the metastatic cancer has spread to the lymph system was not performed until April 12, 2006 (another gross and inexcusable delay). That biopsy did show that the cancer had spread while the patient was not receiving effective cancer therapy. (*Id.*)

37.     As noted above, these cases are remarkable both because they were randomly selected from a list of delayed referrals and because the system of monthly reports instituted in January 2006 provided full notice to Defendants of the dangerous treatment delays. The monthly specialty reports (Pls.' Ex. 88) themselves are interesting because they show relevant data as to specialty care. Dr. Pramsteller has testified that he regularly evaluates similar data, especially as to diseases such as  heart disease, cancer,

diabetes and dialysis patients–which diseases have regular fatal outcomes and use significant economic resources. (Pramsteller *De Bene Esse* Dep. 35-36.) He further commented that the *Hadix* facilities require a large portion of the state medical resources because of the population of sick inmates housed there. (*Id.*) He classified cancer and heart disease as the two most expensive medical conditions. (*Id.*)

38.     To take January 2006 and cancer as an example, the January 2006 report showed 48 hematology/oncology patients were seen at DWH in January and another 25 were "pending" to be seen at DWH. (Pls.' Ex.88 at bates no. 321678.) Offsite, nine hematology/oncology patients were seen and ten were pending. (*Id.*) Although the report listed two off-site cancer treatment centers, the report showed that no care was authorized as to those centers. (*Id.*) Later versions of the report did not even list those centers. The February 2006 data for onsite specialty care in this category showed 12 patients were seen, two were rescheduled, 13 were pending and five were past pending. (*Id.* at bates no. 321739.) As to offsite "radiation/oncology," five were seen, ten were pending and three were past pending. (*Id.* at bates no. 321740.) The March 2006 data for onsite specialty care in this category showed 16 patients seen, one rescheduled, 14 pending and seven past pending. (*Id.* at bates no. 321789.) The offsite numbers were 12 patients seen, 11 pending and six past pending. (*Id.* at bates no. 321791.) The April 2006 onsite numbers were 8 patients seen, two rescheduled, seven pending and six past pending. (*Id.* at bates no. 321846.) The April offsite numbers were 12 seen and seven pending with none past pending. (*Id.* at bates no. 321847.) The May onsite numbers were three seen, seven pending and three past pending. (*Id.* at bates no. 321902.) The May offsite numbers were nine seen, two rescheduled, six pending and two past pending. (*Id.* at bates no. 321903.)

39.     To skip to the later months, the summary sheets are not informative as to cancer treatment because CMS shifted to an "automatic" approval process for cancer referrals to facilitate treatment. (Hutchinson Dep. 98-99.) This was done because, "We knew that simply the time required for even

expeditious handling of all the pieces of paper . . . would not deliver some of the cancer care within the time frames that needed to occur." (*Id.*)  Although Dr. Hutchinson proclaims that CMS has caused a "fix" to the system, both the above examples, the statistics and the brute facts do not bear out that blithe conclusion.  For the month of August, which lacks the summary sheet, the "patients seen" report still shows that many cancer patients were seen beyond the prescribed treatment parameters.  For example, patient W.D. had a diagnosis of tongue cancer.  (Pls.' Ex. 88 at bates no. 322119.)  He was to be seen in ten days, but was seen in 43 days because of "first available specialist schedule . . . ." (*Id.*)  Similarly, M.W. had lung cancer and was to be seen in 21 days; he was seen in 27 days and no explanation was given for the delay.  (*Id.*)  Patient R.C. had T-Cell Lymphoma and was to be seen in 14 days; he was seen in 21 days with no explanation for the delay.  (*Id.*)  Patient X.W. also received delayed treatment for cancer of the esophagus.  (*Id.*)  Although some of these delays may seem inconsequential in length, the thorny problem for cancer patients is that their course of treatment (from initial symptoms, to diagnosis, to excision of the cancer (when possible) and to multiple follow-up procedures (radiation and chemotherapy)) requires multiple rounds of waiting and scheduling and potential cancellation due to illness, transport problems, doctor unavailability, *etc.*  This scenario, in the best of circumstances, leaves the inmate fighting for life amidst both the intended and unintended, but equally profound, cords of custody.

40.     Defendants themselves admit that they are unsatisfied with their own progress in improving the specialty referral process.  Here is what defense counsel wrote:

> Even with the Defendants' November 15, 2006 specialty care report, based on October data, the percentage of DWHC specialty care requests reported as "excess" or "late" was twice that of the JMF and SMT facilities.  While this last report is an improvement from the reports early this year, more work needs to be done.

(Defs.' Tr. Br. 11.)

### F. More Medical Malfeasance

41.     Other negative cases were reported by Dr. Jerry Walden, M.D., Plaintiffs' medical expert.

Those cases were discovered by Dr. Walden as a product of 13 days of medical tour and inspection by

by Dr. Walden in September and October 2005 and April and May 2006.  (Pls.' Ex. 1B at 1.)

Dr. Walden summarized these cases in his Report of July 10, 2006.  (*Id.*)[10]   Here are some of the low

lights of what Dr. Walden found.

42.     Regarding cancer treatment, Dr. Walden had concern about four patient files which he did not

have access to for review: patients 105, 106, 107 and 108.  (*Id.* at 27.)  He was, however, able to review

the charts of four other prisoners which showed remarkable indifference to patient well-being.  In

patient number 109, the patient was seen as a follow-up for blood in the urine in February 2004. (*Id.*)

His family history showed cancer on both sides of his family.  (*Id.*)  Thereafter, he regularly saw

physicians because he could not sleep at night due to bladder pressure while he continued to have blood

in his urine.  (*Id.*)  These many visits were treated as either over-active bladder or bladder infection.

(*Id.*)  Finally, on August 9, 2004, a physician noted the possibility of bladder malignancy and testing

was done.  (*Id.*)  The testing was inconclusive while the patient continued to complain of pain and had

persistent blood in the urine.  (*Id.* at 27-28.)  After continued complaints, he was seen by urology, who

---

[10]Plaintiffs have moved, post-hearing, to formally admit Plaintiffs' Exhibits 1A and 1B, which were discussed at length, without objection, in the hearing testimony, but not formally admitted. (Pls.' Tr. Br. 4 n.2.)  This request will be granted.  In so doing, the Court also formally receives all of the post-hearing submissions of the parties (*de bene esse* depositions and exhibits), expressly including Plaintiffs' Exhibit 5 (compilation of reports and documents pertinent to medical care), Plaintiffs' Attachment 1 to Trial Brief (a clarifying appendix meant to explain the prisoner medical references), Plaintiffs' Proffer (Dkt. No. 2218), the T.S. autopsy and toxicology reports, and all *de bene esse* depositions and documents filed by Defendants.

Should the Court of Appeals have cause to review this record later, it is also advised to consult the prisoner key presented during hearing.  The prisoner key presented at hearing did contain some slight errors, which was resolved by revision of the key.  (*See* Pls.' Tr. Br. 4 n.2.)

scheduled him for cystocopy and IVP testing.  (*Id.*)  The testing was eventually performed on October

18, 2004 and on October 19, 2004, the test results showed a 6 centimeter tumor on the bladder.  (*Id.*)

The tumor, once discovered, was too large to permit transurethral resection of the tumor (the less

invasive technique) so in March 2005, surgeons removed the patient's bladder and created a new

bladder from his bowel.  (*Id.*)  As of May 2006, the patient had lost over 50 pounds.  (*Id.*)  The patient

also complained that after the bladder surgery, doctors had difficulty reaching a urologist to treat his

bladder symptoms and nearly caused a serious medical complication.  (*Id.*)

43.    Patient 110 was another like case.  He had recurrent bladder cancer and blood in the urine was

ignored for a prolonged period.  (*Id.*)  It took some six months between the time that blood in the urine

was noted and a urologist appointment was eventually completed.  (*Id.*)

44.    Patient 111 was diagnosed and treated for metastatic cancer.  (*Id.*)  Although he was treated,

he was denied pain medication over a two month period, and this denial caused the cancellation of one

of his cancer appointments.  (*Id.*)

45.    Patient 112 was another patient who was treated for malignant rectal cancer.  (*Id.*)  According

to Dr. Walden's Report, the care was delayed by some five years because cancer care was not given

soon after he arrived in custody.  (*Id.*)  A colostomy was eventually performed.  (*Id.*)  Dr. Walden is of

the opinion that patient 112 will likely die of such cancer.   (*Id.*)

46.    As for cardiology, Dr. Walden's Report likewise discusses approximately 20 problematic

patient records from 2005.  (*Id.* at 14-17, 21-22.)  He found a like number of problematic cases for

2006.  (*Id.* at 17-21.)  A few selected cases are cited now as exemplary of the kinds of indifferent care

delivered at the *Hadix* facilities.

47.    Patient 44 had extreme hyperlipidemia.  (*Id.* at 17.)  He had triglyceride levels 10 times normal

levels and cholesterol of 444.  (*Id.*)  He was not seen on an appointment for repeat testing.  (*Id.*)  When

22

he was seen next, an EKG was ordered and showed a septal infarction with possible inferior ischemia. (*Id.*)  The care providers did not treat either the hyperlipidemia or the unstable cardiac condition.  (*Id.*)

48.     Patient 48 had hypertension that was over-treated with multiple medications.  (*Id.* at 18.)  His blood pressure was not regularly monitored and vital signs were not being recorded in his record. (*Id.*) He also had bleeding in his intestinal tract that was being ignored, with no plan for either a colonoscopy or a gastroscopy.  (*Id.*)

49.     Patient 53 complained of chest pain with activity.  (*Id.* at 20.)  An EKG was performed which showed abnormal results.  (*Id.*)  At the time, the patient had a very elevated cholesterol and a history of a past catheterization and long-term tobacco and cocaine use.  (*Id.*)  No urgent care was scheduled. Dr. Walden's comment:  "This man needs a stress test or an emergency room visit now."  (*Id.*)

50.     As for diabetic patients, notwithstanding the positive comments made above, Dr. Walden's report noted some continued problems in the treatment of hypoglycemia, brittle diabetics and other diabetics with uncontrolled treatment regimes.  Dr. Walden devotes some ten pages of his Report to such cases.  (*Id.* at 5-14.)  The cases noted below are representative of serious *Hadix* treatment failures regarding treatment of hypoglycemia.  Indeed, Dr. Hutchinson similarly testified that to his knowledge, there were three or four patient deaths at *Hadix* facilities due to complication of hypoglycemia (which is treatable if promptly recognized and treated) within the last two years.  (Hutchinson Dep. 51.)

51.     Dr. Walden's overall impression was, "I am still amazed that the need to prevent hypoglycemia hasn't been more effectively addressed by the administration and that CMS has not focused on this problem."  (Pls.' Ex. 1B at 5.)  Dr. Walden noted some death cases due to hypoglycemia and further noted that although the policy is to treat all patients with blood sugar readings of less 50 mg/dl with intravenous glucose, this does not regularly occur.  (*Id.*)

52.     Patient 4 died of hypoglycemia.  (*Id.* at 5-6.)  He had a severe hypoglycemic reaction without any referral to a physician.  (*Id.*)  He later died of complications of a second instance of severe hypoglycemia.  (*Id.*)

53.     Patient 20 is a paraplegic who is wheelchair-bound.  (*Id.* at 11.)  His care was complicated by the fact that custody transport to specialist appointments sometimes left him unable to eat his meals and, thus, prone to hypoglycemia.  (*Id.*)

54.     Patient 22 had severe hypoglycemia on March 12, 2006 and was unconscious.  (*Id.* at 12.)  He was treated with IV glucose.  (*Id.*)  However, post-reaction adjustment to his regime did not occur consistent with community medical standards.  (*Id.*)

55.     Patient 25 is a dialysis patient with a recent history of severe hypoglycemia.  (*Id.*)  He was given a Glucagon injection (a chemical that induces the liver to produce glucose) for hypoglycemia on March 28, 2006.  (*Id.*)  This followed several earlier incidents of serious hypoglycemia.  (*Id.*)  On March 20, 2006 his blood glucose readings were 26, 31, 53 and 76 mg/dl, respectively, and he received two Glucagon injections.  (*Id.*)  At 11:55 p.m., staff was called to his cell when he was unresponsive and his blood sugar was 39 mg/dl; he then received his third Glucagon injection of the day.  (*Id.*)  He did not have successful follow-up care and Dr. Walden (who had warned Defendants) noted that his care had not improved as of June 14 (since he had other reactions on or about June 12).  (*Id.*)  This is clearly an example of a patient needing urgent specialist care whose needs have been under-served.  (*Id.*)

56.     Other serious patient care/treatment problems were noted in the following areas: access to health care (*id.* at 22-44); medical record deficiencies (*id.* at 24-25); treatment of methicillin-resistant staphlycoccus infections (*id.* at 25-27); dialysis care deficiencies (*id.* at 29-35); surgical care (*id.* at 35-36); custody treatment (*id.* at 36-39); nursing issues (*id.* at 39-41); and medication problems (*id.* at 41-42).  Also remarkable in his Report are prolonged discussions of cases in which CMS delayed patient

care and other cases in which delayed and/or negligent care were a factor in patient deaths.  (*Id.* at 42-64.)

### G.  How Much to Make of a Bunch of Deaths

57.     One of the issues repeated in the briefing and argument is the statistical question of how to treat the individual gross treatment failures.  Defense counsel argues in part that the treatment failures do not show deliberate indifference to the "class as a whole."  (Defs.' Tr. Br. 6.)  The basis for this argument is given as *Lewis v. Casey*, 518 U.S. 343 (1996), a case in which the Supreme Court repelled a request for class-wide relief as to First Amendment access violations because only two actual deprivations to class members were shown and the "constitutional violation has not been shown to be systemwide . . . ."  *Lewis*, 518 U.S. at 360.

58.     When the Supreme Court made that announcement, it most assuredly did not mean that every class member must be a victim of a violation for system-wide relief to stand.  What it did mean was that occasional violations which are not rooted in systemic causes, do not warrant system-wide relief.  As an example, the number of inmates with untreated cancer at any given month is small as a percentage of the total prison population (between 10 to 50 at the *Hadix* facilities as an example).  However, the systemic failure to timely treat those persons is clear from the statistics given that there was a 30 to 40 percent delay rate past the physician assigned deadlines for timely care of prisoners generally and a similar rate of delay for cancer patients.  Furthermore, the rate of non-care and delayed care is even higher given that the record reflects that physicians were often not protective enough of the right to treatment in assigning treatment dates, and often failed to take the initial diagnostic steps necessary to promptly diagnose cancer.  Many deaths have occurred because of such systemic failures, and these failures have occurred in regular treatment patterns (*e.g.,* deaths due to delinquent treatment of hypoglycemia, delinquent treatment of dialysis patients, *etc.*)

25

59.     The testimony of Dr. Creekmore, explained at length in the Court's November 13, 2006 Opinion and adopted here by reference, likewise supports a conclusion that Defendants' malfeasance was systemic. This is particularly so given the history of a facility which has not met constitutional standards repeatedly.  Defendants may wish that by simply pointing out an obvious red herring–that most people are not sick most of the time regardless of their medical treatment–they may wish away their involvement in this suit.  It is not so.  Wake up Dorothy.  You are not in Kansas anymore.[11]

### H.  Work Without Workers

60.     Apart from the individual case failures explained above, even Defendants' staff has testified that staffing and related facility failures are making the job of delivering timely and necessary medical care untenable.  Debbie Roth, the Director of Nursing, testified that she had current staff vacancies (which were being addressed by temporarily using nurses from other facilities) and also that even if all vacancies were filled, the full staff complement would have difficulty in performing assigned work due to the sheer volume and complexity of the work.  "If I was fully staffed in all my facilities, it would still be difficult for the nurses to keep up with the workload. . . .  We need more allotted staff positions, and we need more staff, both."  (Roth Dep. 50.)

61.     Regarding the SMT facility, Roth testified that she needed "two additional R.N.s for the day shift, two on the afternoon shift and one on the night shift."  (*Id.* at 51.)  She also testified that additional staff was necessary to cover vacation and sick leave for regular staff.  (*Id.*)  Regarding JMF, she testified that three additional staff positions were necessary and a third night-shift nurse would also be beneficial.  (*Id.* at 52.)  Similarly, she testified that RGC needed three additional staff nurses, though

---

[11]Apologies to Noel Langley, lead author of the 1939 screenplay, *The Wizard of Oz.*

not a night-time nurse given that RGC involves short-term prisoner stays, shorter daily hours of

operation, and a smaller percentage of very sick inmates.  (*Id.* at 52-53.)

62.    These opinions were shared by Dr Cohen both about nursing and physician staffing.  Dr. Cohen

testified:

> There have been critical nursing and physician shortages at the *Hadix* facilities over the last six
> months.  During a three month period, [in JMF] there were only two physicians and one
> physician assistant on limited duty providing care.  This situation exist[ed] almost through
> September and resulted in extreme delays in physician review of abnormal laboratory studies,
> especially consultations and their ability to see nurse referrals from sick call and kite evaluation.
> The inadequate physician staffing compromises the ability of nurses to refer patients for M.D.
> evaluation and schedules were so packed in September that physicians at JMF could not follow-
> up on their own patients because their schedules were so filled up for weeks . . . ahead.
>
> Correctional Medical Services has been aware for a long time that they have been unsuccessful
> [in] recruiting and retaining physicians in the *Hadix* facilities, and this is documented in the
> minutes between CMS and MDOC, but they have not taken yet the necessary action to provide
> direct employment, including benefits, accrued vacations, and health insurance to the vast
> majority of their physician employees.  If they do so, they would become much more
> competitive and would have access to a large pool of board certified physicians whose
> immigration status requires them to have full-time jobs in order to remain in this country.
>
> Nursing staffing in the *Hadix* facilities has been in disarray.  The fact that in September just as
> these hearings were approaching the nursing staff was three days behind in their evaluation of
> kites is due to the inadequate number of nursing staff. . . . .

(T.T., vol. III, 580-82.)

63.    Dr. Cohen's comments about the kite system are important to understand.  The kite system is

utilized by prisoners to communicate important requests for services, advice and medicine.  Typical

kites might ask for a prescription refill, indicate that a prisoner needs to see a physician regarding an

ailment or ask for clarification regarding medical advice or a treatment regime for the prisoner.  When

these requests go unanswered, particularly as to a chronically-ill population dependent on daily

medications and treatment advice, they create the real possibility of patient injury and death.  Dr. Cohen

discovered during one of his September tours that JMF nursing staff were three days behind in

27

responding to kites and notified MDOC administrative staff.  Debbie Roth, following up on Dr. Cohen's investigation, received confirmation from a substitute RN (one drafted from another facility) that there was a three-day-old stack of kites to be reviewed. (Roth Dep. 48.)  Roth then drafted still other staff, two RNS from other facilities, to address the three-day backlog of kites at JMF, but could not  reduce staffing at other facilities for any prolonged period due to the needs at those facilities.  (*Id.* at 48-50.)  In other words, the conditions that caused this problem have persisted and make repetition of this and other critical problems likely.

64.    A related staffing issue is the use of LPNs almost exclusively at the *Hadix* facilities to meet required staffing.  Fifty percent of the RN staffing is provided by contract staffing.  (Roth Dep. 70.)  Of that group, 60 percent are LPNs, even though they are assigned to replace RNs.  (*Id.* at 55.)  This has resulted in the use of LPNs to take action on prison kites, actions which they are not qualified to perform in some cases.  (*Id.*)  This situation contradicts Defendants' previous representations that prisoner kites were being reviewed exclusively by RNs.  (*See* 2002 Findings at ¶ 89.)  The medication kites that the LPNs review typically may have symptom components (*e.g.,* I need more inhalers because I used them too quickly).

65.    Craig Hutchinson, M.D., of CMS had a somewhat less dire opinion about the staffing inadequacies.  He viewed the *Hadix* facilities as 92-93 percent fully staffed though "I haven't done an accounting of the hours . . . ."  (Hutchinson Dep. 23.) In Hutchinson's opinion, the only physician shortage was the failure to obtain one physician for RGC (who needed to be replaced due to recent retirement), Defs.' Tr. Br. 7, and additional physician hours for the dialysis unit.  (Hutchinson Dep. 23.) He explained that this shortage was due to the fact that the hiring was to be done by Dr. Deon Middlebrook (the nephrologist who provides hours at the dialysis unit and who works for CMS as an independent contractor with his physician employees). (Hutchinson Dep. l7, 23-26.) More particularly,

28

he explained that the unfilled physician hours were due to the fact that one of Dr. Middlebrook's physician hires dropped out after he attended CMS orientation.  (*Id*.)  According to Dr. Hutchinson, Dr. Middlebrook is still attempting to hire for those hours.  (*Id*.)  Defendants' briefing admits that the dialysis unit is understaffed, but argues that the under-staffing does not jeopardize patient health and asks for an opportunity to present supporting testimony at hearing in January.  (Defs.' Tr. Br. 8.) Defendants' briefing does not explicitly comment on the absence of nurse staffing, presumably because Plaintiffs' motion had specifically requested additional physician staffing only.  (*See* Defs.' Tr. Br. 5-6.)

66.     Defendants have submitted the *De Bene Esse* Deposition of Barbara Hladki on the subject of their hiring plans.  According to her testimony, she has received tentative administrative approval for two additional LPNs and a third position (either a nurse or pharmacy technician) for JMF.  (Hladki *De Bene Esse* Dep. at 33-34.)  Hladki speculated that the "spending plan" would be approved in committee the next week and then she would be authorized to seek the new staff in January.  (*Id*.)  Hladki explained that it would take another two weeks to one month to fill the positions, but she did not explain in her answer why past openings had not been readily filled.  (*Id*.)  Indeed, defense counsel in the briefing accuses the Court and the media of making these positions difficult to fill, and says that one-half of recent applicants have cancelled interviews.  (Defs.' Tr. Br. 7.)  As of November 2, 2006, JMF had five nursing vacancies out of 13 allocated positions.  (Hladki *De Bene Esse* Dep. 36.)  RGC had one vacancy out of seven allocated positions.  (*Id*. at 37.)  Parnall had one vacancy out of seven allocated positions.  (*Id*.)

67.     Interestingly, the testimony of Dr. Hutchinson and Barbara Hladki assumed the staffing of JMF was adequate even if not compliant with the Court-ordered Plan.  The Plan set the minimum staff levels for JMF at four physicians and one mid-level provider.  (Plan at 20.)  This staffing was in addition to

other additional staff for other parts of the *Hadix* facilities, including new staffing of the dialysis unit. (Plan at 19-20.) Defendants admit that they have not complied with this requirement–having employed only three physicians and one physician's assistant. (Defs.' Resp., Dkt. No. 2219, at 10.) They deem this as a sufficiently good-faith response even though no permission to deviate from the Plan was ever sought or extended.

### I. Workers Without Computers

68.     One important side alley discussed during the recent hearing involves the implementation of the SERAPIS system--which was a requirement of the Preliminary Injunction. As specified above, the Preliminary Injunction required the expansion of SERAPIS to lab reports, the pharmacy and DWH, but did not provide an exact deadline for completion. This requirement was not an idle one. Since a landmark report of the Institute of Medicine of the National Academy of Sciences, the medical profession generally has recognized that an electronic medical record is the preferred method of recording keeping for health care in order to reduce errors associated with handwriting, prevent medication errors, expedite service and facilitate stable and remote access to patient records. *See* Institute of Medicine, *The Computer-Based Patient Record: An Essential Technology for Health Care* (National Academy Press 1991); *see also* Institute of Medicine, *To Err is Human: Building a Safer Health System* (National Academy Press 2000) (discussing cost in lives of medical error and strategies for prevention). As Dr. Cohen put it in his testimony, "You have to . . . do it, otherwise you end up with the charts which are unreadable and have bad effects." (T.T., vol. III, at 586.) Another huge advantage of the technology is that it allows one to rapidly search a patient record for pertinent information. (Pramsteller *De Bene Esse* Dep. 13.)

69.     Furthermore, it appears that Defendants agree that the expansion of SERAPIS or a SERAPIS compatible system to all parts of the *Hadix* facilities, including records for in-patient care at C-Unit and DWH, is an important goal which must be met soon.  (*See* Greifinger T.T., vol. III, 468-71.)  It is possible to use SERAPIS for all ambulatory care, lab studies and prescriptions, but the system is not configured for in-patient care at C-Unit or DWH because it does not accommodate nursing notes. (*Id.*)  Defendants are presently working at finding a SERAPIS-compatible system which can be used for in-patient care and which has connectivity to Foote Hospital, the Jackson public hospital where prisoners are often transferred when care is not appropriate or available at DWH.  (*Id.*)  According to the *De Bene Esse* Deposition of Richard Russell, the process of working toward an in-patient electronic record envisions making such record compatible with regional electronic medical records (such as those maintained by the Department of Community Health and the Veterans Administration) and is well underway.  (Russell *De Bene Esse* Dep. 29-36.)

70.     Defendants were late to the game in both their overall program and in instituting the Court-ordered expansion, beginning some of that work only this fall.  (Hladki *De Bene Esse* Dep. 38.) Nevertheless, Hladki promises that implementation of SERAPIS at DWH and C-Unit regarding lab orders and prescriptions (but not as to in-patient care records) will be completed by January 2007.  (*Id.* at 9-10.)  Defendants also are presently working to ensure that PharmaCorr will have connectivity with SERAPIS by the end of January 2007.  No promises were made about the participation of certain specialty care providers, such as Dr. Middlebrook, who have not used SERAPIS, (s*ee* Pramsteller *De Bene Esse* Dep. 40.), and whose future participation is likely to be limited to instructing others to use the system on their behalf.  Older specialists who provide valuable services (e.g., care of a large number

of dialysis patients) must be handled with some care, however, to coax them into the system without alienating their services.  Such a loss might be catastrophic for patients.[12]

## II.  CONCLUSIONS OF LAW

### A.  LEGAL STANDARDS

#### 1.  Contempt Standards

71.   The standards for adjudicating civil contempt were given by the Sixth Circuit Court of Appeals in *Glover v. Johnson*, 138 F.3d 229 (6th Cir. 1998) as follows:

> In a civil contempt proceeding, the petitioner must prove by clear and convincing evidence that the respondent violated the court's prior order.
>
> A litigant may be held in contempt if his adversary shows by clear and convincing evidence that "he violate[d] a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Id.* at 707 (citation omitted).  It is the petitioner's burden-here, the plaintiffs'-to make a *prima facie* showing of a violation, and it is then the responding party's burden to prove an inability to comply.  *See Huber v. Marine Midland Bank,* 51 F.3d 5, 10 (2d Cir. 1995).  This court has explained:
>
> > [T]he test is not whether defendants made a good faith effort at compliance but whether "the defendants took all reasonable steps within their power to comply with the court's order."
> > [G]ood faith is not a defense to civil contempt.  Conversely, impossibility would be a defense to contempt, but the Department had the burden of proving impossibility, and that burden is difficult to meet.  Although diligence is relevant to the question of ability to comply, the Department's evidence of diligence alone does not satisfy that burden.
> > "[I]nability to comply would be a defense ⋯ but defendants would be expected ⋯ to show this 'categorically and in detail.' "

---

[12]Plaintiffs are none too complimentary of Dr. Middlebrook and their concern is shared to some degree by Defendants' Medical Director, Dr. Pramsteller.  (*See* Pramsteller *De Bene Esse* Dep. 37.)  With that said, since Dr. Middlebrook and his practice group are providing extensive services to the dialysis unit, and since it may be very difficult to replace those services and the loss of the services even temporarily might cause patient deaths, care must be given to that relationship.

*Glover,* 138 F.3d at 244 (quoting *Glover v. Johnson,* 934 F.2d 703, 708 (6th Cir. 1991) (internal citations omitted)).

72.     As noted above, the exercise of contempt powers is a dire exercise and one requiring all manner of fair and due process to respondents.  The exercise of contempt powers is also, however, a necessary part of any judicial system of courts of general jurisdiction.  *See Bridges v. State of Cal.*, 314 U.S. 252, 285 (1941) (citing *United States v. Hudson*, 11 U.S. 32, 34 (1812)).  Without that power, courts would lose their legitimacy and watch idly as their decrees furnished only morbid entertainment to those willing to disregard them.

73.     When a civil contempt finding is made, the question becomes what sanctions are sufficient but not excessive to coercive the ordered conduct.  In considering civil contempt sanctions, the Court may consider such penalties as coercive imprisonment, *see, e.g., Matter of Campbell*, 761 F.2d 1181, 1184 (6th Cir. 1985), and coercive and conditional fines, *see, e.g., United States v. Work Wear Corp*., 602 F.2d 110, 116 n.14  (6th Cir. 1979); *see also In re Special Proceedings*, 373 F.3d 37, 46 (1st Cir. 2004); *United States v. Mongelli*, 2 F.3d 29 (2d Cir. 1993) (affirming coercive fines of $10,000 a day).

## 2. Eighth Amendment Standards

74.     "Deliberate indifference to serious medical needs" violates the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The Eighth Amendment standard has both objective and subjective components.  *Id.*  Thus, to be liable, a defendant must know of and disregard an excessive risk to prisoner health or safety.  *Farmer*, 511 U.S. at 837.  However, in an injunctive case, proof of the subjective component is straightforward:

33

> In this case, we are concerned with future conduct to correct prison conditions. If these conditions are found to be objectively unconstitutional, then that finding would also satisfy the subjective prong because the same information that would lead to the court's conclusion was available to the prison officials.

*Hadix v. Johnson*, 367 F.3d 513, 526 (6th Cir. 2004).

75.    One of the cases cited with approval in *Farmer* was the Supreme Court's previous decision in *Helling v. McKinney*, 509 U.S. 25 (1993). *Helling* said the following about future threats of injury:

> It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them. The Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event. Two of them were cited with approval in *Rhodes v. Chapman,* 452 U.S. 337, 352, n. 17 . . . (1981). *Gates v. Collier,* 501 F.2d 1291 (CA5 1974), held that inmates were entitled to relief under the Eighth Amendment when they proved threats to personal safety from exposed electrical wiring, deficient firefighting measures, and the mingling of inmates with serious contagious diseases with other prison inmates. *Ramos v. Lamm,* 639 F.2d 559, 572 (CA10 1980), stated that a prisoner need not wait until he is actually assaulted before obtaining relief.

*Helling v. McKinney*, 509 U.S. 25, 33-34 (1993).

76.    To explain this matter in the vernacular, a prisoner who receives a sentence of 2-10 years, deserves to do 2-10 years. What he does not deserve is a *de facto* and unauthorized death penalty at the hands of a callous and dysfunctional health care system that regularly fails to treat life-threatening illness.

### 3. PLRA Standards

77.    As to the injunction requests, the controlling legal standards are the Eighth Amendment legal standards explained above, when combined with the PLRA injunction standards applicable under 18 U.S.C. § 3626(a)(1) in prison condition cases and the injunction standards explained below. However, the PLRA on its face and in its meaning does not apply to contempt requests. *Jones-El v.*

*Berge*, 374 F.3d 541, 545 (7th Cir. 2004); *Essex Co. Jail Annex Inmates v. Treffinger*, 18 F. Supp.

2d 445, 462 (D.N.J. 1998). Section 3626(a), which was enacted as section 802(a) of the PLRA,

states in pertinent part:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1).

### 4. Permanent Injunction Standards

78. Since this determination represents a final adjudication of Plaintiffs' requests for injunctive

relief, following the earlier Preliminary Injunction hearing, the standards require final findings as to

whether Plaintiffs have clearly shown an entitlement to relief on the merits and whether an injunction

is necessary to prevent irreparable harm. The following case law explains the pertinent standards.

79. In *Weinberger v. Romero-Barcelo*, the Supreme Court gave an able explanation of the

controlling legal standards as follows:

> It goes without saying that an injunction is an equitable remedy. It "is not a remedy which issues as of course," *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337-338 . . . (1933), or "to restrain an act the injurious consequences of which are merely trifling." *Consolidated Canal Co. v. Mesa Canal Co.*, 177 U.S. 296, 302 . . . (1900). An injunction should issue only where the intervention of a court of equity "is essential in order effectually to protect property rights against injuries otherwise irremediable." *Cavanaugh v. Looney*, 248 U.S. 453, 456 . . . (1919). The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61, 95 S.Ct. 2069, 2077, 45 L.Ed.2d 12 (1975); *Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 951, 39 L.Ed.2d 166 (1974); *Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 506-507, 79 S.Ct. 948, 954-955, 3 L.Ed.2d 988 (1959); *Hecht Co. v. Bowles, supra*, at 329, 64 S.Ct., at 591.

Where plaintiff and defendant present competing claims of injury, the traditional function of equity has been to arrive at a "nice adjustment and reconciliation" between the competing claims, *Hecht Co. v. Bowles, supra*, at 329, 64 S.Ct., at 592. In such cases, the court "balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction." *Yakus v. United States*, 321 U.S. 414, 440, 64 S.Ct. 660, 675, 88 L.Ed. 834 (1944). "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles, supra*, 321 U.S., at 329, 64 S.Ct., at 592.

In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. *Railroad Comm'n. v. Pullman Co.*, 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941).

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982). *See also Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998); *City of Parma v. Levi*, 536 F.2d 133, 135 (6th Cir. 1976). As implied above, and consistent with the PLRA, injunctive relief involving matters subject to state regulation may be no broader than necessary to remedy the constitutional violation. *See Knop v. Johnson*, 977 F.2d 996, 1008 (6th Cir. 1992)

80.     While saying so, the Supreme Court in *Weinberger* also explained the importance of the legal principles which give rise to equity jurisdiction:

Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.'

*Weinberger*, 456 U.S. at 313 (citation omitted).

81.     The Court also concurs with the argument of Plaintiffs' counsel that where previous violations have been adjudicated, then a presumption of further injury inures to Plaintiffs' benefit. *See Thompson v. City of Los Angeles*, 885 F.2d 1439, 1449 (9th Cir. 1989); *Qui v. Ashcroft*, 329 F.3d

140, 148 (2d Cir. 2003); *Jacksonville Branch v. Duvall Co. Sch.*, 273 F.3d 960, 988-89 (11th Cir. 2001). While the Court agrees with this proposition, this agreement does not in any way affect the outcome of this suit, which would be the same regardless of the presumption in light of the record.

### B. CONTEMPT ANALYSIS

82. Plaintiffs have requested contempt regarding six provisions of the Plan (as adopted and approved by the later Order).[13]   The non-compliance at issue concerns: (1) the requirement that Defendants enhance their mortality review by the use of outside reviewers; (2) the requirement that Defendants pursue other options to obtain autopsy results; (3) the requirement that Defendants assure there is a prompt review of all specialist reports; (4) the requirement that Defendants assure that medications and laboratory studies be entered in SERAPIS at DWH; (5) the requirement of additional physician staffing at JMF; and the (6) the failure to assure a full time equivalent nephrologist or internist for the dialysis unit. Plaintiffs ask for a finding of contempt on each issue and entry of a coercive fine.

### 1. Mortality Review Process

83. The October 19, 2005 Preliminary Injunction required Defendants to submit a plan to accomplish various objectives, including, to "provide for assessment and medical review of all prisoner patient deaths . . . ." (Prelim. Inj. 2.) Defendants then submitted their Plan which provided: "Defendants intend to enhance their mortality review process through the use of outside professional reviewers who will provide a timely and complete review of all patient deaths . . . ." (Plan 2)

_____

[13]Plaintiffs made a seventh request in their moving papers, but have since withdrawn it. (Pls.' Tr. Br., Dkt. No. 2216, at 2 n.1.)

(emphasis added.)   On January 12, 2006, Defendants' Plan was approved by Order of the Court, with revisions not relevant to the above provision.  (Order of Jan. 12, 2006 at 1.)

84.    As to compliance, Defendants' Revised May Compliance Report stated in pertinent part,

> While Defendan[ts] have not ruled out the use of an outside agency [to conduct mortality reviews], it has become apparent that prior to following through with outside reviews the Department needs to streamline the internal review process so that the review occurs closer to the event.

(Rev. May 2006 Compliance Report 2.)  Barbara Hladki later wrote in August 2006 to Plaintiffs to indicate that this objective "is not being aggressively pursued at this time."  (Br. in Supp. of Mot. to Show Cause, Attach. 1 at 4 & Attach. 2.)  Defendants never did accomplish the outside review objective, but did, however, increase the speed of its internal regional review of mortality cases.

85.    Contempt sanctions are inappropriate in this instance.  The Plan language was worded vaguely and in terms of Defendants' "intent" as opposed to a specific requirement to accomplished a set objective within a set time frame.  Defendants have made some progress in their internal review and it cannot be said that they have violated a "clear and specific" order by clear and convincing evidence.

### 2. Autopsy Reports

86.    The Plan language provides in pertinent part:

> By statute, the need for an autopsy in Michigan is the sole determination of the County Medical Examiner, the prisoner's family, and in some cases may be requested by two or more registered voters in the county.  It is not always possible to obtain an autopsy as this is not in the control of the Defendants.  The Defendants will request an autopsy for all unexpected deaths.  The Defendants are also pursuing other options to be able to obtain an autopsy in all cases.

38

(Plan 13.) (emphasis added.)

87.     Plaintiffs contend in their Motion that Defendants have violated the underscored language because no "other options" are being pursued.  (Pls.' Br. 3.)  The statutory authority referenced by Defendants in the Plan, assigning authority to the County Medical Examiner, is found at Mich. Comp. Laws §§ 52.202-52.207.  The County Medical Examiner is required by statute to conduct investigations (investigations are preliminary to autopsies under § 52.205) in cases of "unexpected deaths," deaths without "medical attendance," and in other circumstances listed in the statute.  *See* Mich. Comp. Laws § 52.202.  Other physicians are required to alert the Medical Examiner when the physicians believe that an "unexpected death" or other statutory circumstance warrants investigation. Michigan Compiled Laws § 52.207 also mandates investigation by the medical examiner upon a petition by "six electors" of a county.  However, investigation is preliminary to autopsy and does not eliminate the medical examiner's discretion.  The medical examiner of Jackson County, according to the hearing evidence, has determined as matter of his discretion not to routinely do such autopsies, even when he has received requests, due to dangers of blood-borne disease.  (Hutchinson *De Bene Esse* Dep. 9-10.)

88.     In this instance, contempt sanctions are not warranted.  The requirement of the pursuit of "other options" is vague, does not require specific conduct, and it is difficult to discern on this record what, if any, further conduct would result in additional autopsies.   Therefore, this request is denied.

### 3.  Processing of Handwritten Specialist Reports

89.     The Plan requires that "Defendants shall ensure that there is a prompt review of all specialist reports (both handwritten and dictated) . . . "  (Plan 15.)  The Plan also says that "CMS should not

39

'pend' consultation while awaiting dictated consults . . . ."  (*Id.*)  Notwithstanding, the record does show that on rare occasions, certain CMS' doctors pend specialty consultations while awaiting their dictation of handwritten notes.  (*See* Pls.' Tr. Br., Dkt. No. 2216, at 9-10, citing references to Pls.' Exs. 88 & 89.)  The rate of these pending consults was relatively rare, though, approximating only two per month, with violations not reported every month.  (*Id.*)

90.     This rate (though still requiring improvement) represents a very dramatic improvement from pre-Plan levels.  The improvement is explained by the work of Dr. Mattai who now regularly checks all "pended" decisions with the objective of eliminating the practice as far as possible.  (Mattai Dep. 24-29.)  The remaining delays are explained as a product of requests by CMS for more information as to the requested consultations to determine whether the services were medically necessary. (Hutchinson Dep. 19-22.)  The record further shows that Dr. Mattai is taking steps to help assure that these rare events do not negatively impact patient care.  (Mattai Dep. 24-29.)

91.     Upon review of such record, and in light of the substantial improvement and substantial compliance with the Plan, the Court finds that contempt sanctions are not appropriate as to this issue.

### 4. SERAPIS–Medication and Lab Orders at DWH

92.     The Plan required that Defendants "[e]xpand the SERAPIS system to include all clinical areas . . . including . . . DWH . . . ."  No deadline was established.  Barbara Hladki's August 30, 2006 response to Plaintiffs indicates that progress has been made on the general goal, but there is not compliance as to DWH medication and lab orders.  (Pls.' Br. in Supp. of Mot. for Order to Show Cause, Attach. 1 at 4.)  As noted above, Ms. Hladki's most recent testimony is that the process of

SERAPIS implementation for labs and medications is now underway and is expected to be completed by January 2007.

93.    Plaintiffs argue the case of *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 853 (2d Cir. 1995), which held that the failure of an order to set a "doomsday" did not prevent enforcement in the absence of prompt compliance.  That case involved the imposition of a dismissal order due to non-compliance with a discovery order.  Notwithstanding, the more germane case is probably the case of *Armstrong v. Executive Office of the President, Office of Admin.,* 1 F.3d 1274, 1277 (D.C. Cir. 1993).  In *Armstrong*, the district court ordered the Executive Office to issue new policy without a deadline and held the Executive Office in contempt for failing to do so in a four-month period, but the D.C. Circuit reversed because the underlying order did not contain a deadline.

94.    The reason that the *Armstrong* case is more germane is that it involved the kind of task at issue here–a complicated administrative task that may take extended administrative work, consultation with others, *etc.*  An order absent a deadline is not meaningless.  Rather, the best construction of such an order is that it requires action within a "reasonable time."  However, since a "reasonable time" is such a broad and flexible concept as applied to complex administrative and technical tasks, the conclusion follows that there has been no showing of a clear violation of a "clear and definite" order as to this element of the Plan.

### 5.  JMF Hiring

95.    Defendants were ordered to increase staffing at JMF to cover new clinical responsibilities for the dialysis program and to increase staffing at JMF to serve prisoners in segregation.  (Plan 21-22.)  These are separate and independent requirements.  (*Id.*)  Staffing of JMF was to include "four

physicians and one mid-level [provider]." (*Id.*) Defendants have not provided these staffing levels. According to Plaintiffs' Brief, Defendants were only providing two physicians and one mid-level provider at JMF as of mid-August 2006, and Dr. Cohen viewed this failure as critical. (Pls.' Br. 5.) Barbara Hladki's August 30, 2006 Response showed additional staffing– *i.e.,* three physicians and one mid-level provider at JMF, (*Id.,* Attach. 1 at 2), though this is still short of the required staffing levels. Another problem noted in the briefing is that the mid-level provider is restricted and cannot see patients with certain communicable diseases. (*Id.* at 5 n.2.)

96.     Defendants' post-trial briefing likewise admits the short staffing levels. (Defs.' Resp., Dkt. No. 2219, at 10.) The briefing is a bit disingenuous in that it implies that additional dialysis staffing (which is a separate element of the Plan) may be counted toward meeting the five provider limit (which was clearly not the intent of the Plan). However, even if the dialysis staffing is counted, the staff is still short as the briefing admits. (*Id.*) Defendants' argue that this was "substantial compliance" with the Plan and that "[o]ne MSP for 69 patients is a very low patient to MSP ratio."[14]

97.     Arguments about the necessity of the services, of course, are not germane. The train long ago left the station on whether the additional staffing was necessary–when Defendants agreed to the Plan and failed to challenge its implementation and enforcement. The staffing is not in substantial compliance because the Plan promised five full-time MSPs and what is presently being provided are four full-time MSPs. This situation is also distinguished from the SERAPIS situation mentioned

---

[14]This argument fails to appreciate that staffing levels at the *Hadix* facilities must be much lower than staffing levels at other facilities because the MDOC elects (due to the presence of the dialysis unit and DWH) to send its sickest prisoners to the *Hadix* facilities. Indeed, the record shows that physician schedules for September 2006 were so packed that inmates were scheduled several weeks out to be seen regarding health concerns. (T.T., vol. III, at 581.)

above in that the hiring of an additional physician is not a complicated matter. It is a matter of simply placing an advertisement and offering sufficient compensation and benefits to attract capable candidates. Such hiring is routinely done by the MDOC in short-time frames, such as 30 days. (*See* Hladki *De Bene Esse* Dep. at 33-34.) The record does not show that the hiring was not done due to difficulty of finding a qualified applicant or confusion about a deadline. Rather, it shows that the hiring was not done because Defendants made a deliberate choice not to comply with the requirement. This is contemptuous and demands a finding of civil contempt and an appropriate civil contempt remedy.

98.    Defendants are held in civil contempt for failing to meet this staffing obligation. To remedy this contempt, the Court makes the following coercive sanctions: Defendants are fined $1 million dollars, the payment of which is suspended for a period of 120 days from entry of the contempt sanction. If within the 120 day period the additional staffing is engaged, then Defendants shall file a sworn true affidavit with the Court so testifying, which shall have the effect of exonerating the fine.[15] Additionally, to ensure prompt hiring, Defendants shall do the following: If an applicant is not engaged within the first month of advertisement, then starting on the first day of the second month, they shall increase the offered compensation and/or benefits by a factor of 30 percent in whatever manner they deem fit.[16] Every month thereafter that the position remains open, the offered compensation and/or benefits shall be increased by another factor of 30 percent *vis-a-vis* the first month amount until hiring is completed. If the position remains unfilled for more than 120 days, in addition to the million dollar

---

[15]Of course, a false certification would not exonerate the fine and, should a false certification be filed, then Plaintiffs may move both to enforce the payment of the contempt sanction and for additional sanctions against Defendants and/or the affiant.

[16]The Court does share Dr. Cohen's opinion that enhanced benefits is the best manner for maintaining a long-term workforce. This is because, in the past, some care providers have left CMS' employment due to absence of health insurance. However, in saying so, the Court leaves the issue of compensation and benefits solely to Defendants and CMS.

sanction, an additional sanction of $10,000 per day shall be assessed for every day the position remains unfilled. It is not hard to fill a physician position, you simply have to try.

### 6. Full Time Physician at the Dialysis Unit

99. This Court's Order of January 12, 2006 specifically amended Defendants' Plan to require that Defendants employ an additional internist or nephrologist such that the total hours of that person and Dr. Middlebrook in the dialysis unit would equal the hours of a full-time physician. (Order of Jan. 12, 2006 at ¶ 2(d).) No specific deadline for compliance was given. This requirement was deemed a separate requirement from the other JMF staffing because the physician hired would have to have fluency in nephrology and because additional services would have be dedicated solely to nephrology. Defendants have employed an internist who works 20-hours a week in the unit and Dr. Middlebrook or his partner work another eight to 12 hours per month in dialysis. (Pls.' Ex. 109C at 3.) This is far short of the 40-hour requirement. The average has been 24 hours per week. (Defs.' Resp., Dkt. No. 2219, 13.) There are also significant questions about whether the physicians even work as many hours as credited them. (T.T., vol. III, at 582-83.) These failures are significant because the dialysis unit serves approximately 75 patients with end-stage renal disease and other significant chronic diseases which complicate their treatment.[17] (Third Report of the Assoc. Monitor 53.) These patients need timely and effective service on a regular basis to simply stay alive until the next round of dialysis.

100. Defendants argue in their briefing that there has been substantial compliance with the Plan and Order, not because they have hired sufficient physician hours, but because the dialysis patients

---

[17]Defendants put the current number at 69, which may or may not be accurate. (*See* Defs.' Resp., Dkt. No. 2219, 13.)

are being sufficiently treated by the combination of available physician hours and the services of outside specialists to whom the patients are referred offsite.[18]   While the Court appreciates that Defendants are using an outside specialist to increase the percentage of patients with fistulas as opposed to shunts, given the unnecessary suffering and complications shunts cause, the Court has not asked them their opinion about the adequacy of their care.  The Court has asked them why they are not complying with the Plan and Order which were neither stayed or appealed.  Their answer of "substantial compliance" as to this staffing is a bare fig leaf hiding a gaping chasm.  This argument assumes that 16 hours of physician services per week is not an important commodity to dialysis patients requiring regular, life-sustaining care.  Like the issue of JMF staffing, this staffing requirement was sufficiently explained and required minimal effort to accomplish.  The clear failure to accomplish it, whether due to the assignment of the task to the unmotivated or the simple refusal of Defendants to comply, requires a finding of contempt.

101.   Defendants are held in civil contempt for failing to meet this staffing obligation.  To remedy this contempt, the Court makes the following coercive sanctions: Defendants are fined $1 million dollars, the payment of which is suspended for a period of 120 days from entry of the contempt sanction.[19]  If within the 120 day period the additional staffing is engaged, then Defendants shall file

_____

[18]There is, however, a significant problem as to offsite services.  Although offsite services are appropriate as to occasional services which are not emergent, as to emergency services and those which are regularly performed (care pertinent to bi-weekly dialysis), the lack of rapid and regular availability forecloses essential services from being performed and creates grave risks to patient health.

[19]Lest Defendants be confused, this is a separate million dollars from that expressed in the previous contempt finding.

a sworn true affidavit with the Court so testifying, which shall have the effect of exonerating the fine.[20]

Additionally, to ensure prompt hiring, Defendants shall do the following: If an applicant is not engaged within the first month of advertisement, then starting on the first day of the second month, they shall increase the offered compensation and/or benefits by a factor of 30 percent in whatever manner they deem fit. Every month thereafter that the position remains open, the offered compensation and/or benefits shall be increased by another factor of 30 percent *vis-a-vis* the first month amount until hiring is completed. If the position remains unfilled for more than 120 days, in addition to the million dollar sanction, an additional sanction of $10,000 per day shall be assessed for every day the position remains unfilled. Try, try, try again.

## C.  INJUNCTION ANALYSIS

### 1. Plan and Order Terms

102.    There seems to be no real disagreement between the parties that the Plan and Order adopting it should continue. As Defendants put it, "Defendants have been implementing its provisions . . . [and] are now beginning to see the benefits of many of those implemented Plan provisions . . . ." (Defs.' Tr. Br. 1.) Plaintiffs' position is that "[s]ince the approval of Defendants' Plan, many of its provisions have proven insufficiently rigorous to prevent continued denials of necessary medical care to the Plaintiff class." (Pls.' Tr. Br., Dkt. No. 2217, at 2.) "Plaintiffs urge the Court to require additional modification of the current Defendants' Plan." (*Id.*) Defendants, to the contrary, "oppose Plaintiffs' requests for further relief as unwarranted by the facts and as an overly intrusive

---

[20]Of course, a false certification would not exonerate the fine and, should a false certification be filed, then Plaintiffs may move both to enforce the payment of the contempt sanction and for additional sanctions against Defendants and/or the affiant.

interference with and encumbrance of the already difficult task of administrating health care services in the *Hadix* facilities." (Defs.' Tr. Br., Dkt. No. 2220, at 1.)

103.     Given the history of the Plan and implementation Order and the record evidence, including evidence of preventable death, illness and suffering which prompted them, the Court finds that (1) continuation of the Plan and Order provisions is necessary to prevent irreparable injury and violations of the Eighth Amendment as to class members–including, unnecessary and preventable death, illness and suffering–due to systemic causes; and (2) there is no legal remedy available to address the interests sought to be protected.   Furthermore, continuation of these provisions are consistent with the PLRA provisions.  The Plan was authored jointly by Defendants and others, and its implementation has been welcomed by Defendants as a means of improving care, and is not an overly intrusive action which would contradict the PLRA requirements.  In so approving it, the Court makes one initial modification of the Plan, which is supported by the testimony of Dr. Cohen at hearing.  (*See* T.T., vol. III, at 586.)  That is, the Court will require the final implementation of the SERAPIS as to lab orders and medications at DWH and as to the PharmaCorr pharmacy system to be completed by February 1, 2007.  Defendants have already promised in their briefing that SERAPIS will be completed by that date, so the practical effect of this Order is only to prevent against the kind of back-sliding which Dr. Cohen warned could have seriously adverse patient consequences.

### 2.  JMF Staffing, Other Staffing and Related Issues

104.     Due to delays in care, including the provision of medicines, surgery and other specialty care caused by the unavailability of JMF and dialysis unit physicians to promptly see patients, the Court

concludes (consistent with the relief ordered above) that: (1) the ordering of the additional JMF staffing and dialysis staffing discussed above is necessary to prevent irreparable injury and violations of the Eighth Amendment as to class members–including, unnecessary and preventable death, illness and suffering–due to systemic causes; and (2) there is no legal remedy available to address the interests sought to be protected.[21] The Court also finds that such remedy is proper under the above mentioned PLRA provisions because it is non-intrusive (a part of Defendants' original Plan as implemented) and the imposition of this requirement will reduce the burdens of this litigation upon Defendants by assisting in the prompt provision of services to class members.

105.    Further additional staffing has also been requested by Plaintiffs in light of the record evidence that persons employed within the system with responsibilities for staffing (*e.g.,* Debbie Roth) have expressed opinions that staffing is inadequate and complicates patient care, as well as other record evidence. The under-staffing has caused regular delays of patient appointments with the certain consequence that patients' care has been delayed and they have suffered unnecessarily in the interim. Such testimony, and the general condition of health care, make clear that staff shortages must be addressed to assure prompt delivery of care. For this reason, the Court will order a comprehensive staffing plan to be filed by Defendants, which shall include a statement of Defendants' plans regarding strategies for recruiting and retaining staff. Plaintiffs and the Associate Monitor are free to comment on the Plan in advance of hearing.

---

[21]Defendants had asked in their Trial Brief to further put off a decision on the dialysis unit staffing until after hearing of January 2007. The Court declines this invitation. Defendants have received more than adequate opportunities to present testimony. The request for further delay, if granted, would only serve to jeopardize the interests of dialysis patients.

106.    This Court finds that the injunctive order described in the preceding paragraph is (1) necessary to prevent irreparable injury and violations of the Eighth Amendment as to class members–including, unnecessary and preventable death, illness and suffering–due to systemic causes (particularly the delay in patient care caused by the nursing absences); and (2) there is no legal remedy available to address the interests sought to be protected. As such, the Court approves an injunctive order requiring the making of such a plan to be timely implemented by Defendants.  The Court likewise finds that such remedy is proper considering the terms of the PLRA in that the filing of such a plan will permit Defendants all necessary flexibility to address the constitutional violations at issue and will not be overly intrusive or otherwise prohibited by the PLRA.

107.    Plaintiffs has also requested that two additional MSP floaters be mandated to cover hours at JMF and RGC when regulars MSPs are unavailable.  This request appears moot.  JMF and RGC already have two floaters assigned.  (Mattai Dep. 37, 89.)  The Court assumes that Plaintiffs still have concerns about the reliability of those floaters given that nursing floaters (a separate subject) have not been reliably available.  The record on this issue is insufficient to support injunctive relief. Nevertheless, the Court does direct Defendants to brief, for consideration at the plan approval hearing, the issue of the availability of existing floaters to provide services during leave of regular staff.

108.    Plaintiffs has also requested that the Court enjoin Defendants to implement a scheduling committee to increase provider productivity.  This the Court assuredly will not do.  Provider productivity is principally a money issue and it is not one which negatively impacts Plaintiffs' care. That is, it is unimportant in terms of the delivery of necessary services whether Plaintiffs are adequately served by a few productive workers or many unproductive ones.  This is a resource

allocation issue which is properly within Defendants' administration and control.  Relief is denied on this issue because such issues are within the sole province of Defendants and are not properly the subject of intrusive federal action.  In saying so, the Court understands that efficiency is related to staffing itself.  However, remedies as to staffing, though more costly, are less intrusive and to be preferred under the PLRA because they do not involve the courts in staff supervision of correctional employees.

109.    Finally, Plaintiffs have requested that a plan be ordered to assure completion of CCC enrollment at RGC.  The competing evidence on this point is not persuasive.  The Court accepts the testimony of Ms. Hladki that CCC enrollment is proceeding according to plan and selected failures are being addressed with staff.  (*See* Hladki *De Bene Esse* Dep. 18.)  As such, the Court determines that an injunction on this subject should not issue because irreparable harm does not support it.

### 3. Specialty Care Issues

110.    Both the persuasive testimonies of Dr. Cohen and Dr. Walden demonstrate clearly and beyond peradventure that the specialty referral process is "profoundly deficient."  (T.T., vol. III, at 402, 589-96.)   Such care is routinely delayed beyond the time medically necessary.  Furthermore, the delays tend to topple one upon the other for patients with regular needs for specialty service (*e.g.,* cancer patients).  Such delays routinely cause unnecessary death, illness and extreme suffering.   In light of such record, it is clear that injunctive relief is necessary to prevent further irreparable harm to class members.

111.    Plaintiffs have requested that the Court order a 20-percent reduction in the specialty care delays as a starting point in addressing the problem.  Although it is clear that remedy is essential, this

exact formulation of the remedy is problematic for some important reasons. First of all, when the care providers are, for example, saying that a patient suffering a heart attack may be seen in 30 days, then no validity should attach to the service-times currently being assigned. Credible expert testimony also supports that Defendants' record-keeping and statistics are error-ridden and not to be relied upon as evidence of adequate care. (*See* Creekmore Report 1-4; T.T., vol. III, 536; Ferguson *De Bene Esse* Dep. 128-84; Pls.' Ex. 2A at 27.) It is possible that those figures can be made reliable in the future, but at present they cannot serve as a solid basis for corrective action. The other reason that a blanket reduction is not the wisest policy is that a bland 20-percent reduction does nothing to distinguish between the most urgent cases and those which are less than urgent.

112.    Plaintiffs have correctly determined, in the Court's judgment, that two root causes of specialty delay are: (1) provider unavailability; and (2) transport problems. To this list, one may add a third factor, namely that a persistent and daily effort is not made to reschedule dropped appointments within short-time frames. The Court believes that injunctive relief should be narrowly crafted to address these three issues. Therefore, the Court will at this juncture simply require the filing of a plan by Defendants which addresses these objectives by devoting real resources to the problems–additional transport officers, additional specialty providers and additional staff making daily efforts to reschedule dropped appointments quickly. This effort should, as explained above, concentrate the effort upon providing services to those most urgently in need of services.

113.    This Court finds that the injunctive order described in the preceding paragraph is (1) necessary to prevent irreparable injury and violations of the Eighth Amendment as to class members–including, unnecessary and preventable death, illness and suffering–due to systemic causes; and (2) there is no legal remedy available to address the interests sought to be protected. As

such, the Court approves an injunctive order requiring the making of such a plan to be timely implemented by Defendants.  The Court likewise finds that such remedy is proper considering the terms of the PLRA in that the filing of such a plan will permit Defendants all necessary flexibility to address the constitutional violations at issue and will not be overly intrusive or otherwise prohibited by the PLRA.

114.    Plaintiffs have also requested additional relief as to specialty care, in-patient clinics with endocrinologists and psychiatrists.  The record presently indicates that Defendants are working on these issues to make appointments and/or possibly schedule in-patient treatment when medically necessary.  Given this effort, the Court does not presently find that other injunctive relief is necessary as to these issues to prevent irreparable harm.  Due to the risk of hypoglycemia deaths, the Court will, however, closely monitor this issue in the future.

### 4.  Further SERAPIS Expansion and Transfer Assessment Forms

115.     Under the umbrella of SERAPIS, Plaintiffs have clustered two additional injunctive requests. Aside from the SERAPIS implementation which has been ordered above (concerning DWH lab and medication orders and PharmaCorr connectivity), the sole remaining issue is whether SERAPIS (an ambulatory record system) or a SERAPIS-compatible system must be expanded to include DWH and C-Unit in-patient care.  The record deems this to be essential to patient services, but provides little guidance as to the practical difficulties of doing so and the time frames necessary to achieve success. The Court certainly believes that expansion is essential for the provision of adequate patient care and must commence at a rapid pace.  However, at the same time, it is important to get this process right and to end with a product that works well with SERAPIS and has connectivity with Foote Hospital

and other regional systems. Because the record is insufficient to mandate hard deadlines on such issues, the Court finds that the present record does not support immediate injunctive relief since the terms of that relief and the practical difficulties of implementation cannot be determined on the present record.

116.    While the Court has declined this invitation for immediate injunctive relief, the Court nevertheless does expect that Defendants will continue their present efforts toward an in-patient electronic record which is compatible with SERAPIS and has connectivity with Foote Hospital and other regional systems. That objective should be reached in the short-term and not the long-term. In saying so, the Court further expects that Defendants will exercise all possible diligence and study to determine the best possible system to assist medical staff and patients. With the freedom and flexibility to choose their own path in this area, comes the responsibility that it be done correctly and as expeditiously as possible.

117.    Also mentioned under the same rubric is Plaintiffs' request that Defendants be ordered to include special accommodation lists (a form for disabled prisoners) as part of the standard patient overview within SERAPIS. Defendants represent that they are presently able to do so and will show at the forthcoming hearing in January that the system is reliable. For these reasons, the Court determines, at present, that injunctive relief is not necessary and would violate the terms of the PLRA.

### 5. Kite System Expansion and HUM Review

118.    Plaintiffs have also requested two items of relief relating to the operation of the kite system, which as noted above permits prisoners to make health care requests regarding systems, services,

advice and medicines. The first is expansion of the kite system to DWH. The kite system is not used as to in-patient care at DWH. The reason it is not used is that nursing staff is assigned to those places to provide in-patient care and while doing so, typically answer questions and respond to verbal requests on a routine basis. Furthermore, a prisoner who is dissatisfied with the level of response may file a grievance to address the issue. (Hladki *De Bene Esse* Dep. 52-55.) While the Court agrees with Plaintiffs' counsel that prisoners need timely response and help at DWH, the place this should start is by verbal communication. Adding another layer of impersonal communication, to a system already bogged down with it, is not likely to increase the level of care or serve the Plaintiff class' overall interests. The Court simply finds that the present record does not support such injunctive relief to so expand the kite system since such expansion would be inconsistent with the PLRA provisions and is not supported by a sufficient showing of irreparable harm.

119. Plaintiffs' second related request is that the HUM (Health Unit Manager) be made to regularly review the help line, kite logs and Urgent/Emergent logs. The Court understands that these logs are already being reviewed by other personnel. Furthermore, the objective sought by Plaintiffs (protection of critical cases) is currently being addressed by Defendants' development of a case management system for critical cases. The entry of the injunction would be inconsistent with the PLRA provisions and is not supported by a sufficient showing of irreparable harm.

### 6. Reporting of Unexpected Deaths and Significant System Failures

120. Both Plaintiffs and the Associate Monitor have requested that Defendants regularly report unexpected deaths and significant system failures. This request is supported by the fact that recent catastrophic events went unreported until discovered by the Associate Monitor during chance visits.

Interestingly, Defendants state that they "do not have any problem with taking up . . . the idea of reporting to the Associate Monitor on a regular basis certain events." (Defs.' Tr. Br. 14.)  At this juncture, the Court simply finds that a separate reporting requirement is unnecessary because the relief described below will require sufficient reporting to address this issue.

### 7.  Disability Remedies

121.    Plaintiffs have requested disability remedies in eight separate categories.  Some of the relief sought is incredibly far-reaching, including the establishment of a 150-bed air conditioned assisted living center.[22]  The record, including Plaintiffs' Exhibits 2A, 2B and 2C and the deposition testimony of Debbie Roth, certainly support that there are large unmet needs in the system, which affect both *Hadix* prisoners and others.

122.    At the same time, however, the record is unclear as to systemic causes and the extent of any relief which should be ordered to address the short-comings of the present system.  The Court also believes that the relief described later in this decision will provide sufficient relief to *Hadix* prisoners on disability issues provided that Defendants make available sufficient patient beds and living quarters and arrangements for the uncertain number of inmates needing assisted living.  For these reasons and because of the PLRA restrictions as to overly intrusive remedies, the Court finds that

---

[22]The record on that item is a cloudy one.  On the one hand, Defendants' Director of Nursing Debbie Roth testified that *Hadix* prisoners needed as many as one hundred assisted living beds. (Roth Dep. 76.)  On the other hand, Dr. Mattai testified that the number was a much smaller fraction of that total number. (*See* Mattai *De Bene Esse* Dep. 45 & 48.)  Defendants also represent that the MDOC is presently exploring plans for a large assisted living center in the Upper Peninsula which would meet state-wide needs, including the *Hadix* facilities. (Defs.' Tr. Br. 15.)

Plaintiffs' various requests for relief as to disabilities should be presently denied with the exception of the remedies described in the following paragraphs.

### 8. Office of the Independent Monitor

123.    Both Plaintiffs and the Medical Monitor have requested that the Court order the establishment of an Independent Monitor's Office with special powers to take corrective actions regarding patient care. The specific draft proposal for the office asks for the creation of office facilities with sufficient staff and administrative support to accomplish the following goals: (1) monitor the sanitation of the dialysis unit and DLW; (2) accomplish a one-time review of pain relief practices; (3) monitor the adequacy of physician and nursing staffing; (4) monitor the implementation of SERAPIS; (5) monitor the treatment of renal patients; (6) monitor the pharmacy system and delivery of prescription drugs to *Hadix* patients; (7) monitor the promptness of specialty care consultations; (8) receive and investigate all manner of prisoner complaints about their medical care; and (9) receive appropriate and requested information from the parties, including medical records, so that such information may be shared and evaluated by the Independent Medical Monitor. (*See* Pls.' Mot. for Further Relief 5-6 & Attach. 1 at item 9.)

124.    Why do such a thing? The answer is many faceted. In the private market place, consumers are protected by competitive pressures and choice. That is, if your doctor does not serve you adequately, you get a second opinion. There is little opportunity for second opinions in prison medical service. You get one opinion, that of the prison or CMS physician. If you do not like it, you kite or grieve it, but you are too often told to pound sand. While it is true that federal courts are sometimes an effective check on this abuse, the sad fact is that the circumstances which create

effective checks on prison conditions usually happen only after the prisoner has been either killed or severely injured.  This is because the private market place of attorneys is not interested in taking other cases because they do not generate sufficient income.

125.    So what about the prisoner whose treatment (he feels) is likely to jeopardize his health and he wants injunctive relief?  That prisoner, after going through the grievance process, files a federal action where typically nothing happens in a hurry.  He may move for immediate injunctive relief, but he is lacking the one thing he needs to obtain it–a supporting medical opinion that he will be seriously harmed if additional or different care is not provided.  Such cases, almost universally, run into the Sixth Circuit Court of Appeals' precedent in *Westlake v. Lucas,* 537 F.2d 857, 860 n.5 (6th Cir. 1976), and similar cases, which stand for the proposition that federal courts will not intervene merely due to differences of opinion as to treatment decisions.   *Westlake* mows down those cases like a scythe cuts wheat.

126.    But what about the present Plaintiffs' counsel and medical monitor?  The sad fact is that neither presently have the resources to protect prisoners' interests in obtaining timely treatment of serious medical conditions.  Plaintiffs' counsel and the medical monitor typically will bring matters to the Court's attention only after serious injury and/or death has resulted from medical indifference and systemic failures.  Notwithstanding the grave systemic failures of the current medical system, the prisoners within it presently lack the means to protect their own health and to prevent medical indifference from killing and injuring them.  This situation does not whimper for a remedy.  It cries aloud in a voice acknowledged by all but the deaf and defiant.

127.     Starting today, however, prisoners shall have a voice in their medical care at *Hadix* facilities. The Court finds that the present system is systematically defective, dangerous and readily results in preventable death, illness and suffering due to untreated serious medical conditions.  The Court further finds that (1) the establishment of an Office of the Independent Monitor capable of receiving and acting on prisoner complaints, and otherwise improving medical care at the *Hadix* facilities, is necessary to prevent irreparable injury and violations of the Eighth Amendment as to class members; and (2) there is no legal remedy available to address the interests sought to be protected. Furthermore, the establishment of the Office shall be by plan of Defendants, which shall permit them sufficient freedom that the resulting Office is not overly intrusive or otherwise in violation of the PRLA provisions.  In particular, intervention will be limited to those causes in which at least two physicians of the Office concur that some form of treatment or services is not being timely provided, or where relief from custodial constraints (*e.g*, placement in a medical setting instead of segregation), is necessary to prevent death, illness or suffering due to an untreated serious medical condition.

128.     Therefore, it is now necessary to establish basic parameters and ground rules for such Office. Beginning with facilities, Defendants shall supply the Office and its staff, including the Associate Monitor, office space on the grounds of the *Hadix* facilities.  The Office staff, including the Associate Monitor, shall have full-card access to all of the *Hadix* facilities, and shall have the powers to interview prisoners, review medical records, receive and act upon prisoner complaints and petitions, inspect prison conditions throughout the facilities, including those in segregation. Defendants shall accommodate and assist the Office and its staff in completing all assigned duties. Defendants shall urgently report unexpected deaths and significant system failures to the Office.

129.    Duties assigned to the Monitor shall include all of the duties mentioned in the draft proposal. They shall also include the duties to: (1) study staffing, access to and repair of equipment, and facility issues, including hospital and long-term care bed availability, at any time that it appears that any of these factors are preventing the treatment of serious medical conditions or causing harm or injury to prisoners with disabilities; (2) take corrective action as to failures of care and non-treatment; (3) intervene with custodial officers and medical officers whose treatment of prisoners violate the Eighth Amendment; (4) revise the statistics of Defendants so that the statistics fairly portray the matters being studied; (5) set new or different treatment dates regarding specialty care and medical case management, and to review and revise Defendants' Specialty Care Reports so that those Reports represent treatment realities; (6) mandate remedial care in secure locations outside the *Hadix* facilities (*e.g.*, a secure cancer treatment center) when necessary for corrective action; and (7) mandate prompt and secure transfer of prisoners to medical care both within and outside of the *Hadix* facilities.

130.    These duties require significant staffing.  Therefore, Defendants shall employ for the Associate Monitor a full-staff of medically qualified applicants.  The applicants will be finally selected by the Associate Monitor and serve at the pleasure of the Associate Monitor.  The applicants must include the following: (1) a full-time physician; (2) a full-time nurse investigator; (3) a full-time administrative support staff member; and (4) such consultants as are necessary to complete required studies.  The Office shall be given an annual budget sufficient to permit the employment of consultants and to otherwise function efficiently and perform the assigned duties.

131.    The Office will make all decisions regarding patient care by consensus determinations of the Associate Monitor and the Office physician.  Any case as to which they fail to reach consensus will

59

not result in directions to Defendants to provide different or additional medical care. The decisions of the Office will be recorded in meeting minutes which shall be kept by the administrative support staff member. Those meetings may be conducted with one or more participants expressing decisions over the telephone, or electronically. The supporting records for all treatment decisions shall likewise be regularly kept as will all prisoner requests. Any prisoner filing a petition for medical services with the office shall not be transferred during the term that the petition is under consideration, nor during the term of any ordered treatment, except with the express and voluntary agreement of the prisoner. Defendants shall incorporate, in their forthcoming plan, procedures to ensure that frivolous petitions are promptly disposed of, and do not frustrate legitimate prisoner transfers. The plan shall also include protocols for insuring that custodial and medical officers, and independent contractors, follow the directions of the Office and that the directions of the Office do not interfere with safe and secure transportation and housing of prisoners.

132.    This plan, as well as the plans discussed in the preceding paragraphs, shall be filed within 90 days of the entry of the Final Injunction.[23]  Hearing shall follow on the plans soon thereafter.

## CONCLUSION

133.    A Permanent Injunction shall enter granting in part and denying in part Plaintiffs' Motion for Order to Show Cause and Motion for Further Relief, which order shall require remedy of Defendants' contemptuous conduct and provide injunctive relief as explained in the Court's Findings of Fact and Conclusions of Law.

---

[23]Plaintiffs also requested heat-related remedies, but have post-poned presentation of evidence pending later hearing. As such, those requests are denied without prejudice and may be renewed by later hearing.

A new day has dawned for the *Hadix* facilities and prisoner medical care.  Let us greet it with

the joy that a new day demands.  Those who will curse it, and other progress, shall only resign them

selves to pain, hardship and eventual irrelevancy.

DATED in Kalamazoo, MI:
    December 7, 2006

    /s/ Richard Alan Enslen
RICHARD ALAN ENSLEN
SENIOR UNITED STATES DISTRICT JUDGE

61