UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

EVERETT HADIX, *et al.*,

    Plaintiffs,

Case No. 4:92-CV-110

v.

Hon. Richard Alan Enslen

PATRICIA L. CARUSO, *et al.*,

**OPINION**

    Defendants.

_____/

    As the record reflects, Defendants announced their planned closure of the Southern Michigan Correction Facility ("JMF") and Block 7 of the Reception and Guidance Center ("RGC") on February 20, 2007. The next day the Court heard Plaintiffs' oral motion for temporary restraining order during a court hearing planned for a separate purpose. Following that, the Court issued a Preliminary Injunction which halted non-routine prisoner transfers from JMF while the parties completed further briefing on the issue of whether additional or different injunctive relief was necessary to prevent irreparable harm to prisoners subject to transfer from JMF. That briefing has been completed and causes this Opinion and Amended Preliminary Injunction to issue.[1]

**I. BACKGROUND**

    The basic background for this controversy is well-known to the parties, but bears repeating for those new to this controversy. The *Hadix* facilities, of which JMF and RGC are part, have long been subject to a Consent Decree mandating remedy for violations of prisoner-patients' rights to adequate health care for serious medical illness, including chronic diseases. As part of this Decree,

---

[1]Further hearing has not been requested by Defendants and is not necessary given the previous hearing and the briefing received.

the Duane Waters Hospital ("DWH"), now a health care center, was constructed as a means for delivering necessary health care services to prisoners with serious medical needs. The construction of the facility and its use, in connection with the RGC, to identify prisoners needing medical care and channel them to surrounding facilities where medical care could be delivered on-site, together with regular medical clinics for the chronically-ill, was a necessary response to the United States Supreme Court's decision in *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), which first recognized an Eighth Amendment right to medical care for prisoners with serious medical needs. Prior to *Estelle*, medical care by jails and prisons was not a right and was subject to capricious denials by custody staff. *See* Mark Taylor, *Prisoners of the System*, Modern Healthcare (Special Report) 25 (Feb. 19, 2007). Ever since *Estelle*, custody systems, including those in Michigan, have struggled to comply with the minimal medical care needs of this complex patient population which, in large measure, did not receive regular medical services before incarceration. *Id.*

As described above, since the construction of DWH, the *Hadix* facilities surrounding JMF have housed an increased percentage of persons with serious medical needs. This is in part a consequence of the aging of the prison population in general, but also a consequence of selection of sick inmates for housing at or near DWH to assure adequacy of care. Defendants have no other state correctional medical hospital for prisoners outside of DWH and the *Hadix* facilities. Care outside of the *Hadix* facilities is greatly limited by both the medical staffing and the number of transport officers available at those facilities. When inmates are identified either at RGC or another facility as needing a higher level of medical treatment, then they have in the past been routinely transferred to JMF to improve their access to and regularity of medical care. According to the Medical Monitor, Dr. Robert L. Cohen, M.D., the percentage of prisoners enrolled in Chronic Care Clinics at JMF

(clinics to treat chronic illness such as diabetes or heart failure) is "at least half" of the prisoners at JMF. (Cohen Memo., Pls.' Attach. 3, at 1.) JMF has also, in the recent past, housed and treated a unit of 65-70 dialysis patients who need access to dialysis three times a week, in addition to other medical care for serious illness. (*Id.*) Additionally, JMF has been the site of a recently constructed transitional care unit which provides an intermediate level of medical service to JMF prisoners discharged from Foote Hospital or other hospitals, but still in need of 24-hour on-site medical assistance before their return to JMF. DWH also provides acute care for JMF patients requiring 24-hour nursing and physician care (but not acute hospitalization).

For examples, diabetics who have been experiencing regular bouts of hypoglycemia (low blood sugar), which is not an irregular cause of death for diabetic patients, have received care at DWH until stabilized. These capacities were created under Court supervision because of the high clinical acuity of the JMF patient population. The same group of diabetic patients, through a pilot project, has had access to the patients' own glucometers and testing supplies which have assisted in the prevention of unnecessary hyperglycemia and hypoglycemia in that prisoner population. Taking away such equipment and supplies in the context of a medical transfer would invite gross and avoidable complications to those patients' medical care.

While the history of the *Hadix* facilities has not been without some success and some improvements of medical care for affected prisoners, there has also been a continued history of constitutional violations of the Eighth Amendment, which in some cases have been egregious. This last fall, the Court heard evidence regarding this subject and in December 2006 issued Findings of Fact and Conclusions of Law as well as a Permanent Injunction to remedy Eighth Amendment violations. The Permanent Injunction included as part of its formula of remedies the creation of an

on-site Office of Independent Medical Monitor ("OIMM") to assist prisoners with chronic and untreated serious medical illness to obtain prompt treatment of those conditions.

This work has coincided with recent disputes in the state government about the taxing and expenditure of state resources. This dispute has crystallized during the current budget year and, if the public announcements are to be believed, now requires prompt and drastic cuts in public spending to achieve the requirement of a balanced state budget. Part of the Governor's current cost-cutting agenda is to reduce the number of Michigan prisoners during the current budget year, which plan includes the planned closure of JMF. The reduction of prisoners is welcomed by Plaintiffs, both because it favors Plaintiffs' interests in release from custody, but also because it is likely to reduce service delivery failures of the health care system by reducing the number of elderly and ill prisoners who are served by such system. (Pls.' Br. 1.)

With that said, Plaintiffs do not support a wholesale transfer (as opposed to release on parole or due to clemency) of prisoners at JMF to other facilities without any sufficient plan to provide medical services at those facilities. (*Id.* at 1-2.) For this reason, Plaintiffs have moved to modify the previously entered Preliminary Injunction to include 12 terms which, if implemented, would have the effect of stalling prisoner transfers of persons with chronic and serious illness pending further planning and remedial action by Defendants to prevent the transfers from resulting in delay and denial of care for serious medical conditions.

One of the ongoing terms of the Consent Decree which has not been terminated requires: "Prior to transfer to another facility or other substantial travel, each inmate shall continue to be evaluated by qualified health care personnel to assess suitability for travel or other institutional reassignment." (Consent Decree 8, ¶ II.A.3.b.) Defendants' past practice to accomplish such

transfers has been the completion of a complete transfer assessment screening of prisoners. In 2002, the Court found that error and omissions in the transfer process perpetuate harm to prisoners by discontinuing medical care. (2002 Findings ¶ 925.) Since then, Defendants were given the opportunity to present evidence that they have cured defects in the transfer assessment process, but failed to do so during the last set of evidentiary hearings. Indeed, prior to those hearings, Plaintiffs' expert, Elizabeth J. Ferguson, studied some 40 prisoner transfer cases to comment on the effectiveness of the assessment process. What she found was that 19 of 40 cases surveyed involved failures to access medical and accommodation[2] issues which resulted in unnecessary suffering and treatment delays. (Ferguson Report, Dkt. No. 2054, Attach. at 20.) Of those cases, the majority did not received necessary follow-up care following transfer. (*Id.*) Ms. Ferguson also determined that Defendants have ceased auditing the transfer process. (*Id.* at 23.) As reflected in her Report, this is a significant failure because:

> Errors and omissions in the transfer clearance process at the *sending institution* add to deficiencies in continuity of care . . . . [including] omission of specialty consultation visits, medications, dietary referrals or accommodations . . . . Such review and documented omissions at the sending institution perpetuate harm and discomfort to prisoners because of breaks in health care delivery.

(*Id.* at 19, emphasis in original.)

It is significant that these documented problems have occurred in the context of small prisoner transfers. A mass prisoner transfer of severely ill prisoners with chronic medical conditions poses grave facilities/resource issues which tend to prevent the adequate delivery of care. This is especially true when the movement of such prisoners is away from the primary treatment source

---

[2]Accommodations include such medically necessary items as wheelchairs, canes, glasses, prosthetic limbs, specialty footwear, *etc.*

(DWH) for those prisoners. Dr. Cohen described this problem superbly in his recent February 27, 2007 communication with the parties regarding the necessity of a prisoner transfer protocol and use of a "transfer grid" which analyzes the ability of the receiving institution to provide required medical services for serious medical needs:

> Based upon my experience of the current deficiencies in access to specialty care and chronic care at the *Hadix* facilities, institutions which have been the focus of MDOC's efforts to bring medical care in the state up to minimal constitutional standards, at this point I have no reason to believe that the other facilities in the state will be able to handle the clinical responsibilities that the transfer "grid" suggests.
>
> ***
>
> How could we access the adequacy of the receiving institutions to absorb the *Hadix* prisoners? We could look at the medical staffing: RN, LPN, MSP (MD and mid-level) at each of those facilities. We could determine the number of patients at each of those facilities currently receiving chronic care, and estimate those that should be in chronic care but are not. We could determine the number of patients with disabilities requiring special programs, housing, wheel-chairs, *etc.* in these facilities and determine the number of additional beds available for this group of disabled prisoners. We could then compare each of these facilities, according to these criteria, with what is known about the capacity, adequacy and inadequacy of care at the *Hadix* facilities.
>
> The above describes the necessary planning exercise that must be done before the proposed mass transfer. There needs to be a medical transfer plan, not just a medical transfer protocol. For dialysis, there needs to be a detailed plan, including the chronic care of these patients, as well as a plan for referral for transplantation. For oncology, there needs to be a plan. For specialty care, there also has to be a plan, specific and detailed, including the description of any necessary enhanced transportation as well as specific description of specialty care capacity actually available at the receiving sites. If a *non-Hadix* facility is less able to get its patients to specialty care in a reasonable time frame than the *Hadix* facilities, transferring prisoners to these facilities will have predictable adverse health effects.

(Feb. 27, 2007 Memo., Attach. 3 to Pls.' Br., 2-3.)

Dr. Cohen's comments bear on not only the availability of medical service providers at the receiving facilities, but the availability of transport officers at the receiving facilities. This could be a problem with any large transfer of this chronically ill prisoner population given that the

population's needs dictate a large number of specialty care appointments. The February 16, 2007 Monthly Report Regarding Specialty Care shows both a large number of patient appointments for specialty care and a large percentage of appointments not occurring within the medically necessary time frame set by the medical care providers. For January 2007, at all *Hadix* facilities, there were 327 scheduled appointments for specialty care; some 260 patients were seen by specialty care providers. (Feb. 16, 2007 Monthly Report at Jackson Complex summary page.) The same month 129 patients (one-half of those seen) were seen past the medically necessary time frames. (*Id.*) Another 98 referrals were listed as pending past the dates medically necessary for the appointments. (*Id.*) These numbers reflect delay in medical treatment and omit instances where the delay is due to a patient falling ill, refusing treatment, or being unavailable either due to a writ issuing or the prisoner dying. (*Id.*)

Such specialty care referrals are not negligible matters. They relate to care for cancer, cancer diagnosis, HIV treatment, cardiology, ophthalmology and and other serious medical conditions as to which a failure to treat timely will contribute toward unnecessary death, disease and suffering. The more detailed portion of the Report explained some delays for legitimate reasons (such as a patient being hospitalized for another condition or being unavailable for transport due to a temporary quarantine to prevent the spreading of disease), but other missed appointments were either wholly unexplained or the explanation reflected a lack of resources to provide the services in a timely manner (*e.g.,* "no detail" pending consultations, appointment cancelled by care provider without explanation, or first appointment available with care provider).

Similarly, the December 2006 Monthly Report Regarding Specialty Care reflects the same trends for the affected prisoners. Two hundred and three specialty care appointments were

7

conducted during November 2006. (Dec. 2006 Monthly Report at Jackson Complex summary pages.) The percentage of those patients seen within the medically assigned time frames is not recorded on the summary pages, but it is clear from reviewing the report that a large percentage of the appointments are after the dates deemed medically necessary and some of the appointments were significantly after those dates. Ninety-one patent appointments were listed at "past pending." (*Id.*)

Such numbers explain the depth and breadth of the treatment needs of the affected population. A large percentage of the prisoners being transferred have chronic and serious medical needs which require prompt treatment. Another large percentage of them require specialty care. A plan to transfer such inmates without provision for treatment is a sure recipe for violation of the Eighth Amendment prohibition of cruel and unusual punishment.

Other appropriate areas of concern regarding this prison population relate to the history of past violations observed at the *Hadix* facilities. One past example was the closure of the Parke Davis facility in March 1994. Then Defendants moved a small number of prisoners, 19, *en masse*. A subsequent report about the transfer prepared by Dr. Craig Hutchinson, M.D. and Elizabeth Ferguson showed that many of the transferred prisoners received inadequate care as a consequence of the transfers. (*See* Op. of Oct. 25, 1994 at 3-6.) The number of prisoners to be transferred in connection with the planned closure of JMF and the extent of their medical illness is a far graver situation than was the Parke Davis closure.

Dr. Cohen's Report of February 12, 2007 also contains several important conclusions relevant to the operation of the *Hadix* facilities. Dr. Cohen has observed that the present system for reordering medications for prisoners receiving ambulatory care is essentially broken. This is because the contract which was implemented to replace on-site pharmacists, involving  PharmaCorr

8

Corporation, a subsidiary of Correctional Medical Services, Inc. ("CMS"), does not involve PharmaCorr renewing medications for ambulatory care. According to Dr. Cohen, there have been no efforts by PharmaCorr staff to address the problems of continuity of medications for ambulatory patients. In addition, CMS physicians have not taken responsibility for renewing necessary chronic medications which have expired. Thus, there is no functioning system to assure reordering chronic medications for patients receiving critically necessary chronic medications (*e.g.,* anti-rejection drugs for a patient with a kidney transplant, *etc.*). Requests for medication renewals for these patients have been piling up on physician desks without action. (Feb. 12, 2007 Report 1.)

Two related problems are lack of supervision because of CMS' failure to supervise medical doctors and a lack of professionalism by the unsupervised staff. For example, Dr. Cohen cites instances of CMS physicians routinely cancelling appointments, without reason, at the time of those appointments. (*Id.* at 2.) These problems are reminiscent of the pharmacy problems experienced in April 2006. That is, when it was announced that the *Hadix* on-site pharmacy was closing, a pharmacist chose to take leave and there was no provision for the dispensing of medications until emergency measures were taken at Dr. Cohen's request. To put the matter bluntly, when Defendants close a facility, motivation by staff tends to dwindle and unless staff is both dedicated to the tasks performed and highly professional, required tasks will not be performed. That scenario appears to be repeating in terms of the present operations of physician staff at JMF.[3]

Another aspect of the timing of this facility closure announcement is interesting from the standpoint of the relief granted in the Permanent Injunction of December 2006. That Injunction

---

[3]Dr. Cohen also notes a lack of nursing leadership amidst changes to the facility operations as another source of grave concern. (Feb. 12, 2007 Report 2.)

required the filing of a plan for establishment of the OIMM with the duties to assess prisoner complaints regarding denial of medical care and the power to direct Defendants to provide medical supplies and treatment to prisoners upon consensus determination of the Medical Monitor and his physician staff member. It was a further provision of the Injunction that prisoners filing complaints with the OIMM not be transferred away from the Court's jurisdiction during the pendency of the complaint and any ordered treatment. This was a deliberate requirement because the complaint procedure itself was necessary to provide timely prisoner access to time-sensitive needs for medicine and treatment. Thus, the Injunction fashioned respected the Eighth Amendment rights of prisoners, but also the First Amendment rights of prisoners to petition both the courts and prison officials for effective remedies for constitutional deprivations. *See Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*). Any mass prisoner transfer before the OIMM complaint procedures are finalized jeopardizes the effectiveness of the remedy previously ordered.

     Defendants are aware of the present record, but argue against the modification of the Preliminary Injunction on several fronts. Defendants point to paragraph 2 of the Consent Decree which defines the class of prisoners as "all prisoners who are now or will be confined within said institution . . . ." (Consent Decree ¶ 2.) The reference to "said institution" was a reference to the State Prison of Southern Michigan Central Complex. (*Id.*) Defendants reason that because the class definition is so limited, this suit may not include limitations on transfers because those limitations affect only the medical care delivered at prisons outside the *Hadix* facilities. This argument is mistaken for several reasons. One, as explained above, the Court has recently found that there are pervasive Eighth Amendment denials of health care within the *Hadix* facilities which must be remedied by the OIMM overseeing the delivery of care and preventing transfer while the overseeing

of care occurs. This is not an expansion of the Court's jurisdiction, but rather is the essential and necessary means to ensure that effective Eighth Amendment remedies are afforded to the affected class members.

This same rationale applies to restrictions sought by Plaintiffs on the transfer of prisoners currently using glucometers and inhalers. The non-provision of such staples to prisoners in the past has caused several prisoner deaths within the *Hadix* facilities. The Court has previously found that the provision of such medical staples to prisoners is necessary to prevent regular hypoglycemia and hyperglycemia, and the expected complications of both, including death. (Dec. 2006 Findings of Fact & Conclusions of Law ¶ 16.) That finding was an express finding that Defendants' previous methods of addressing diabetic control for those patients (try limited testing at nursing stations and hope for the best) did not meet community standards and so violated the Eighth Amendment. The limitation upon transfer is not meant to exert control over other facilities, but is rather intended to insure that constitutional remedies are not frustrated by transfers during a course of corrective treatment for past medical/Eighth Amendment violations at the *Hadix* facilities.

## II. PRELIMINARY INJUNCTION STANDARDS

This Motion is governed by the standards for relief under both Federal Rule of Civil Procedure 65(a) and 18 U.S.C. § 3626(a). Under Rule 65(a), the Court must examine four factors: (1) whether there is a strong likelihood of success on the merits; (2) whether there is proof of irreparable harm to the moving party without the injunction; (3) whether substantial harm to others will be caused by the injunction; and (4) whether the public's interest is favored by the issuance of the injunction. *Jones v. City of Monroe*, 341 F.3d 474, 476 (6th Cir. 2003); *Nightclubs, Inc. v. City of Paducah,* 202 F.3d 884, 888 (6th Cir. 2000); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th

Cir. 1992). This evaluation focuses on all four factors--rather than any particular factor. *In re De Lorean Motor Co.*, 755 F.2d 1223, 1228-30 (6th Cir. 1985).

### III.  PRISON LITIGATION REFORM ACT ("PLRA") STANDARDS

Under 18 U.S.C. § 3626(a)(2), a preliminary injunction may not issue unless it is:

> . . . narrowly drawn, extend[s] no further than necessary to correct the harm . . ., and [is] the least intrusive means to correct that harm. The Court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity . . . .

18 U.S.C. § 3626(a)(2). These PLRA standards are consistent with traditional norms of non-interference with the state regulation of prisons. However, such norms must, as the statute recognizes, give way to constitutional standards to prevent ongoing Eighth Amendment violations.

### IV.  EIGHTH AMENDMENT STANDARDS

"Deliberate indifference to serious medical needs" violates the Eighth Amendment. *Estelle*, 429 U.S. at 104; *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Eighth Amendment standard has both objective and subjective components. *Id.* In order for liability to attach, a state actor must both know of and disregard an excessive risk to prisoner health or safety. *Farmer*, 511 U.S. at 837. However, in prison conditions cases, the subjective element is routinely proven by the history of past violations at the facility and the apparentness of the current and ongoing problems. As the Sixth Circuit has instructed:

> In this case, we are concerned with future conduct to correct prison conditions. If these conditions are found to be objectively unconstitutional, then that finding would also satisfy the subjective prong because the same information that would lead to the court's conclusion was available to the prison officials.

*Hadix v. Johnson*, 367 F.3d 513, 526 (6th Cir. 2004). *See also Helling v. McKinney*, 509 U.S. 25, 33-34 (1993) (citing cases).

The purpose of these requirements in a modern system of penal justice is both obvious and essential. A prisoner serving a term of confinement is required by law to serve such term in humane conditions of confinement. The Eighth Amendment forbids the States from imposing either a *de facto* death penalty or torture by non-delivery of essential medical services for serious medical needs.

## V. LEGAL ANALYSIS

### A. Likelihood of Success

The above factual scenario equates with a likelihood of success of approximately 110 percent. It is one thing to dismantle a constitutionally-required system of medical care with a detailed plan for the provision of care at other facilities. It is quite another to do so without any plan for the provision of care for a large number of chronically ill prisoners with serious medical needs. Plaintiffs' own assessment of the situation is an accurate one–it would take a miracle to place a mass prisoner transfer of seriously ill prisoners on top of a collapsing medical system and not expect disastrous consequences. While Divine rescue remains available to religious adherents and others, such has never been a sufficient or diligent plan for fulfilling the objectives of civil government. It can reliably be predicted that a certain segment of the prisoner population to be transferred, due to their ongoing need for medical care, the provision of which has not been planned, will perish upon transport, though only after suffering unnecessarily due to the non-provision of essential medical services (*e.g.,* diabetics not provided insulin or glucometers, cancer patients not provided radiology, high blood pressure patients and cardiac patients not provided medications, surgery or follow-up care, *etc.*) The Eighth Amendment and the PLRA both require that the transfer of such a prisoner population not occur until a plan is fixed which will prevent medical injury upon the transfer of such

13

patients. The contours of the Eighth Amendment must depend upon more than vain hope and patent dereliction of duty.

Defendants have argued, as noted above, that transfer restrictions should not be allowed because the Consent Decree is limited to prisoner treatment at *Hadix* and because such restrictions violate the import of such cases as *Turner v. Safley*, 482 U.S. 78, 79 (1987) and *Meachum v. Fano*, 427 U.S. 215 (1976). As noted above, the class definition is not violated by remedial efforts for class members which restrict their transfer until corrective care is delivered or transfer is allowed on the remedial condition that corrective care is delivered at another institution. To say otherwise would be to strip the federal courts of their traditional powers in assuring constitutional compliance, including compliance under the Eighth Amendment.

Further, neither *Turner* nor *Meachum* dealt with any situation remotely like this one (a failing prison medical system transferring prisoners away from a source of treatment and federal court jurisdiction). *Turner* does stand for the proposition that federal courts are ill-equipped to deal with complex matters of prison administration. The Court agrees with that premise, though it is quite beside the point. *Turner* dealt with the question of what standard of scrutiny should apply to prison regulations affecting the exercise of a prisoner's constitutional rights–a question not at issue here. *Meachum* dealt with prison transfers of prisoners to a higher security level, another question which is not *apropos*. While both of those cases, and others, counsel deference to the administrative decisions of prison officials, they do not counsel blanket acceptance of plans that are likely to cause wholesale Eighth Amendment violations both at the transferring and receiving institutions. Restrictions on inmate transfer which are intended to only effectuate Eighth Amendment remedies,

14

and to prevent further Eighth Amendment violations in the process, are not prohibited by such case law, nor by any other rational reflection upon the purposes and powers of an effective judiciary.

### B. Irreparable Harm

Loss of life and unnecessary exposure to disease and illness are the likely consequences of transfer without medical provision and protection. These consequences constitute irreparable harm under the Eighth Amendment case law.

### C. Harm to Others

The Court understands that Defendants intend to save the State facility/personnel/staffing costs by closing a prison facility and that these financial savings are impossible without closing some Michigan prison. This is understandable and a laudable goal. Nevertheless, Defendants' interests in financial savings does not equate with the interests of inmates in serving their sentences within humane conditions of confinement. The harm to Defendants is not irreparable as compared to the irreparable harms posed to the affected prisoners. Further, the cost savings sought by Defendants remain possible should Defendants either design a system for the humane transfer of prisoners to other facilities capable of serving prisoners' medical needs, close other prisons which do not house seriously ill inmates, transfer JMF prisoners to other *Hadix* facilities which will not be closed, or parole or grant clemency to the affected prisoners.

### D. Interests of the Public

The public's interest favors respect for the public policies announced in the Constitution, including the Eighth Amendment. Humane conditions of confinement are part of that document, such that the public's interest strongly favors the injunction sought.

As such, the Court determines that the balance of all of the factors sought strongly favors the preliminary injunction sought by Plaintiffs. The terms of the Preliminary Injunction to be granted are explained below.

### E.  PLRA Compliance

The Court is mindful of both the PLRA limitations and the constitutional duties created by both *Estelle* and *Farmer*. In light of the history of constitutional violations at the *Hadix* facilities and the dire need for injunctive relief, the Court further finds that the preliminary injunction terms described below are in compliance with the terms of the PLRA, described above, which limit injunctive relief against state prison officials.

### F.  Terms of Preliminary Injunctive Relief

1. Defendants shall timely file a transfer plan. As noted in Dr. Cohen's February 27, 2007 Memorandum, any sufficient plan to transfer prisoners currently receiving chronic medical care must assess the capacity of the receiving institution to deliver sufficient care to both the transferred prisoners and the existing population of the receiving institution. This plan must provide a specific and detailed statement as to how chronic care patients will receive continued and regular chronic care appointments, specialty care, and hospital care at the receiving institution. The plan must specify the staffing available at the receiving institution and assess the current pre-transfer work load upon available staffing. The plan must also explain how the receiving institution will provide regular dialysis care as to dialysis patients, and transportation for patients to specialty care appointments, including cardiac patients, oncology, *etc.* The plan should further assess whether the facility may humanely house disabled persons and the receiving institutions capacities (including special housing

units) to receive and humanely house disabled prisoners. No prisoner transfers to reduce the JMF prisoner population shall be made until such transfer plan is submitted and approved by the Court.[4]

2. All prisoners selected for transfer as part of the closure plan shall be screened by a Registered Nurse according to policy. The screening shall include a full review of the prisoners' full medical records, including any unfiled documents (*e.g.,* recent lab results).

3. Defendants shall ensure that all prisoners within any of the four categories listed below shall received a face-to-face transfer assessment by a Medical Service Provider ("MSP") before transfer to another facility, other than another *Hadix* facility. The MSP shall also conduct a full review of medical records, including unfiled documents, of the transferring patients in those four categories. The four categories are: (1) prisoners enrolled in any Chronic Care Clinic; (2} prisoners who either have a pending specialty care appointment, have had such appointment within the previous two months, or have a condition requiring regular future specialty care appointments; (3) prisoners confined in single cells due to either gender identity issues or bowel management issues; or, (4) prisoners with an accommodation for a wheelchair, walker, or elevator detail.

4. Defendants shall augment their existing "transfer grid" regarding medical care and disabilities accommodations to include the following information to assure that class members are not transferred to facilities that are unable to provide for their medical needs: (1) a list of facilities

---

[4]Plaintiffs separately moved to stop all transfers from JMF until a food borne virus outbreak at the facility on February 27, 2007 could be confirmed not to be an outbreak of Norovirus. While this request would be proper in another circumstance, it is unnecessary in this instance because the delay for planning (which will take at least 45 days) will provide Defendants more than enough time to diagnose and treat such illness, should it be present, before the resumption of transfers.

that have no physicians available on-site; and (2) a list of facilities that do not accept prisoners requiring a chronic care program.

     5. Defendants shall ensure that prisoners who are receiving or are scheduled for radiation therapy or chemotherapy shall remain as close as possible to a therapy site and that those prisoners' transfers do not interfere, delay or prevent their therapies. The transfer grid shall include the following categories for designation by a nurse or MSP: (1) Prisoners who must remain in the Jackson area due to needs for medical treatment; and (2) Prisoners who must remain within 90 minutes' time travel of the Jackson area. This latter category shall include all prisoners (*i.e.,* not limited to cancer patients) who can be reasonably expected to require access to Foote Hospital, or one or more of the specialty clinics offered at DWH, unless an equivalent routinely scheduled specialty clinic is offered at another location accessible to the prisoner at his contemplated transfer facility.

     6. Defendants shall permit transferring prisoners who possess glucometers and inhalers to retain those items at their new institutions, and shall continue to supply medically necessary supplies to those prisoners to enable them to continue to use the glucometers and inhalers (*e.g.,* lancets, glucose testing strips and inhaler cartridges).

     7. Defendants shall not transfer prisoners needing any special housing, including access to regular or specialty medical care, disability accommodation, or access to mental health care, unless such housing needs will be met at the receiving facility. Prisoners who are transferred in violation of this requirement may request remedial action by written complaint to the OIMM, who shall review such complaints and are empowered to determine such complaints and, when appropriate, to grant return of transferred prisoners to a *Hadix* facility in such cases as the Medical Monitor and

his physician staff member determine by consensus that the transfer was in error and return to a *Hadix* facility is necessary to prevent current and ongoing deprivations of the prisoner's rights to medical care, mental health care or disability accommodation. Defendants shall comply with any direction of the OIMM in this regard.

8. Defendants shall ensure that MSPs carrying out the face-to-face screenings described above shall select the receiving facilities for transferring prisoners based upon the augmented transfer grid described herein.

9. Defendants shall make available to the OIMM all transfer summaries, transfer orders, and related documents for prisoners transferring from *Hadix* facilities. Defendants shall also make available to the OIMM prisoner location reports, accommodation reports, SERAPIS patient overview documents, special accommodation lists and chronic care enrollment reports for the purpose of auditing prisoner transfers. The OIMM shall audit transfers by selecting and reviewing a sufficient sample of the transfers to ensure the safety of transferred prisoners.

10. Defendants shall make available to the OIMM, upon the OIMM's request and within two weeks of any request, complete medical records of any transferring or transferred prisoner.

11. Defendants shall not transfer dialysis patients until the OIMM has certified in writing that the transfer does not, in the collective judgment of the Medical Monitor and his physician staff, pose any significant threat to the continuity and quality of dialysis services to such patients. Defendants shall provide the OIMM with access to any proposed new dialysis prisoner-patient residential and treatment facilities for the purpose of the OIMM determining whether to make any such certification.

**G.  Future Scheduling**

1.  Filing of Transfer Plan

Should Defendants elect to continue JMF closure transfers, they shall file a transfer plan within 45 days of this Opinion.  The Plan shall be in compliance with the Court's instructions herein.

2.  Final Hearing as to Permanent Injunctive Relief

Should Plaintiffs continue to seek permanent injunctive relief regarding these prisoner transfers, final hearing on such request shall be heard together with the final hearing on the mental health proofs, which hearing was previously scheduled to be conducted in November 2007.

## CONCLUSION

An Amended Preliminary Injunction should issue which grants Plaintiffs' Motion and affords preliminary injunctive relief as described in this Opinion.

Dated in Kalamazoo, MI:  　　　　　　　　　　　　/s/Richard Alan Enslen
March 6, 2007　　　　　　　　　　　　　　　　　Richard Alan Enslen
　　　　　　　　　　　　　　　　　　　　　　　Senior United States District Judge