UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

EVERETT HADIX, *et al.*,

        Plaintiffs,

v.

PATRICIA L. CARUSO, *et al.*,

        Defendants.
_____/

Case No. 4:92-CV-110

Hon. Richard Alan Enslen

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

In order to resolve issues presented during the evidentiary hearing of January 31, 2007-February 1, 2007 and in post-hearing filings, the Court now announces its following Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**:

In accordance with Federal Rule of Civil Procedure 52, the Court reaches the following Findings of Fact:

**General Background**

1. By Order of February 18, 2000, in accordance with written findings of that date, this Court denied Defendants' Motion to Terminate the Consent Decree and required Defendants to self-remedy constitutional violations, including the Eighth Amendment constitutional violation that Defendants had subjected prisoners with heat-related illnesses to conditions of incarceration at the Southern Michigan Correctional Facility ("JMF") and the Charles E. Egeler Correctional Facility ("Egeler" also known as "Reception and Guidance Center" or "RGC") which exposed them to an

unnecessary risk of heat-related injury and death. (*See* Dkt. No. 1372 at ¶¶ 299, 338; Dkt. No. 1373 at 1.)

2. The summer heat conditions at those facilities were not self-remedied between 2000 and 2002. (Dkt. No. 1658 at ¶ 1152.) The Court in February 2002 required Defendants to prepare a plan for the purpose of assuring that prisoners at risk of heat-related injury were not exposed to levels of heat and humidity in residence areas exceeding a heat index of 90. (*Id.* at ¶ 1442.)

3. The reason for setting the safety level at a heat index of 90 was that expert medical testimony showed that heat illness contributes to unnecessary death in two ways: by direct heat injury and by exacerbation of pre-existing illness, especially for high-risk groups including persons with cardiac and pulmonary disease, high blood pressure, the elderly, chronic invalids, persons taking certain medications such as diuretics, and persons suffering from severe obesity. (*See* Dkt. No. 1658 at ¶¶ 1167-69.) In terms of setting the precise limits of safety for heat-related illness, the 90 heat index level was determined because data showed that heat injury risk begins at levels as low as an 80 heat index with a marked increase of heat-related injury and death at 90. (*See id.*)

4. Defendants' subsequent 2002 plan provided prisoners with a special accommodation, allowing them to receive medical leave from work on heat alert days and to receive lower level housing as a further accommodation. (Dkt. Nos. 1686 & 1703.) This plan was approved on July 2, 2003 pending further evidentiary hearing. (Dkt. No. 1721.)

5. At the time of the evidentiary hearing, the parties also submitted a Stipulation limited to the issue of conditions in the segregation cells of JMF (pods C, D & E.) (Dkt. No. 2295.) Said Stipulation provided that Defendants would take steps to ensure that the heat index for those cells would not exceed 90. (*Id.*) The Stipulation was consensual, but did not provide that its entry may

be used as concession of other heat-related issues before the Court. (*Id.*) Indeed, when the Court approved the Stipulation, the approval reserved for later determination the issue of whether the Stipulated relief was consistent with requirements of the Prisoner Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626. (Dkt. No. 2316.)

6. On February 20, 2007, Defendants announced a plan to close all of JMF and Cellblock 7 of Egeler. (Dkt. No. 2328.) Based on this notice, Plaintiffs moved for injunctive relief to ensure that medically-fragile prisoners who are subject to the *Hadix* Decree are not injured by transfer from the *Hadix* facilities. Plaintiffs' requests for injunctive relief were granted by injunctive orders entered on February 22, 2007 and March 6, 2007. (Dkt. Nos. 2331 & 2343.) The later Amended Preliminary Injunction prohibits prisoner transfers pending Court approval of a transfer plan, which has not yet occurred.

**Medical Evidence of Heat Risk and Injury**

7. At the recent evidentiary hearing, this Court heard medical testimony from a single witness–Dr. Jerry Walden, M.D. No contrary medical expert was called by Defendants nor was contrary medical testimony presented by Defendants.

8. Dr. Walden testified that both temperature and humidity (the components of the heat index) are important to assessing the risk of heat-related injury to a particular person. Humidity is important because it interferes with effective cooling through use of the sweat glands. (Trial Testimony ("T.T.") 102-03.) Other important factors include: acclimatization (the human body's adjustment to a regular heat-level at a particular time); the length of exposure to extreme heat conditions; and the presence of heat-related illnesses which either interfere with effective cooling

3

and/or may cause illness or death due to the body's inability to cope with the demands of extreme temperature. (*Id.* at 103, 108-10.)

9. At the *Hadix* facilities, a large number of prisoners/large percentage of prisoners have been classified at risk of heat-related injury due to their medical conditions. As of September 29, 2006, there were some 1,364 prisoners at JMF (523), Egeler (207) and the Parnall Correctional Facility ("Parnall") (634) classified as having heat-related illnesses.[1] (Pls.' Ex. 34-A at 1; T.T. 111-13.) Dr. Walden was of the opinion that the percentage and number of *Hadix* prisoners subject to heat-related injury was even larger. (T.T. 111-13.)

10. The above numbers represent a large increase in both the numbers and percentages of *Hadix* prisoners classified at risk for heat-related injury since 2000. (C. Pulitzer 12/21/06 *De Bene Esse* Dep. at 19, stating that there was a 60 percent increase in the number of at-risk inmates between 2000 and 2006.) For example, at JMF, for 2006, 36 percent of inmates were at risk of heat-related injury according to Defendants' statistics. (*Id.*) In part of JMF, block 5, fully one-half of prisoners were at risk for heat-related injury. (*Id.* at 19-20.) The increase is typical of both a growing "special needs" prisoner population caused by more life sentences, and a reflection of a policy of placing prisoners with special needs close to the Duane Waters Hospital ("DWH") (now a health care center), for the purpose of facilitating care. (*Id.* at 21.)

11. One of the reasons for separately listing prisoners at high risk of heat-related injury has been to allow them access to accommodations to prevent their injury and death. This is the import

---

[1] The Sixth Circuit's 2004 decision relating to the District Court's jurisdiction made clear that it had jurisdiction over parts of Egeler, JMF and Parnall regarding ventilation/health-safety issues. *See Hadix v. Johnson*, 367 F.3d 513, 517-18 & n.7 (6th Cir. 2004). It also noted wisely that when constitutional violations were present, it was not in the interests of judicial efficiency to begin a second suit to correct them. *Id.*

of Defendants' current heat-related injury plan, which is intended to ensure prisoners at risk of heat-related injury are assigned cells at the base or first gallery (as opposed a higher level) with the expectation that those levels will be cooler than the higher levels. (*See* Defs.' Ex. 4/Pls.' Ex. 28A at 3.) Notwithstanding this expectation, the effect of the policy is significantly undercut by the large number of prisoners who waive the lower cell placements. (*See, e.g.,* Pls.' Exs. 39, 44 & 45.) Plaintiffs' disability expert, Elizabeth Alexander, was of the opinion that such waivers may have been caused by prison staff's directing of prisoners to sign waivers. (*See* Pls.' Ex. 2A at 100 ¶ A-21.)[2]

12. The significant number of prisoners at risk for heat-related injury has been a continuing concern for the *Hadix* facilities because statistics show a certain causal connection between "heat waves" and heat-related injuries and death. That is, statistics show that prior to air conditioning, the risk of death during a "heat wave" was three times the normal rate and the risk of death to an infirm population (such as a nursing home population) was three to five times the normal rate of death. (T.T. 104.) A "heat wave" is defined as heat-alert conditions (heat index of 90) which persist for at least three days or longer. (*Id.*)

13. Defendants' own recent statistics and discovery responses very likely greatly understate the frequency and severity of heat-related illness. A discovery response for the summer of 2005 listed only three prisoners as suffering from heat-related illness. (Pls.' Ex. 29.) However, telephone

---

[2]While this may be true in some cases, it is difficult to generalize as to all prisoners. Some prisoners may have waived lower cell placements simply because they did not notice an appreciable difference in cell temperatures at the different housing levels; others may have waived placement because an existing cell placement served what they perceived to be a greater interest (*e.g.,* a safe placement next to reasonable neighbors or a placement next to a cell neighbor who assists a prisoner meeting special disability needs). It is difficult to generalize without survey information, which is absent on this record.

logs for the same time period listed at least eight such incidents. (Pls.' Ex. 30.) Further, both of those lists were focused on spotting the most easily recognized forms of heat-related illnesses–prisoners complaining of heat stroke symptoms, including hyperthermia and dizziness during heat waves. The numbers do not reflect an endeavor to document the number of heat-related deaths caused by heat waves. Documenting those kinds of deaths is difficult due to the multiple causes at work and the need for specific information, such as core body temperature, at the time of death. (*See* T.T. 107-08; Pls.' Ex. 1A at Appx. D-1.[3])

14. Despite the difficulty of assessing deaths due to heat wave conditions, one death due to heat-related conditions was documented in 2006. Michigan prisoner T.S. died on August 6, 2006 of complications of hyperthermia and dehydration. (T.T. 133-34; Pls.' Ex. 256 at 1 & 8.) T.S., though only 21 years old, was subject to risk of heat-related illness due to his prescription regime for mental illness. (*Id.*) His mental health issues, *e.g.,* hallucinations, also complicated his intake of fluids, and his health was further compromised by his treatment by custody staff–T.S. was locked to a cement bed for prolonged periods of time without water or effective medical care. (T.T. 133-35; Pls.' Ex. 256.) Although in response to this tragedy, Defendants are now apparently compliant with Court-ordered restrictions which prevent such prolonged restraints and require medical attention for the mentally ill, they have not announced any policy which will prevent heat-related injury from occurring to mentally-ill persons while housed in general population.[4]

---

[3]Dr. Walden suspected two cases as possible heat-related deaths at the *Hadix* facilities for 2005, but lacked the sufficient information to draw a definitive conclusion.

[4]They have also planned to no longer subject persons on psychotropic medications to segregation placements within the *Hadix* facilities, with the exception of dialysis patients. They have also planned to move dialysis patients, but have not yet done so.

15. Another case which documents both an instance of heat-related death and Defendants' failure to document such cases, was the case of A.F., who died in 2001. (T.T. 132-33.) Defendants failed to timely treat A.F.'s symptoms of congestive heart failure; he was taking Nitroglycerin at the time and did not receive a timely "lay-in" (permission to stay in his cell) for a heat-alert day (heat index of 107) when he collapsed dead of a heart attack after walking to his cell block. (*Id.*) Defendants failed to investigate or document his heat-related death. (Dkt. No. 1658 at ¶ 1242.) During the same summer, Plaintiffs documented many other cases of heat-related illness, five of which were conceded by Defendants' Medical Director, Dr. George Pramstellar, D.O. (*Id.* at ¶¶ 1243-68.) During the same time period, prisoners suffered many other medical problems that were related to the hot weather conditions, *e.g.,* increased use of inhalers for asthma or increased need for other medications. (*Id.* at ¶ 1247.)

16. Prisoners in Michigan are at heightened risk for heat-related injury during summer months because of the difficulty of acclimatizing one's body to summer conditions during a short summer season with some very hot days. (T.T. 103.)

17. During heat wave conditions, increased ventilation alone is ineffective in preventing heat-related injury. (*Id.* at 249-50.)

**Pertinent Summer Heat Conditions**

18. During the summer of 2001, there were 35 heat alert days at the *Hadix* facilities and ten days in which the heat index measured between 105 and 130. (Dkt. No. 1658 at ¶ 1171.)

19. During the summer of 2006, based on Accuweather heat index data for the Jackson, Michigan area, there were 17 heat alert days and two days (August 1-2, 2006) with a heat index in excess of 105. (Pls.' Ex. 37A.)

20. The summer heat data for 2005 was consistent with the general temperature data for past years and the data for particular blocks reflects that in-cell temperatures are warmer than outdoor temperatures due to the nature of the cell construction. (Pls.' Ex. 1A at Appx. D-1; C. Pulitzer 12/21/06 *De Bene Esse* Dep. 13; Pls.' Ex. 48 at 3.)  In fact, Plaintiffs' architectural expert, Curtis Pulitzer, who has long experience with the *Hadix* facilities, testified that the "steel box" construction of the JMF cell blocks envisioned air-conditioning because such cells generate tremendous heat during summer conditions. (Pulitzer Dec. 21, 2006 Dep. 13.)  Notwithstanding the disagreement of Defendants' architect at the time, Defendants however completed JMF without air-conditioning of prisoner living space, though staff quarters were air-conditioned. (*Id.*)  This was determined to be a political choice of policy makers as opposed to a rational cost or design decision of architects. (*Id.* at 13-14.)

21. Air-conditioning of prisoner residence space at the *Hadix* facilities is limited to health care facilities which are treating very seriously-ill prisoners (*i.e.,* DWH and C-Unit of JMF). (Interim Report of C. Pulitzer, Pls.' Ex. 4A at 4; T.T. 133.)   In fact, it was the recent testimony of Thomas Faussett, the manager of the physical plant for the Michigan Department of Corrections, that even if air conditioning for prisoner residence areas was cost-competitive with ventilation, it would not be done by Defendants. (T. Faussett *De Bene Esse* Dep. 33-35.)

22. Summer temperatures in Michigan, as in other places, vary from year to year; though it is certain that over an extended period of years summer temperatures in certain "heat wave" years will cause high incidence of "heat wave" deaths, *i.e.* ten times the normal rate. (T.T. 104.)

**Defendants' Heat Reduction Evaluation Plan**

23. Defendants' plan to address summer heat conditions at the *Hadix* facilities was summarized as follows in their Status Report Regarding Heat Reduction Evaluation Final Plan of March 16, 2007.  (Dkt. No. 2359.)  This Heat Reduction Evaluation Final Plan proposes that Defendants spend $929,833 for facility modifications to Blocks 1, 2 and 3 of Egeler, which includes mostly the installation of very large ventilation fans and duct work, but not the installation of air cooling equipment.  (*Id.*)  The Plan also provides in pertinent part,

> This plan does not propose any remedial actions for 7-Block, RGC.  Nor does the plan include any proposal for lower 6-Block (pods A and B, GP Level IV) or for cell blocks 5 and 4 (GP Level II) because Defendants intend to close those blocks as soon as practicable.

(*Id.* at summary pages 1-2.)

24. Defendants' Plan does not make any provision for its contradiction of the Court's Amended Preliminary Injunction, which conditions future transfers on court approval premised upon a manner of transfer which is not likely to cause medical injury to at-risk prisoners.  Nor does Defendants' Plan make any provision for its own admission in its filing of March 2, 2007 that the rate of transfers from JMF has been slow and "[a]t this rate it will take an excess of three years to transfer the JMF prisoners to other locations . . . ."  (Dkt. No. 2338 at 3.)

25. Defendants' Plan also calls into question whether their earlier Stipulation to ensure that the heat index within the segregation pods of JMF does not exceed a heat index of 90 was proposed in good faith, particularly since the Plan contains no fail-safe prescriptions to cover the very likely event that JMF segregation will not be evacuated before the coming summer months.  Further, the Stipulation was based upon a cost estimate and evaluation of Defendants' architects which stated that it was likely, during summer conditions, that the interior conditions of segregation (left untreated)

9

would be that of the "outside conditions plus 10%." (Pls.' Ex. 264 at 1.) Thus, this evaluation recommended that air be "tempered" (meaning "air conditioned") to at least 78 degrees F. to achieve sufficient cooling of the segregation air. (*Id.*) This is also obvious given the pertinent summer conditions–*i.e.,* some summer days involve temperatures significantly above 90 degrees F.–such that no amount of dehumidifying can reduce the heat index below 90 degrees without some level of air cooling.

26. The same conclusion applies to Defendants' Plan regarding the Egeler/RGC blocks which Defendants intend to treat with large ventilation fans–marketed under the brand name Big Ass Fans. (*See* Dkt. No. 2359, Attach. 1-3.) Because increased ventilation will not significantly affect either of the two components of the heat index (high temperature and high humidity) which jeopardize health, it will not assist in the provision of healthful living conditions. (*See* Shane Puckett *De Bene Esse* Dep. 19 (effect of the ventilation would be to change the "perceived temperature" as opposed to reducing the heat index below outside ambient temperatures); Robert Recher *De Bene Esse* Dep. 76 (Defendants' architect cannot assure that the fan renovations will reduce summer heat indexes below 103); Michael Chonko *De Bene Esse* Dep. 10-14, 20, 43-44, 75 (plan would slightly reduce temperature, would not affect humidity and would result in only minimal reductions in heat index conditions). Further, because this plan focuses on "destratifying" air in cell blocks, Dkt. No. 2359, Attach. 1, it also works at cross-purposes to Defendants' previous heat-related injury plan (which provided lower level housing to prisoners at risk with the expectation that those levels would be cooler).

27. Defendants' conjecture for why the Plan might create healthful conditions, which is based upon advertising and not scientific study or reliable data, is that the fans may facilitate

sweating by cell residents. The pertinent health regulation relating to this theory is the American Society of Heat, Refrigeration and Air Conditioning Engineers, Inc. ("ASHRAE") Standard 55-2004. (Thermal Environmental Conditions for Human Occupancy). (Defs.' Ex. I-1/Dkt. No. 2329-10.) This ASHRAE standard allows the use of increased ventilation for the purpose of increasing the perceived comfort of healthy residents and of facilitating their increased perspiration. (*Id.* at 6, § 5.2.3.) The standard specifically states that it does not apply to a population of unhealthy adults. (*Id.* at 2, § 2.3.) The reason for this limitation is that unhealthy persons, including the large number of *Hadix* prisoners suffering from chronic illnesses and heat-related illnesses, often lack the physiological capacity to cool by perspiration. (T.T. 109-11.) Additionally, since increased perspiration requires additional cardiac activity, it may further jeopardize the health of persons suffering from cardiac and circulation disease. (*Id.*)

28. Another troubling aspect of Defendants' Plan is that it utilizes a product, Big Ass Fans, which has been primarily marketed for other uses–large sports stadiums as opposed to enclosed residential spaces. (C. Pulitzer 2/23/07 *De Bene Esse* Dep. 17-21.) As such, Plaintiffs' architectural experts believe that its application to a residential setting would be problematic due to proximity of the large fans to living spaces and the attendant effects of noise, dust and air movement. (*Id.*) Plaintiffs' experts also point out that Defendants have not completed computer modeling and, as such, have no basis to predict whether the fans would produce sufficient in-cell velocity of air movement. (*Id.;* see also Chonko Dep. 8.)

29. Defendants' Plan also assumes that during day-time hours, importation of outside air will be minimized to prevent heat transfer. Defendants intend to minimize the importation of fresh air during daytime hours to a rate of five cubic feet per minute. (Recher Dep. 7.) This level of

11

ventilation is below the level deemed safe in the Consent Decree. (*See* Consent Decree 7, ¶ I.S, requiring 7 cfm year-round transfer and 54 cfm exhaust during summer months.) Ventilation is a separate Consent Decree health requirement which fosters health by preventing the build-up of noxious gases and fumes in living space.

30. Defendants' Plan does include some other minor but positive changes to Blocks 1, 2 and 3. These include: the installation of energy efficient lighting to Block 1, (Dkt. No. 2359, Attach. 2); the installation of solar reflective coating to the windows of Block 2, (*id.*); the installation of energy efficient lighting to Block 2, (*id.* at 3); and the installation of lights and coatings to Block 3 identical to that applied to Block 2, (*id.*). While these are positive changes to the facilities in terms of the summer heat load, these will not significantly reduce the summer air temperatures or prevent injury to unhealthy residents. (*See* T.T. 24-25; Pls.' Ex. 31B at Bates 325821; Dkt. No. 2359, Attach. 2-3.)

31. Without some level of air cooling, in addition to dehumidifying, Defendants have no prospect of assuring that cell conditions for the *Hadix* facilities maintain a heat index of less than 90 during hot summer months.

32. Air conditioning is a norm and required feature of prisons serving "special needs" prisoner populations. (C. Pulitzer 2/23/07 *De Bene Esse* Dep. 11.) Given the level of health care needs at the *Hadix* facilities, those facilities qualify as a "special needs" prisoner population.

33. Defendants' previous estimates for air conditioning have exaggerated the costs of such systems by pricing the most expensive options for such systems (*i.e.,* cold-water chiller piping systems) and neglecting systems which are commonly used for business and commercial applications (*i.e.,* Trane air conditioning units). (T.T. 35-37, 73-83.) Plaintiffs priced such permanent air

conditioning units for blocks 1-7 at a total price of $4,913.172, or between $600,000-$800,000 per block depending upon the features of the block. (T.T. 78; Pls.' Ex. 266.)

34. Further, since Plaintiffs have only requested relief on behalf of high-risk prisoners, Pls.' Tr. Br. 24, then, assuming that Defendants would select certain of the blocks to house such prisoners together, the remedy would only be required for those blocks containing the high-risk prisoners.[5] The testimony of Plaintiffs' architects also supported that such systems could be operational in a short-time period and temporary systems could be employed until permanent systems were in place. (T.T. 42.)

**CONCLUSIONS OF LAW:**

In accordance with Federal Rule of Civil 52, the Court reaches the following Conclusions of Law:

**Eighth Amendment Standards**

35. "Deliberate indifference to serious medical needs" violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Eighth Amendment standard has both objective and subjective components. *Id.* Thus, to be liable, a defendant must know of and disregard an excessive risk to prisoner health or safety. *Farmer*, 511 U.S. at 837. However, in an injunctive case, proof of the subjective component is straightforward:

---

[5]The Court understands that the structure of such a remedy might create a perverse incentive for Defendants to minimally classify those at risk of heat-related injury. The safe-guard in this instance is the Office of the Independent Medical Monitor created as part of the Court's Final Injunction of December 2006, which is empowered to oversee such classifications. Obviously, Defendants' decisions relating to future prisoner housing will reflect proper concerns not only about heat-related injuries, but also about safety and security of prisoners and correctional staff.

13

> In this case, we are concerned with future conduct to correct prison conditions. If these conditions are found to be objectively unconstitutional, then that finding would also satisfy the subjective prong because the same information that would lead to the court's conclusion was available to the prison officials.

*Hadix v. Johnson*, 367 F.3d 513, 526 (6th Cir. 2004).

36. The decision in *Farmer* did not limit the protection of the Eighth Amendment to medical care only, but also extended it to other conditions necessary for prisoner health and safety–including food, clothing, shelter, medical care, and reasonable steps to guarantee prisoner safety. *Farmer*, 511 U.S. at 844. The temperature and humidity conditions within prisoner dormitories are one such aspect, since prison officials may not, consistent with Eighth Amendment values, cause the expected deaths of prisoners subject to heat-illness by exposing them to high heat and humidity conditions. *See Kost v. Kozakiewicz*, 1 F.3d 176, 189 (3d Cir. 1993) (holding that prisoner who suffered heat stroke repeatedly due to cell conditions had cognizable Eighth Amendment/civil rights claim against jailers); *Bush v. Viterna*, 795 F.2d 1203, 1208 (5th Cir. 1986) (stating that use of a "hot box" to punish prisoners was properly assumed to be a violation of the Eighth Amendment).

37. One of the cases cited with approval in *Farmer* was the Supreme Court's previous decision in *Helling v. McKinney*, 509 U.S. 25 (1993). *Helling* said the following about future threats of injury:

> It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them. The Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event. Two of them were cited with approval in *Rhodes v. Chapman,* 452 U.S. 337, 352, n. 17 . . . (1981). *Gates v. Collier,* 501 F.2d 1291 (CA5 1974), held that inmates were entitled to relief under the Eighth Amendment when they proved threats to personal safety from exposed electrical wiring, deficient firefighting measures, and the mingling of inmates with serious contagious diseases with other prison inmates. *Ramos v. Lamm,* 639 F.2d 559, 572 (CA10 1980), stated that a prisoner need not wait until he is actually assaulted before obtaining relief.

*Helling v. McKinney*, 509 U.S. 25, 33-34 (1993).

### PLRA Standards

38. As to the relief requested, the controlling legal standards are the Eighth Amendment legal standards framed by *Farmer* and *Helling* together with the PLRA injunction standards applicable under 18 U.S.C. § 3626(a)(1) in prison condition cases. Section 3626(a), which was enacted as section 802(a) of the PLRA, states in pertinent part:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1).

### Permanent Injunction Standards

39. Since this determination represents a final adjudication of Plaintiffs' requests for injunctive relief as to heat-related injury, the standards under Federal Rule of Civil Procedure 65 require final findings as to whether Plaintiffs have clearly shown an entitlement to relief on the merits and whether an injunction is necessary to prevent irreparable harm. The following case law explains the pertinent standards.

40. In *Weinberger v. Romero-Barcelo*, the Supreme Court explained the controlling legal standards as follows:

> It goes without saying that an injunction is an equitable remedy. It "is not a remedy which issues as of course," *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337-338 . . . (1933), or "to restrain an act the injurious consequences of which are merely trifling." *Consolidated Canal Co. v. Mesa Canal Co.*, 177 U.S. 296, 302 . . . (1900). An injunction should issue only where the intervention of a court of equity "is essential in order effectually

> to protect property rights against injuries otherwise irremediable." *Cavanaugh v. Looney*, 248 U.S. 453, 456 . . . (1919). The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 61, 95 S. Ct. 2069, 2077, 45 L.Ed.2d 12 (1975); *Sampson v. Murray*, 415 U.S. 61, 88, 94 S. Ct. 937, 951, 39 L.Ed.2d 166 (1974); *Beacon Theaters, Inc. v. Westover*, 359 U.S. 500, 506-507, 79 S. Ct. 948, 954-955, 3 L.Ed.2d 988 (1959); *Hecht Co. v. Bowles, supra*, at 329, 64 S. Ct., at 591.
>
> Where plaintiff and defendant present competing claims of injury, the traditional function of equity has been to arrive at a "nice adjustment and reconciliation" between the competing claims, *Hecht Co. v. Bowles, supra*, at 329, 64 S. Ct., at 592. In such cases, the court "balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction." *Yakus v. United States*, 321 U.S. 414, 440, 64 S. Ct. 660, 675, 88 L.Ed. 834 (1944). "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Hecht Co. v. Bowles, supra*, 321 U.S., at 329, 64 S. Ct., at 592.
>
> In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. *Railroad Comm'n. v. Pullman Co.*, 312 U.S. 496, 500, 61 S. Ct. 643, 645, 85 L.Ed. 971 (1941).

*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982). *See also Kallstrom v. City of Columbus,* 136 F.3d 1055, 1067 (6th Cir. 1998); *City of Parma v. Levi,* 536 F.2d 133, 135 (6th Cir. 1976). As implied above, and consistent with the PLRA, injunctive relief involving matters subject to state regulation may be no broader than necessary to remedy the constitutional violation. *See Knop v. Johnson,* 977 F.2d 996, 1008 (6th Cir. 1992).

41. While saying so, the Supreme Court in *Weinberger* also explained the importance of the legal principles which give rise to equity jurisdiction:

> Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.'

16

*Weinberger*, 456 U.S. at 313 (citation omitted).

### Legal Application

42. Plaintiffs have requested the entry of an injunction requiring that all prisoners classified at high-risk for heat-related injury be housed in areas in which the heat index is reliably maintained below a heat index of 90. Plaintiffs have shown success on the merits because the requirements of safe Eighth Amendment custody are violated by housing high-risk inmates in facilities which are routinely at heat index levels above 90 during summer months when it is known that such heat conditions will reliably cause heat injury and death.

43. The Injunction in question is necessary to prevent irreparable harm, including bodily injury and death. Defendants' own plans for heat-reduction will not significantly reduce heat-exposure for high-risk inmates and will likely also cause a dangerous lack of ventilation during summer months.

44. The scope of the Injunction will be narrowly tailored: it will permit Defendants to use temporary equipment to reliably achieve a heat index below 90 for high-risk inmates so that Defendants, should they wish to preserve an option to close a given facility in the future, will retain that option without the loss of the costs of permanent installation of air handling units.

45. The scope of the Injunction to be entered meets the limitations of the PLRA in that it extends no further than necessary to correct the Eighth Amendment violation, is narrowly tailored and is the least intrusive means of correction of the violation. This remedy also fosters public safety since it will both facilitate the work of correctional officers while in prisoner residential areas and will also facilitate the health and cordiality of the affected inmates.

46. Accordingly, an Injunction shall enter requiring that Defendants house all prisoners within the *Hadix* facilities who are at high-risk for heat related injury within cell blocks in which the summer heat index is reliably maintained below a heat index of 90. Defendants are afforded latitude to plan the manner of this remedy and the placement of affected inmates, but shall file a plan within 45 days, together with a construction schedule, which implements this remedy by July 15, 2007. The plan shall detail whether Defendants intend to maintain a segregation facility within the *Hadix* facilities and whether they intend to house prisoners in segregation on heat alert days, and, if so, shall provide that segregation facilities are maintained below a heat index of 90 while housing high-risk prisoners.

## **CONCLUSION**

Accordingly, the Injunction sought by Plaintiffs shall enter, Defendants' Heat Reduction Evaluation Final Plan is rejected, and Defendants shall file a remedial plan consistent with the Court's Findings of Fact and Conclusions of Law.

DATED in Kalamazoo, MI:  
    April 3, 2007

    /s/ Richard Alan Enslen  
RICHARD ALAN ENSLEN  
SENIOR UNITED STATES DISTRICT JUDGE