UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

EVERETT HADIX, *et al.*,

        Plaintiffs,

v.

PATRICIA L. CARUSO, *et al.*,

        Defendants.
_____/

Case No. 4:92-CV-110

Hon. Richard Alan Enslen

**OPINION**

       This Court's December 7, 2006 Injunction required Defendants to submit separates plans providing remedies to systematic defects in their medical care staffing and the delivery of specialty care services. The Court's Injunction likewise required the filing of a plan to establish an Office of the Independent Medical Monitor ("OIMM"), which would be effective in addressing the widespread denial of necessary medical services to *Hadix* prisoners. Defendants have submitted plans on these subjects for Court review. (*See* Dkt. No. 2347.) Plaintiffs have responded in opposition to these plans. They regard these plans as grossly deficient in many details, including its provisions relating to medical care staffing, increased provision of specialty care services and the operation of the OIMM. (Dkt. No. 2371.)

       Subsequent to Plaintiffs' Response, the Court's Independent Medical Monitor filed a Special Report with the Court on April 25, 2007 discussing those plans. The Report was critical of the plans in some respects, particularly the failure of the plans to reduce the percentage of delayed specialty care appointments. (Apr. 25, 2007 Report 5.) According to the Monitor, Defendants are presently providing specialty care within medically acceptable time frames only 63 percent of the time. (*Id.*) The Monitor believes that a 90 percent goal is the appropriate goal for these specialty care

appointments. (*Id.*) The Court agrees with this assessment given that these appointments are necessary in many instances to attempt to save the lives of the affected prisoners and the delay in services regularly results in avoidable suffering and disease. The Monitor was unable to assess certain aspects of the medical staffing due to uncertainty created by Defendants' recently announced plan to close the Josephine McCallum Facility ("JMF"), uncertainty created due to the recent movement of *Hadix* prisoners from Block 8 of the Parnall Correctional Facility ("Parnall") to buildings A and B of Parnall, and uncertainty created by other closure plans. (*Id.* at 1-4, 7.)

Other deficiencies in the plans consist of the failure to plan sufficiently for the future operations of the OIMM and to address the procedures necessary to ensure that Defendants and their staff comply with directives of the OIMM, including directives to provide remedial care to prisoners whose health has been injured as a consequence of Defendants' deliberate indifference to prisoner care. One recent example is telling because it shows exactly how deliberate the indifference to medical care has become and how necessary are such remedial directives. In the course of the hearing testimony last fall, the Independent Medical Monitor, Robert L. Cohen, M.D. explained the situation of one cancer patient, D.U., whose had received delayed access to specialty care. D.U. presented with a melanocystic skin mole and had a family history of cancer, but was made to wait over six months for substantive care while he received "hot compresses" and excuses. (Dec. 7, 2006 Findings of Fact ¶ 35.) He did not receive a lymph biopsy until some ten months later, which by then showed that the cancer had spread while the patient was not receiving effective therapy. (*Id.*) Notwithstanding that these deficiencies were brought to Defendants' attention at hearing, D.U.'s later treatment itself showed continued deliberate indifference to his medical needs. In fact, the OIMM has received and verified complaints from D.U. that his cancer treatment in 2007 has been

significantly interrupted by Defendants because they failed to order cancer treatment drugs in a timely way and placed one-half orders for certain of the cancer drugs he required.[1] (*See* Apr. 25, 2007 Sealed Memo. of OIMM re D.U.)

Defendants have also filed a transfer plan as required by the Court's March 6, 2007 Preliminary Injunction. Their initial transfer plan was filed on March 15, 2007. (Dkt. No. 2357.) They also filed a revised and more detailed plan on April 20, 2007. (Dkt. No. 2397.) The latter was filed after Plaintiffs had responded in opposition to the original transfer plan. (Dkt. No. 2377.) On April 30, 2007, the Court received a Special Report from the Office of the Independent Medical Monitor regarding the transfer plan. (Dkt. No. 2404.) Such Report faults Defendants' revised transfer plan in several respects. It faults the plan for suggesting that movement of prisoners to non-*Hadix* facilities will likely improve their medical access to care when the medical staffing for those facilities is at a much higher staffing ratio (more prisoners per care providers) than the *Hadix* facilities. (Report 6-8.) The Report also faults the transfer plan's conclusion that spreading out prisoners amongst 35 prison facilities will somehow improve their access to specialty care when those prisoners will still be subject to the limitations of the list of CMS' specialty care providers, which is not otherwise modified by the transfer plan and will be subject to greater transportation difficulties to receive periodic and necessary care.[2] This is troubling because CMS has chronically

---

[1]Physicians, including physician administrators, who place budgetary constraints above patient health and who order drugs in smaller quantities than necessary to save funds in the oft-hand chance that the patient might either die or be paroled before the drugs are fully used are not worthy of the title of physicians.

[2]The requirement in the Court's December Findings that Defendants devote "real resources" (Dec. 7, 2007 Findings ¶¶ 112-13) to specialist staffing did not require a specific approach, but did require that Defendants adopt an approach which devoted additional resources to a solution–*e.g.,* requiring CMS to employ more specialists, requiring CMS to pay specialists

provided belated specialty care to persons with life-threatening illnesses (cancer patients, cardiology patients, *etc.*) and the plan and associated documents provide no basis for a conclusion that CMS will be better able to provide specialty care to those patients as a consequence of the transfer. (*Id.* at 8-9.) The Report likewise faults Defendants' assertions that transfer can be accomplished while protecting the health of fragile dialysis patients and while ensuring chronically ill patients' access to chronic medications. (*Id.* at 9-10.) The record of Defendants' performance at these tasks indicates that their blithe conclusions about future performance have no basis in science or fact. (*Id.*)

Upon review, the Court concurs with Plaintiffs' objections to the transfer plan and remedial plans and the Special Reports of the Independent Medical Monitor. The plans do not provide sufficient facilities and services to prevent further violations of the Eighth Amendment caused by denial of necessary medical care. *See Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *LeMarbe v. Wisneski*, 266 F.3d 429, 437 (6th Cir. 2001) (holding that delay in referring patient for specialist care was evidence of an Eighth Amendment violation); *Oxendine v. Kaplan*, 241 F.3d 1272, 1278 (10th Cir. 2001) (same); *Wynn v. Southward*, 251 F.3d 588, 594 (7th Cir. 2001) (holding that delay in providing necessary heart medication constituted evidence of Eighth Amendment violation).

Further, future plans by Defendants must appreciate the future of continued federal court intervention *until a remedial framework is shown to cure current and ongoing violations of the Eighth Amendment*. The concept that federal intervention may end simply by moving prisoners outside of one building within the Court's jurisdiction across the street to another building outside

---

enhanced fees for quicker appointments, or employment of a competing company or medical school which could compete with CMS based upon which entity could provide the quickest appointment. These solutions have not been tried and the plan approach does not suggest any use of additional resources to improve results.

4

of it, has been previously rejected by the Sixth Circuit Court of Appeals and is not likely to be accepted in future court filings. *See Hadix v. Johnson*, 367 F.3d 513, 518 n.7 (6th Cir. 2004); *Hadix v. Johnson*, no. 93-1551, 1995 WL 559372 at \*\*6 (6th Cir. Sept. 20, 1995) (unpublished decision).[3] For this reason, any amended plans should likewise anticipate that future plan approval is likely to be conditioned upon the extent to which the transfer of prisoners make future federal remedial efforts workable (*e.g.*, a transfer to a large number of facilities is less workable than a transfer to a smaller number of facilities due to the inherent difficulties of exercising federal jurisdiction over a large number of prison facilities).[4]

Therefore, an Order rejecting the plans shall enter consistent with the Court's Opinion and the Reports of the Independent Medical Monitor.

|  |  |
|---|---|
| DATED in Kalamazoo, MI:<br>   May 4, 2007 | /s/ Richard Alan Enslen<br>RICHARD ALAN ENSLEN<br>SENIOR UNITED STATES DISTRICT JUDGE |

---

[3] The implicit suggestion made in such plans is that the Court is willing to sign off on a shell game which substitutes mere movement of prisoners for significant improvement in medical health care. The Court will not. The Court often sentences criminal financial miscreants for various versions of financial shell games. Playing such shell games as a substitute for significant improvements in the delivery of medical care is an idea unworthy of just public administration or federal oversight.

[4] This Opinion and the accompanying Order are directed toward speeding plan approval because of the obvious insufficiencies of the plans presented. The Order will require cancellation of the pending hearing on plan approval. It is the Court's hope that future plan approval will be rapid, either without hearing due to the agreement of the parties upon the revised plans or after prompt hearing to resolve minimal disagreements of the parties as to the revised plans.