UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


EVERETT HADIX, et al.,

       Plaintiffs,

                              CASE NO. 4:92-CV-110

v.

                              HON. ROBERT J. JONKER

PATRICIA L. CARUSO, et al.,

       Defendants.

_____/

## OPINION


       This is a prisoner civil rights action addressing conditions of confinement at the State Prison of Southern Michigan Central Complex.  Twenty-three inmates originally filed the case as a class action in the Eastern District of Michigan in 1980.  The Court certified a class on August 21, 1981 of "all prisoners who are, or will be, confined at the State Prison of Southern Michigan-Central Complex."  (Order Granting Motion for Certification, Dkt. No. 33.)  On May 13, 1985, the Court accepted a Consent Decree proposed by the parties.  The Order accepting the Decree expanded the class facilities to include not just the walled Central Complex itself, but also "all areas which will supply support services under the provisions of this Consent Judgment, e.g., food service and Boiler Plant operations."  (Order Accepting Consent Judgment, Dkt. No. 213, at 1-2.)

       Twenty-two years of litigation ensued.  The Eastern District of Michigan

transferred the case to the Western District of Michigan on August 4, 1992.  Since the transfer, there have been over 2,600 docket entries.  Printing the docket entries now requires over 230 pages.  All of the original named plaintiffs have died.  A single named Plaintiff–Cecil Moore–now represents the class.  Since December of 2006 alone, there have been six appeals to the United States Court of Appeals for the Sixth Circuit from injunctive orders of the District Court.  Those appeals are scheduled for hearing before the Court of Appeals on September 14, 2007.  During the same time, there have been over 300 new docket entries in the District Court file despite the appeals.

The sheer size, duration and procedural intricacies of the case, combined with a constant flow of new fact patterns and regular changes in class members, threaten to obscure the core issue that must drive, shape and limit any prison Consent Decree case following Congress' enactment of the Prison Litigation Reform Act ("PLRA") on April 26, 1996.  This is the core issue:  has the Plaintiff demonstrated that Defendants are failing to comply with the Consent Decree in a way that creates a current violation of the Constitution (or other Federal right); and if so, what is appropriate relief that "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C.A. § 3626(a)(1) (2007).

The case is now before this Court on a variety of motions and related matters, including a direction from the Court of Appeals to reconsider three questions related to Defendants' plan to close portions of the facilities originally covered by the Consent Decree,

and to transfer prisoners housed there to other facilities in the Michigan prison system.  This Court conducted oral argument on all matters addressed in this Opinion on August 29, 2007. (Notice of Hearing, Dkt. No. 2588, and Transcript, Dkt. No. 2621.)

## **BACKGROUND**

The foundation of this case is the Consent Decree accepted by the Court effective May 13, 1985.  The Consent Decree addresses broad categories of prison conditions within SPSM-CC such as sanitation, safety, health care, overcrowding and security.  There was no adjudication of constitutional violation in connection with the Consent Decree, and the Decree states explicitly that "[b]y entry of this judgment, the Defendants make no admission of liability on the claims of the Plaintiffs."  (Consent Decree at 1.)  The parties simply reached an agreement to address specified prison conditions, and to avoid or at least limit further litigation over constitutional requirements.

In 1996, Congress enacted the PLRA.  This had a profound impact on litigation over prison conditions.  In particular, the PLRA limits a federal court's ability to grant prospective relief in prison conditions cases: "Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  18 U.S.C.A. § 3626(a)(1) (2007). Before entering any prospective relief, the Court must find "that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  *Id.*  These same limits–in addition to others–apply to any preliminary injunction issued by the Court.

18 U.S.C.A. § 3626(a)(2) (2007).  Moreover, the statutory limits of the PLRA expressly apply to consent decrees, not just litigated adjudications.  *Id.* § 3626(c)(1).  In short, the PLRA limits this Court's power–whether under a Consent Decree or otherwise–to enter any prospective relief without first finding an ongoing violation of a constitutional (or other Federal) right.

The requirements of the Consent Decree and the PLRA taken together mean that in this case Plaintiffs must demonstrate not only a breach of the Consent Decree but also that the breach has constitutional significance.  If either is lacking, the Court can give no relief in this case.  Thus, if a violation of the Consent Decree occurs but does not rise to the level of a constitutional violation, the Court has no power to order relief.  Similarly, even if Plaintiffs could demonstrate a constitutional violation, that alone would not suffice to authorize relief *in this case*.  Rather, such a violation would have to be the subject of a new lawsuit.  To be part of this case, a constitutional violation must tie back to a breach of the Consent Decree.  Recognizing the limited scope of this case is critical, because a lawsuit like this one, encompassing so many different issues over 27 years, has the potential to expand far out of proportion to its original Consent Decree shape, and to become, in effect, a roving judicial commission to search for and correct constitutional violations wherever they may occur in the Michigan prison system.

Two major occurrences have shaped the recent procedural history of this case: the tragic death of a mentally ill prisoner in August, 2006, which highlighted mental health issues described in detailed findings by the Court (Opinion of November 13, 2006, Dkt. No.

2186, and Opinion of December 7, 2006, Dkt. No. 2233); and the State of Michigan's decision as part of an overall cost-containment plan to close significant portions of the original *Hadix* facilities and transfer inmates to other MDOC facilities. (Opinion of March 6, 2007, Dkt. No. 2343.) The Court's Opinions and Orders linked to those two occurrences have resulted in a number of appeals to the Sixth Circuit now scheduled for hearing September 14, 2007 as well as a blizzard of further proceedings in the district court. This Opinion disposes of the district court motions considered during oral argument on August 29, 2007.

### DECISION

A.    *Defendants' Motion regarding SMT's B Unit (Dkt. No. 2540)*

Earlier this year, Defendants permanently closed 8-Block, which was within the original SPSM-CC and therefore a *Hadix* facility. (Order of May 14, 2007, Dkt. No. 2419, at 1.) Defendants transferred Prisoners housed in 8-Block immediately before it closed to housing Units A and B, outside the walls of SPSM-CC. (*Id.*) Units A an B are not original *Hadix* facilities. Because Unit B is not an original *Hadix* facility, and because former 8-Block prisoners now housed in Unit B are not going to return to 8-Block, Defendants ask "to Terminate the Court's Jurisdiction" over Unit B.

The *Hadix* class certification order defines the *Hadix* class as "all prisoners who are, or will be, confined at the State Prison of Michigan – Central Complex." (Order Granting Motion for Certification to Proceed on a Class Action Basis, Dkt. No. 33.) The Order Accepting Consent Judgment clarifies that SPSM-CC, including the Reception and

Guidance Center, means "all areas within the walls of the State Prison of Southern Michigan a the time this cause commenced and all areas which will supply support services under the provisions of this Consent Judgment."  (Order Accepting Consent Judgment, Dkt. No. 213 at 1-2.)  Only prisoners housed in such areas are part of the *Hadix* class.  Unit B  is not part of SPSM-CC.  Therefore, Unit B is a *Hadix* facility only if it provides "support services" under the Consent Decree to a *Hadix* facility.  If B Unit provides such support services, then prisoners housed in B Unit fall within the *Hadix* class.  If B Unit does not provide such support services, then prisoners housed in B Unit do not fall within the *Hadix* class.

The United States Court of Appeals for the Sixth Circuit has set forth a framework for analyzing whether a facility is providing "support services" under the *Hadix* Consent Decree.  The case involved whether the district court had improperly extended its jurisdiction under the Consent Decree by permitting independent monitoring of *Hadix* prisoners at certain institutions outside the SPSM-CC.  *Hadix v. Johnson*, Nos. 93-1551, 93-1555, 93-1559, 93-1560, 93-1642, 93-1643, 1995 WL 559372, at *6 (6th Cir. 1995).  At the time of the 1995 *Hadix* case, mentally ill *Hadix* prisoners were receiving regular mental health treatment off-site.  *Id*.  The Defendants sought to preclude monitoring of such off-site services because they took place outside of the SPSM-CC.  *Id*. at* 7.  The district court disagreed.  *Id*.  In affirming the district court, the Sixth Circuit found that the plain language of the Consent Decree recognized that some mental health services would be provided outside of the SPSM-CC and that the locations of such services might change over time.  *Id*.

The Sixth Circuit emphasized, however, that the facilities providing such services did so on a temporary basis and noted that the order at issue did not contemplate following and monitoring permanent transferees.  *Id*. at *8.  The Sixth Circuit concluded that "monitoring outside the SPSM-CC does not apply to transfers based on security or safety concerns or for other administrative reasons, but applies only to the *Hadix* prisoners who are sent outside the confines of the SPSM-CC temporarily for the purpose of receiving mental health care, *with the anticipation that they will return to the SPSM-CC once treatment is complete*."  *Id. (emphasis added).*

In the current situation, there is no expectation that any prisoners will return from Unit B to 8-Block, because Defendants have closed 8-Block.  (Order of May 14, 2007, Dkt. No. 2419, at 1.)  This makes the former residents of 8-Block permanent transferees, and not prisoners temporarily receiving services "with the anticipation they will return to SPSM-CC."  Under the Sixth Circuit's prior holding, B Unit is neither within the walls of SPSM-CC, nor providing support services to a *Hadix* facility.  Thus, B Unit is not a *Hadix* facility, and prisoners transferred from 8-Block to B Unit are not part of the *Hadix* class. Termination of injunctive relief as to B Unit is therefore appropriate.

Plaintiffs object that Defendants may not simply close *Hadix* facilities and transfer prisoners for the purpose of evading orders of the Court.  But whatever limits there may be on Defendants' ability to close facilities and transfer prisoners *for the purpose of evading Consent Decree requirements,* those limits do not apply to *bona fide* closure, transfer

and other prison management decisions simply because they have an impact on the size of the class covered by the Consent Decree.  In this case, Defendants have decided to close 8-Block and transfer prisoners as part of an integrated prison management plan designed to minimize costs and otherwise improve prison management.  Far from using Unit B to evade the Consent Decree, Defendants actually transferred prisoners there in partial fulfillment of the fire safety aspect of the Consent Decree.  It would be perverse indeed if fulfillment of one aspect of the Consent Decree had the effect of expanding the scope of the overall litigation. There is no indication here that Defendants are manufacturing a pretext for their facility closure and prisoner transfer plan.  Provided Defendants honor the Consent Decree, there is no basis for this Court to interfere with their management decisions.  If Defendants subject transferred prisoners to unconstitutional conditions of confinement in the new housing units, new litigation can address and correct any violations.

Defendants have framed the relief requested as a "termination of the Court's jurisdiction" over B Unit.  This is not the language of the PLRA.  The statute speaks only in terms of granting and terminating prospective relief, not termination of jurisdiction.  *See* 18 U.S.C.A. § 3626(b) (2007).  Accordingly, the Court will use the language of the statute, grant Defendants' motion to the extent of terminating all injunctive relief regarding B Unit, and deny the motion in all other respects.

B.   *Questions Posed by the Sixth Circuit Concerning Transfer Issues*

In February 2007 Defendants announced plans to close SPSM-CC and Block

7 of the Reception and Guidance Facility, both *Hadix* facilities. (Opinion of March 6, 2007, Dkt. No. 2343, at 1). Shortly after the announcement of the closure plan, the District Court enjoined its implementation and ordered Defendants timely to file a transfer plan addressing specific concerns relating to health care for transferees. *(Id.)* Defendants filed an initial Transfer Plan (Defendants' Transfer Plan of April 20, 2007, Dkt. No. 2397), which the District Court rejected. (Order of May 4, 2007, Dkt. no. 2410.) On June 26, 2007, the Sixth Circuit stayed a portion of the Court's injunction on transfers and at the same time directed this Court "to reconsider the Defendants' Transfer Plan with respect to special needs prisoners, specifically addressing the following issues: 1) whether transfer evaluations are to be undertaken on an inmate-by-inmate basis or a facility-by-facility basis; 2) which party – the State or the plaintiffs – bears the burden of proof with respect to the medical care available at the non-*Hadix* facilities and the suitability of that care for each inmate; and 3) why does the State's transfer plan fall short of complying with the transfer requirements of the consent decree." (Order, Dkt. No. 2508, at 3-4.)

The Sixth Circuit's first question is whether transfer evaluations must be on an inmate-by-inmate basis or a facility-by-facility basis. To answer the question, this Court looks first to the Consent Decree, the foundation of the case. The Consent Decree calls for an inmate-by-inmate approach, stating explicitly that before transfer or other substantial travel, each inmate is to be evaluated by qualified health care personnel to assess suitability for travel or institutional reassignment. (Consent Decree ¶ II.A.3.b.) The one and only

provision of the Consent Decree that addresses transfer issues reads in its entirety: "Prior to transfer to another facility or other substantial travel, each inmate shall continue to be evaluated by qualified health care personnel to assess suitability for travel or other institutional reassignment." *Id.* The Consent Decree does not speak of any evaluation of the receiving facility itself. The parties also support an inmate-by-inmate approach, although Plaintiffs' support is qualified. (*See* Defendants' August Transfer Plan, Dkt. No. 2593, and Plaintiffs' Brief in Opposition to Defendants' Motion to Approve Transfer Plans, Dkt. No. 2594, at 45.) Indeed, it is difficult to imagine how a facility-by-facility approach could work without effectively expanding the scope of this case. Health care issues outside of *Hadix* facilities that rise to the level of constitutional violations must be addressed in separate lawsuits.

The Sixth Circuit's second question is which party bears the burden of proof on medical care available at the non-*Hadix* facilities and the suitability of that care for each inmate. The Court believes that Plaintiffs must bear the burden of proving all elements necessary to trigger this Court's authority to intervene, just like any party seeking affirmative relief under a contract, Consent Decree or other claimed legal right. In this case, that means Plaintiffs bear the burden of proving that Defendants are in breach of the Consent Decree provision governing transfer. Moreover, because this is a prison conditions case, Plaintiffs also must carry the burden of proving that any Consent Decree violation regarding transfer is of constitutional proportions. This result is consistent with the Sixth Circuit's 1995 *Hadix*

decision, holding that where Plaintiffs sought to monitor treatment provided in facilities to which the Consent Decree did not specifically refer, Plaintiffs had to bear the burden of proof regarding the treatment provided. *Hadix v. Johnson*, Nos. 93-1551, 93-1555, 93-1559, 93-1560, 93-1642, 93-1643, 1995 WL 559372, at *8 (6th Cir. 1995).

Plaintiffs contend that they do not necessarily have the burden of proving all facts required to support final relief at the preliminary injunction stage of the case. That is certainly true, but beside the point. It remains their burden throughout the proceeding to prove the factual basis for relief. At the preliminary injunction stage, it may well be that a particularly strong showing of irreparable harm, balance of equities and the public interest makes it relatively easier for Plaintiffs for demonstrate a probability of success on the merits. But that is quite different than suggesting the burden of proof itself shifts in some way to the Defendants. To the contrary, a preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948, at 129-130 (2d ed. 1995). A federal court's authority to prevent harm–even irreparable harm–must always be linked to vindication of a party's legal right, and not simply to the fact of harm itself.

Finally, the Sixth Circuit has asked the Court to address why the State's transfer plan falls short of complying with the transfer requirements of the Consent Decree. The Consent Decree's transfer requirements are simple: "Prior to transfer to another facility or

11

other substantial travel, each inmate shall continue to be evaluated by qualified health care personnel to assess suitability for travel or other institutional reassignment." (Consent Decree ¶ II.A.3.b.) This is all the Consent Decree itself says about transfer issues. The evidence indicates that Defendants more than satisfy this requirement. Before transferring a prisoner, Defendants complete a series of forms and checks to determine what, if any, limiting conditions a prisoner has, and whether the intended receiving facility can accommodate those needs. This is all the Consent Decree requires.

Plaintiffs argue that in addition to the transfer requirements of the Consent Decree itself, the Court must also consider the transfer requirements in a Disabilities Plan submitted to the Court in 1996. (Plaintiffs' Brief in Opposition, Dkt. No. 2594, at 39.) Plaintiffs assert that the Disabilities Plan supplements the Consent Decree. (*Id*.) However, the current status of the Disabilities Plan is murky, and during oral argument the parties disputed whether the Disabilities Plan remains in force. The debate is ultimately academic because the Defendants' August Transfer Plan effectively complies with the transfer requirements of the Disabilities Plan in any event. The Disabilities Plan provides:

> [A]s part of the health clearance for transfer from a Consent Decree facility to another facility of a prisoner with a health-related disability, healthcare staff shall review the prisoner's health record and perform an assessment of the prisoner's disabilities and functional needs. As part of this review, health care staff shall ensure, using the health clearance grid, that the receiving facility is able to accommodate the special needs of a prisoner with a health-related disability. Services not readily identifiable on the health care grid will be assured by health care staff at the sending institution by making telephone contact with

the health care staff at the receiving institution. The Bureau of
Health Care Services staff shall ensure that the health clearance
grid is revised as appropriate and provide health care staff in the
institutions with up-to-date information on the services available
in all Department facilities."

(Defendants' Plan on Health-Related Disabilities dated February 2, 1995, Dkt. No. 633 at 2.)

The evidence indicates that Defendants effectively employ a transfer grid in all their

transfers, and have since the original implementation of the Disabilities Plan. Accordingly,

even if the Disabilities Plan remains in effect as part of the Consent Decree, Defendants are

in effective compliance with it.

Moreover, the updated August Transfer Plan includes protections and

information that was not part of the earlier Transfer Plan the Court rejected. The earlier

Transfer Plan contemplated transferring approximately 32 prisoners each to all or most

MDOC facilities, but the August Transfer Plan contemplates transferring only approximately

20 prisoners each to all or most MDOC facilities–a reduction of over 33%. This reduction

directly responds to the Court's concern about medical staffing ratios at the receiving

facilities. Even if a portion of the reduction is attributed to transfers that have already

occurred, the reduced one time influx of new prisoners will be easier for the receiving facility

to absorb. The August Transfer Plan also addressed the Court's concern about specialty care

available to transferees. The August Plan, unlike earlier versions, describes in detail the

specialists with whom prison medical personnel from the various MDOC facilities may

consult, listing them by name and noting that there will be a "fallback safety net of Jackson

area services while allowing Defendants and CMS to further develop specialist relationships

13

in other communities." (August Transfer Plan at 5.)  Further, Defendants have updated the transfer grid to include a notation if a facility has reached a point at which it can handle no more chronic care prisoners.  (*Id*.)  Defendants have also added steps for assessment following each prisoner's transfer: "Defendants are requiring that all JMF prisoners transferred to a different facility be seen within 5 business days by [a medical service provider] at the receiving facility."  (*Id*. at 8.)  All of these steps go beyond the transfer requirements of the Consent Decree, the plain language of which requires simply that inmates be evaluated for suitability before significant travel or transfer, and address the concerns expressed by the Court in earlier rejections of transfer plans.  If, despite the Transfer Plan, actual conditions in a new facility violate the Constitution, a proper plaintiff can of course bring new litigation on that topic.

Because the Defendants' August Transfer Plan responds meaningfully to the Court's earlier concerns and complies fully with the transfer requirements of the Consent Decree, the Court would normally approve Defendants' August Transfer Plan.  The procedural posture of this issue is unusual, however, with an appeal of the preliminary injunction related to an earlier Transfer Plan pending at the appellate level, and the new August Transfer Plan before this Court.  As a technical matter, the Court appears to have ongoing jurisdiction, despite the pending appeal from a preliminary injunction.  *See* 21 Charles Alan Wright et al., Federal Practice and Procedure § 3921.2, at 53 (2d ed. 1996) ("Ordinarily an interlocutory injunction appeal under § 1292(a)(1) does not defeat the power of the trial court to proceed further  with the case").  However, District Court action that at

14

least arguably touches directly on the very preliminary injunction before the Court of Appeals raises a closer question. *Id.* at 60. With the Court of Appeals hearing in this case is so close at hand, the most prudent course calls for preserving the status quo while awaiting the decision of the appellate court. Accordingly, this Court will approve the August Transfer Plan submitted by Defendants for the reasons just recited, but will stay the effectiveness of its approval until the Sixth Circuit issues its mandate in the pending appeal.

C.    *Plaintiffs' Motion to Show Cause Concerning SERAPIS Connectivity with PharmaCorr System* (Dkt. No.2537)

In December, 2006 the Court entered a Permanent Injunction, one element of which explicitly ordered Defendants "to establish connectivity and utility of SERAPIS [the electronic medical records system used by the MDOC] with the electronic systems of Pharmacorr, Inc.[the pharmacy provider to the MDOC] regarding on-going pharmacy services on or before February 1, 2007." (Permanent Injunction, Dkt. No. 2234, at 2.) Defendants appealed the Permanent Injunction, but did not seek or obtain a stay of any of any of its provisions. Nor did they seek relief from any of the deadlines in the Permanent Injunction. They have not asserted they are unable to comply with portions of it. They have not asked the Court to clarify its meaning on any issue. Even so, they have admittedly not complied or, until recently, even tried to comply with the connectivity order. Accordingly, Plaintiffs ask for a finding of contempt and an appropriate coercive sanction.

It is a basic proposition of law that parties must comply promptly with all orders and judgments of courts. *See Maness v. Meyers*, 419 U.S. 449, 458, 95 S. Ct. 584,

591, 42 L. Ed. 2d 574 (1995).  Failure to do so may lead to contempt citation and sanctions.

A contempt finding is appropriate where a party shows by clear and convincing evidence that

the litigant violated "'a definite and specific order of the court requiring him to perform or

refrain from performing a particular act or acts with knowledge of the court's order.'"  *Nat'l*

*Labor Relations Bd. v. Cincinnati Bronze, Inc.*, 829 F. 2d 585, 591 (6th Cir. 1987), (quoting

*SEC v. First Financial Group of Texas, Inc.*, 659 F.2d 660, 669 (5th Cir. 1981)).  *See also*

*Glover v. Johnson*, 138 F.3d 229, 244 (6th Cir. 1998) (quoting *Glover v. Johnson*, 934 F.2d

703, 708 (6th Cir. 1991) (internal citations omitted)).  Any sanction imposed for a civil

contempt must have as its goal coercing compliance with the Court's orders or compensating

for losses sustained because of the contempt, and not punishment for wrongdoing.  *See*

*Glover v. Johnson*, 199 F. 3d 310, 313 (6th Cir. 1999), (citing *TWM Manufacturing Co. v.*

*Duna Corp*, 722 F. 2d 1261, 1273 (6th Cir. 1983)).

   In this case, Defendants admit they have not complied with the connectivity

order of the Court even now, nearly eight months after the compliance deadline.  The court's

order was clear on its face.  It had a specific deadline.  Defendants did nothing to seek relief

from operation of the order.  In fact, it appears from Defendants' belated and somewhat

inconsistent explanations (discussed below) that they did little, if anything, to even try to

comply with the order until Plaintiffs' filed their contempt motion.  Plainly, Plaintiffs have

carried their burden of establishing a *prima facie* case of contempt.

   Under *Glover*, 138 F.3d at 244, the burden shifts to the Defendants to explain,

if they can, their failure to comply in some way that negates a finding of contempt.  The

explanations offered by Defendants here fail to justify their non-compliance. Defendants belated explanations–first received by the Court on July 13, 2007, six months after the compliance deadline and only in response to a contempt motion–fail to demonstrate a valid defense. Defendants have offered basically three different reasons for not complying with the order: 1) that they decided to change policies internally; 2) that they encountered unexpected technical difficulties; and 3) that their counsel overlooked the obligation. (*See* Defendants' Response to the Show Cause Order regarding SERAPIS Electronic Connectivity with PharmaCorr, Dkt. 2550 at 3 and Transcript of Motion Hearing held August 29, 2007, Dkt. No. 2621, 62 - 81.) None of these reasons is convincing, nor would any of these reasons establish an inability to comply justifying Defendants' ongoing violation. *See Nat'l Labor Relations Bd. v. Cincinnati Bronze, Inc*., 829 F. 2d 585, 590, 591 (6th Cir. 1987), citing *Maness v. Meyers*, 419 U.S. 440, 458 (1975); *Glover*, 138 F.3d at 244 (requiring a detailed and categorical explanation for a claimed inability to comply). As this Court has noted before, Defendants are free to appeal or otherwise challenge the Court's orders through lawful procedures, but they are not free to disregard the Court's orders during the challenge. (Order dated August 14, 2007, Dkt. No. 2595 at 2.)

Defendants have advised the Court that they are actively working on the issue now, and that they anticipate completion no later than October 31, 2007. That is, of course, a step in the right direction, but it does not excuse the lengthy delay to date, particularly on an issue that has potential to improve delivery of pharmaceuticals to the prisoner population–a repeated source of serious medical complications among *Hadix* prisoners. (*See*

17

First Report of the Office of the Independent Medical Monitor, Dkt. No. 2535.) The Court finds that the Plaintiffs have carried their burden on this matter, and that Defendants are in contempt for failing to comply with the Court's connectivity order. As noted above, the sanction imposed should aim at coercing compliance, or compensation for loss, and not punishment. With that in mind, the Court adopts Plaintiffs' suggestion of a fine of $1,000 per day of non-compliance from the February 1, 2007 deadline; provided, however, that if Defendants do establish connectivity by October 31, 2007–as they say they can do–the contempt will be purged and no fines will be imposed, levied or collected.

> D.    *Plaintiffs' Motion to Show Cause concerning Mental Health Plan (Dkt. No. 2485)*

In its November 13, 2006 Order and Preliminary Injunction reopening the mental health issues in the case following the death of Prisoner T.S., the Court ordered Defendants to submit a plan addressing numerous aspects of mental health care. (Order and Preliminary Injunction at 1, Dkt. No. 2187.) Defendants have appealed the Court's order and preliminary injunction, but in the meantime have filed multiple proposed mental health care plans in an effort to comply with the Court's Order and Preliminary Injunction and the Court's further related orders. (Defendants' Health Care Plan regarding Mental Health Activities dated December 28, 2006, Dkt. No. 2256; Defendants' Revised Health Care Plan Regarding Mental Health Activities dated June 7, 2007, Dkt. No. 2474; and Defendants' Revised *Hadix* Mental Health Care Plan dated August 20, 2007, Dkt. No. 2601.) The succession of proposed mental health plans reflect progressive efforts by the Defendants to address the

Court's concerns despite disagreement with the preliminary injunction requiring submission of the plans in the first place.  Plaintiffs move for a contempt finding anyway because they argue that the plans fail to incorporate all the of the specific remedial suggestions made by the Independent Medical Monitor in response to the original plan and concurred with  by the Court.  (Order of May 4, 2007, Dkt. No. 2408.)

The preceding section outlines the applicable law of contempt.  In this instance, the Court does not believe that Plaintiffs have made out a *prima facie* case of contempt.  The root order requiring the mental health plan was the Preliminary Injunction of November 13, 2006 (Dkt. No. 2187), in which the Court–properly mindful of the PLRA–gave Defendants a wide berth in the particulars of any plan, provided the plan was "consistent with" the Court's concerns, as expressed in its Opinion.  If Defendants had completely failed to prepare and submit a plan, that would be one thing.  But here Defendants have submitted multiple plans in a timely manner, each of which in progressive fashion endeavors to address the Court's concerns, albeit not always in a way the Independent Medical Monitor would choose, or the Court was prepared to approve.  Even the Court's later Order rejecting the Defendants original plan (Dkt. No. 2408) does not purport to specify precisely what Defendants' plan must contain; only that it has not yet addressed various issues to the Court's satisfaction.

A disagreement over the particulars of a plan does not, in this Court's judgment, amount to clear and convincing evidence of a violation of "'a definite and specific order of the court requiring [Defendants] to perform or refrain from performing a particular act or acts with knowledge of the court's order.'"  *Nat'l Labor Relations Bd. v. Cincinnati*

*Bronze, Inc*., 829 F. 2d 585, 591 (6th Cir. 1987), (quoting *SEC v. First Financial Group of*

*Texas, Inc*., 659 F.2d 660, 669 (5th Cir. 1981)).  Plaintiffs appear to contend that Defendants

are in contempt if their plan does not adopt precisely the particular remedial measures

recommended by the Independent Medical Monitor and concurred with by the Court.  But

that reads too much into the text of the Court's prior orders, which simply require plans that

are "consistent with" the expressed concerns of the Court (Dkt. No. 2187), or that are

"addressing" the concerns of the Court (Dkt. No. 2408).  Moreover, Plaintiffs' reading of the

orders raises serious due process concerns: if Plaintiffs' reading of the orders were correct,

they would essentially convert the Court's Preliminary Injunction into a Final Injunction

without giving Defendants their right to be heard at a trial on any disputed factual issues.

Indeed, the Court's Preliminary Injunction expressly contemplated discovery and other

preparation for just such a trial.  The Court's orders regarding the mental health plan must

be interpreted in that light.

Of course, a finding that Defendants are not in contempt on this issue is not the

same thing as saying the Court approves of the current, or any other version of the

Defendants' mental health plan.  The Court reserves judgment on that question at this time.

## CONCLUSION

The parties and the Court have accomplished much over the twenty-seven year

life of this litigation.  In particular, the most egregious conditions of confinement that

initially prompted this case–conditions that even Defendants acknowledge were

unacceptable–have been corrected.  There are ongoing issues that must still be addressed

under the Consent Decree and the Constitution, and sometimes the incidents bringing those issues to light are truly tragic, as in the cases detailed in earlier opinions of this Court. When the facts reveal a violation of the Consent Decree of constitutional proportions, then this Court can, must and will act to enforce the Consent Decree, the Constitution and the prior orders of the Court directed to the same ends. In the absence of both a Consent Decree violation and a Constitutional violation, however, this Court has no power to act. This is the guiding principle that the Court has endeavored to apply to the various issues presently before it. The parties and this Court now await the further direction of the Court of Appeals.

Dated:    September 8, 2007        /s/ Robert J. Jonker
                                   ROBERT J. JONKER
                                   UNITED STATES DISTRICT JUDGE