UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EVERETT HADIX, et al.,

       Plaintiffs,

                                  CASE NO. 4:92-CV-110

v.

                                  HON. ROBERT J. JONKER

PATRICIA L. CARUSO, et. al.,

       Defendants.

_____/

## OPINION

### Introduction

    This prisoner civil rights class action began almost thirty years ago, when twenty-three inmates filed suit in 1980 in the Eastern District of Michigan to protest conditions of confinement at the State Prison of Southern Michigan – Central Complex (the "SPSM–CC"). In August, 1981, the Court certified the class, defined as "all prisoners who are, or will be, confined at the [SPSM–CC]." On May 13, 1985, the Court approved a proposed Consent Decree. In doing so, the Court noted that likely structural changes in the SPSM–CC might involve renaming parts of that facility. The Court clarified that "the facility at issue in this lawsuit, [the SPSM–CC], including the Reception and Guidance Center, shall be defined as 'all areas within the walls of . . . the [SPSM–CC] at the time this cause commenced and all areas which will supply support services under the provisions of this Consent Judgment, e.g. food service and Boiler Plant operations.'" (Order Accepting Consent J., docket # 213, *Hadix v. Johnson*, CA No. 80-73581). Under the Consent Decree, the Court retained jurisdiction to enforce the terms of the judgment. (*Id.*)

Now, almost twenty-four years after the entry of the Consent Decree, the shape of the case has changed dramatically. All twenty-three of the original named plaintiffs have died. A single named plaintiff, Clarence Moore, represents the entire class. The primary long-term housing units of the SPSM-CC have closed, and the state does not intend to re-open them. The class itself has therefore diminished greatly in size. The nature of the class has also changed fundamentally: while previously the class encompassed mainly prisoners housed long-term in the SPSM-CC, the class now consists primarily of prisoners housed temporarily in a *Hadix* facility (such as the Reception and Guidance Center (RGC)) before proceeding to the correctional facilities where they will be housed longer-term. As *Hadix* prisoners move to non-*Hadix* facilities, they leave the *Hadix* class. *Cf. Hadix v. Caruso*, 297 Fed. Appx. 504, 506-07 (6th Cir., Oct. 20 2008) (Consent Decree does not apply to non-*Hadix* facilities to which former *Hadix* prisoners are transferred.)) Further, most of the Consent Decree provisions, which pertain to a range of confinement issues such as sanitation, health care, safety, overcrowding and security, have been resolved and closed. Only certain subsections, concerning medical care, have remained open since the entry of the Consent Decree. In addition, the Court re-opened to a limited extent certain provisions regarding mental health care, through a preliminary injunction entered November 13, 2006 (docket # 2187) (the "November 2006 Order").

Observing that changes in the scope and nature of the class might dictate changes in the scope and nature of relief, the Sixth Circuit remanded to this Court three appeals to consider in light of the most recent developments in the case. *Hadix v. Caruso*, 248 Fed. Appx. 678 (6th Cir., Sept. 21, 2007). One of the appeals, regarding heat-related issues in *Hadix* facilities, has been resolved. The other two appeals concern the limited re-opening of certain mental health care provisions in the Consent Decree and the expansion of the Office of the Independent Medical Monitor (OIMM). In

addition, the parties have filed a number of other motions, including motions to terminate injunctive

relief as to JMF and the Dialysis Unit.  The final injunctive hearing on mental health issues has also

taken place.  This Opinion addresses the remands, disposes of several pending motions and closes

trial court proceedings on mental health issues.

### I.  Re-Opening of Mental Health Provisions

#### A.      Background

From the entry of the Consent Decree until early 2001, the Court monitored mental health

care at the *Hadix* facilities.  Early in 2001, the Court found that the mental health care provisions of

the Consent Decree had been satisfied, and granted Defendants' request to terminate enforcement

of those provision.  Approximately five years later, a mentally ill prisoner confined in the segregation

unit of JMF, a *Hadix* facility, died under extraordinary and tragic circumstances.  Following that

event, Plaintiffs moved to re-open the mental health care provisions of the Consent Decree.

Invoking FED. R. CIV. P. 60(b)(6), the Court granted Plaintiffs' motion, and issued a preliminary

injunction re-opening mental health care provisions to a limited extent.  Specifically, the Court

ordered Defendants to: (1) cease using punitive mechanical restraints within the *Hadix* facilities and

develop procedures to enforce that limitation; (2) develop a staffing plan to provide adequate

psychiatric and psychological staffing at *Hadix* facilities to ensure timely routine and emergent

psychiatric and psychological care; (3) work to provide daily psychologist and psychiatrist rounds

in the segregation units at *Hadix* facilities; and (4) better coordinate mental health and medical staff,

in part by requiring weekly conferences of mental health and medical staff and incorporating training

to prevent staff and administrative indifference to the provision of care.  (November 2006 Order,

docket # 2187).  The Court ordered Defendants to prepare a mental health plan addressing those

requirements. (*Id.*) The Court also permitted discovery to illuminate the limited mental health care items it had re-opened, and scheduled a final injunctive hearing to determine the necessity of keeping mental health provisions open. (*Id.*).

Defendants appealed the Court's order. While the appeal was pending, Defendants submitted multiple proposed mental health care plans in an effort to comply with the Court's requirements. (Defendants' Health Care Plan regarding Mental Health Activities Dated December 28, 2006, docket # 2256; Defendants' Revised Health Care Plan Regarding Mental Health Activities dated June 7, 2007, docket # 2474; and Defendants' Revised *Hadix* Mental Health Care Plan dated August 20, 2007, docket # 2601). The Court rejected Defendants' first two proposed mental health care plans but reserved judgment concerning the third plan in anticipation of a final injunctive hearing. (See Revised Opinion dated September 10, 2007, docket # 2624, at 21.)

The Sixth Circuit ultimately remanded to the Court the re-opening of mental health care provisions under the Consent Decree and issues presented by Defendants' appeal concerning mental health care. *Hadix v. Caruso*, 248 Fed. Appx. 678 (6th Cir., Sept. 21, 2007). The appellate court noted that if the State were to close JMF (which has since occurred), and if the Court were to rule that SMT Building A is no longer a *Hadix* facility (which has since occurred), "the prisoner population of the *Hadix* facilities would change dramatically – and so would the number of *Hadix* prisoners needing mental health services." *Id.* at 681-82. The Sixth Circuit pointed out that "if indeed the State closes JMF . . . some portions of the district court's November 13 order assuredly will have little relevance – such as the requirement that the State's mental healthcare plan 'must include additional staffing to ensure full-time psychiatric coverage at JMF.'" (*Id.*)

    **B.**    **Application of Fed. R. Civ. P. 60(b)(6)**

Under FED. R. CIV. P. 60(b)(6), a court may "on motion and just terms...relieve a party or its legal representative from a final judgment, order or proceeding...for any other reason [beyond those found in FED. R. CIV. P. 60(b)(1)-(5)] that justifies relief."  FED. R. CIV. P. 60(b)(6).  A court is limited both in the scope of relief it may grant under FED. R. CIV. P. 60(b)(6) and the circumstances under which it may grant such relief:

> [R]elief under Rule 60(b) is circumscribed by public policy favoring finality of judgments and termination of litigation.  This is especially true in an application of subsection (6) of Rule 60(b), which applies only in exceptional or extraordinary circumstances which are not addressed by the first five numbered clauses of the Rule.  This is because almost every conceivable ground for relief is covered under the other subsections of Rule 60(b).  Consequently, courts must apply Rule 60(b)(6) relief only in unusual and extreme situations where principles of equity mandate relief.

*Blue Diamond Coal Co. v. Trustees of the UMWA Combined Benefit Fund*, 249 F.3d 519 (6th Cir. 2001) (internal punctuation and citations omitted); *accord Ford Motor Co. v. Mustangs Unlimited, Inc.*, 487 F.3d 465 (6th Cir. 2007)).  In re-opening a final judgment, order or proceeding under Fed. R. Civ. P. 60(b)(6), a court must determine that extraordinary or exceptional circumstances exist to justify the re-opening.  *Ford Motor Co.*, 487 F.3d at 470.

Defendants first claim is that the Court misapplied Rule 60(b) by re-opening the mental health care provisions even to a limited extent.  *See* Def.s' Mot. to Terminate Injunctive Relief Regarding Mental Health for the Hadix Facilities, docket # 2684, 18-20; *see also Hadix v. Caruso*, 248 F. Appx. 678, at 679 (Describing Defendants' appeal of the Court's re-opening under Fed. R. Civ. P. 60(b)(6).) The Court disagrees.  Exceptional circumstances underpinned the Court's decision to re-open on a limited basis the mental health care provisions of the Consent Decree.  The death of T.S. was an extraordinary event warranting urgent action.  It occurred in a core *Hadix* facility (now closed).  In applying FED. R. CIV. P. 60(b)(6), the Court strove to balance the public policy favoring

closure in litigation with the need for justice.  The Court restricted the scope of the re-opening to specific, measurable steps carefully tied to the original Consent Decree and applied to a *Hadix* facility.  The Court also scheduled a final injunctive hearing to determine whether the mental health care provisions should remain open, thus limiting the potential duration as well as the scope of the re-opening.  The Court supported its decision to re-open the decree with detailed findings and facts (Opinion of Nov. 13, 2006, docket # 2186; Findings of Fact and Conclusions of Law of December 7, 2006, docket # 2233) that easily satisfy the Rule 60(b) standard.  Moreover, the medical provisions of the Consent Decree have never been closed, and as the death of T.S. illustrates, medical and mental health issues often overlap.

Accordingly, the Court rejects Defendants' claim that the mental health provisions of the Consent Decree were improperly re-opened.  The remaining question is whether ongoing relief under the mental health provisions is warranted under the controlling legal standard.

### C.      Legal Standard: Systemic Deliberate Indifference

Applicable law regarding the provision of mental health care to prisoners has changed significantly since the entry of the Consent Decree, through Congress's enactment of the Prison Litigation Reform Act ("PLRA").  The PLRA strictly limits the Court's ability to grant prospective relief concerning prisoner conditions.  The Court may grant such relief only after finding an ongoing violation of a constitutional or other Federal right, and the relief must be narrowly tailored.  *See* 18 U.S.C. § 3626(a)(1) ("Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff (or plaintiffs))."  Together, the Consent Decree and PLRA require that to obtain prospective relief,

6

Plaintiffs must demonstrate both a breach of the Consent Decree and that the breach has constitutional significance.

In this case, to demonstrate a claim of constitutional proportions concerning the provision of mental health care, Plaintiffs must show systemic deliberate indifference to *Hadix* prisoners' serious mental health care needs. *See Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (*en banc*) ("[P]roperly stated, the [constitutional] right at issue is [a prisoner's] right not to have his serious medical needs treated with deliberate indifference.") (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)). A claim of deliberate indifference under the Eighth Amendment has two components, one objective and one subjective. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The objective component requires the plaintiff to show that the medical need at issue is sufficiently serious. *Id.*, citing *Farmer*, 511 U.S. at 834. The subjective component requires the plaintiff to show that a prison official being sued "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he disregarded that risk." *Id.* (citing *Farmer,* 511 U.S. at 837). "A plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Id.* (citing *Estelle*, 429 U.S. at 106). However, "a plaintiff need not show that the prison official acted 'for the very purpose of causing harm or with knowledge that harm will result.'" *Id*. (quoting *Farmer*, 511 U.S. at 835). Rather, the subjective element of deliberate indifference is the equivalent of reckless disregard of a substantial risk of serious harm. *Id.* (citing *Farmer*, 511 U.S. at 836). A court may infer from circumstantial evidence that a prison official had the requisite knowledge. *Id.* (citing *Farmer*, 511 U.S. at 842).

D.     **Final Injunctive Hearing**

Ultimately, the final injunctive hearing was delayed and rescheduled a number of times and for various reasons, including judicial reassignment and the request of the parties.  It finally took place over the course of seven days in April, May, June and August of 2008.  The Court heard extensive testimony from witnesses for both parties and the Office of the Independent Medical Monitor.  Plaintiffs' witnesses included: Dr. Terry Kupers, M.D., an expert in psychiatry; Robert Walsh, Ph.D., an expert in psychology; Jerry S. Walden, M.D., an expert in medicine; and Diana Childers (through video deposition preserved testimony).  Defendants' witnesses included: Jeffrey L. Metzner, M.D., an expert in psychiatry; Lee H. Rome, M.D.; John Charles Rushbrook, Ph.D.; Haresh Pandya, M.D.; Royal Calley, M.A.; Craig Crawford, M.A.; and Jared Baker, M.A.  Testifying for the Office of the Independent Medical Monitor were Robert L. Cohen, M.D. and Henry Duglacz, M.D.

The parties also introduced numerous exhibits into evidence, including Plaintiffs' Exhibits 1 - 106 (excepting Exhibits 37, 38, 42, 45 and 47), Defendants' Exhibits A - SS, and OIMM Exhibits 1 - 22.  The exhibits contain a broad range of materials, including, among other things, curriculum vitae of expert witnesses; expert reports; memoranda concerning medication continuation; mental health reports; SMHU rounding reports; MDOC policy statements; internal MDOC memoranda and electronic correspondence; medical records; restraints reports; case management meeting minutes; mental health care screening documents; Independent Medical Monitor reports; deposition recording excerpts; and specific case reports.

The Court now must determine whether the State has complied with the Court's preliminary injunction, bearing in mind the observations of the Sixth Circuit concerning the impact of changes in the *Hadix* prisoner population on mental health needs, or whether ongoing relief is warranted, as

8

Plaintiffs urge.  (*See, e.g.*, Pl.s' Trial Brief, docket # 2819.)  The Court must also determine whether Plaintiffs have established a basis for ongoing mental health relief apart from any failure of the Defendants to comply with the preliminary injunction.  The Court's findings of fact and conclusions of law on each of these issues follows.  In making its findings of fact, the Court relies on its observations of the witnesses in open court, and on the analytical points cited in the following discussion.

> **E.      Findings of Fact and Conclusions of Law regarding Preliminary Injunction**
>
> **1.      Mechanical Restraints**

The preliminary injunction requires Defendants and all officers employed at *Hadix* facilities to "cease and desist from the practice of using any form of punitive mechanical restraints within *Hadix* facilities."  (November 2006 Order, docket # 2187.)  It also requires Defendants to "develop practices, protocols and policies to enforce this limitation consistent with the Court's instructions at section V.3.a of its Opinion."  (*Id.*)  While the November 2006 Order prohibits the use of punitive mechanical restraints, the Court's accompanying opinion clarifies that restraints may be used under certain limited circumstances, including "by medical and psychiatric staff to prevent self-harm, injury to staff, and interference with treatment, provided that the medical staff supervises the use of the restraints by daily physician orders and monitors the conditions of patients regularly . . . to ensure that patient health is not unduly compromised."  (Opinion of November 13, 2006, docket # 2186, at 34.)

The record indicates that the Defendants have complied with the requirements of the preliminary injunction concerning mechanical restraints, and the Court so finds as a matter of fact. They have banned the use of punitive mechanical restraints.  Dr. Cohen, of the Office of the

Independent Monitor, testified during the injunctive hearing that he had not seen any use of mechanical in-cell restraints in the housing units following the ban. (Tr. Vol. V, docket # 2815, at 163.) Dr. Cohen did testify that he had seen mechanical restraints used in a medical setting, Duane Waters Hospital, as to two prisoners on hunger strikes. (*Id*.; see also Fourth Report of the Office of the Independent Medical Monitor, docket # 2773, at 4, 8, 14-17.) The instances of mechanical restraints Dr. Cohen describes occurred in a medical context, which the Opinion concerning the ban on restraints permitted as long as there was appropriate medical supervision. (*See* Opinion of November 13, 2006, docket # 2186.) Dr. Cohen's report suggests that the medical supervision of one of the prisoners, MH2, may not have been proper. The problem appears to have had at least as much to do with the decision to force-feed Prisoner MH2 as with the use of restraints. Prisoner MH2's experience appears to have been at most an isolated incident, rather than part of a pattern of non-compliance. The record does not point to a systematic failure to comply with the Court's order concerning mechanical restraints. Defendants have complied with the November 2006 Order as it pertains to banning mechanical restraints.

### 2.    Mental Health Care Staffing

The Court also ordered Defendants to develop a plan for adequate psychiatric and psychological staffing at *Hadix* facilities to ensure timely provision of routine and emergent psychiatric and psychological services. Defendants have complied, and the Court so finds as a matter of fact. Since the Court issued the preliminary injunction, several housing units have closed, and the size of the *Hadix* population has diminished significantly, naturally reducing the numbers of additional mental health personnel needed. *See Hadix v. Caruso*, 248 Fed. Appx. 678, 681-82 (6th Cir., Sept. 21, 2007). At the same time, Defendants have increased the number of mental health

care personnel, adding at least three psychologist positions at RGC.  (*See* Def.s' Second Amended Post-Hearing Proposed Findings of Fact and Conclusions of Law, docket # 2829, at ¶ 22.) Defendants have implemented an on-call psychiatry program that appears to be working.  On-call records Defendants submitted for January, February and March 2008 reflect reasonably prompt response times, with most responses occurring within an hour of a call.  (*See* Def.s' Trial Ex. F.) Indeed, the longest delay the records show between a call and a response is approximately three hours, a time lapse not uncommon in private medical care outside of the prison system.  (*See id.*) Defendants have complied with this aspect of the Court's Order.

### 3.    Daily Rounds

The Court further ordered the Defendants to provide daily psychologist or psychiatrist rounds in the segregation unit at the *Hadix* facilities.  Now that JMF has closed, there remains only one segregation unit in this case: the Special Management Housing Unit ("SMHU") cells in RGC. Defendants have submitted evidence to show that daily rounds are being conducted in the SMHU. (*See* Def.s' Trial Ex. D.)  Although not required by the Court's November 2006 Order, Defendants have also attempted to make the rounds more effective by having one psychologist assume primary responsibility for rounding in a segregation unit for several months at a time.  (*See, e.g.,* Def.s' Revised Mental Health Care Plan, docket # 2601.)   Defendants made this change upon the recommendation of Dr. Metzner, their expert in psychiatry.  (*See* Tr. Vol. 1, docket # 2786, at 43.) Greater familiarity with the prisoners in his or her care should help the rounding psychologist better observe and respond to those prisoners' mental health care needs.  Indeed, the Court heard testimony from Jared Baker, a psychologist responsible for rounding in the SMHU over a period of several months.  It was evident from Mr. Baker's testimony that he knew well the various mental health care

needs of the prisoners in his care and that he had genuine concern for the well-being of those prisoners.

Plaintiffs acknowledge that Defendants have established appropriate weekday rounds in the SMHU. (Pl.s' Trial Brief Reply, docket # 2830, at 11.) Citing the records in Defendants' Trial Exhibit D, though, Plaintiffs contend that weekend rounds have been too short to be meaningful. (*Id*.) Plaintiffs note correctly that one of the weekend rounds reflected in the Exhibit lasted only five minutes though there were seven prisoners in the SMHU at the time. The other weekend rounds lasted longer, though not generally as long as weekday rounds. That weekend rounds tended not to last as long as weekday rounds does not demonstrate systemic deliberate indifference or failure to comply with the Court's November 2006 Order. Weekend rounds are likely to be shorter because, as Jared Baker testified, the primary goal of weekend rounds is to identify prisoners in distress, while weekday rounds have a more comprehensive focus. (*See* Tr. Vol. III, docket # 2788, at 464.) Further, Dr. Metzner explained that where one person is conducting weekday rounds for a period of months, and getting to know the prisoners well, weekend rounds might be shorter, partly because it would not always be necessary to wake prisoners who were sleeping. (Tr. Vol. 1, docket # 2786, at 43-44.) The great majority of the records reflect regular rounding that even Plaintiffs have described as appropriate. Defendants have complied with the Court's order to establish daily rounds.

### 4.    Coordination of Mental Health and Medical Staff

The Court ordered Defendants to develop protocols for the coordination of mental health and medical staff, require weekly conferences of the two disciplines, and provide training to prevent staff and administrative indifference to the provision of care. Defendants have complied with these requirements, and the Court so finds as a matter of fact. Dr. Cohen testified at trial that weekly case

12

management meetings with participants from various disciplines are occurring.  (See Tr. V, docket

# 2815, at 787-89.)  Defendants' Trial Exhibit F supports that testimony and reflects that both mental

health and medical staff are participating.  Defendants have also instituted training to curtail the risk

of staff and administrative indifference through a program, "Offenders in our Care," provided to all

staff having contact with prisoners in the JMF administrative segregation unit (now closed) or the

SMHU.  The content of the training includes, among other things, an overview of mental illness and

instruction on suicide prevention.  (Def.s' Trial Ex. C at 18).  Plaintiffs argue that to comply more

fully with the Court's preliminary injunction, Defendants should provide that training to the rest of

the staff in *Hadix* facilities.  This may well be prudent, but the Court finds that it is not essential to

satisfaction of the Court's preliminary injunction requirements.  Defendants' actions to date

concerning the coordination of mental health and medical staff reflect significant improvement in

coordination and satisfy the terms of the Court's November Order.  The Defendants must have

reasonable flexibility in implementing the coordination mandate of the Court.  Defendants have

complied with the Court's order to coordinate mental health and medical staff.

### F.     Findings of Fact and Conclusions of Law regarding General Re-opening of Mental Health Care

Plaintiffs assert that Defendants have failed to comply fully not only with the

Court's November 2006 Order, but also with the Court's May 2007 Order (docket # 2410),

which rejected Defendant's proposed mental health care plan as insufficient to cure existing

health care violations.  Plaintiffs also seek additional relief concerning mental health care beyond

the scope of the November 2006 Order and any mental health plan required to address the

Court's stated concerns.  (*See* Pl.'s Brief in Supp. of Mot. for Further Relief, Expedited

Treatment, and Waiver of Bond, docket # 2758.)  Since the November 2006 and May 2007

orders, the mental health care needs of the *Hadix* class have changed along with the shifting size,

scope and nature of the class.  Defendants have responded meaningfully and adequately to the

concerns underlying the Court's November 2006 and May 2007 Orders.  The Court sees no need

to extend mental health relief as part of this nearly 30-year-old litigation.  In the Court's view,

Plaintiffs have failed to establish by a preponderance of the evidence that Defendants are

violating the Consent Decree provisions governing mental health care, or that any asserted

violations of the Consent Decree are of constitutional proportions.

> 1.    **Mental Health Provisions of the Consent Decree**

It bears repeating that this case invokes enforcement of a 26-year-old consent decree.  To

prevail in this case, Plaintiffs must not only satisfy the constitutional standard of deliberate

indifference, but also identify and prove a violation of the underlying consent decree.  Plaintiffs

have for the most part glossed over this aspect of the case and focused on claims of alleged

deliberate indifference without any tether to the original Consent Decree's specific requirements.

In a new case challenging the conditions of confinement generally, or the provision of mental

health care in particular, that may well be enough.  But it is not enough in a consent decree case

such as this, where the parties originally entered into a settlement without any adjudication of a

constitutional violation at all.  As in any consent decree litigation, the Court is bound to enforce

the agreement of the parties, not write a new contract for the parties.  Moreover, because of the

Congressional changes to prison litigation under the PLRA, the Court may only enforce the

contract of the parties on a prospective basis to the extent the contract breach is of constitutional

significance.

The only Consent Decree provision Plaintiffs have alluded to that the Court believes is even arguably implicated by Plaintiffs' present claims is Section B.1.a.,[1] the general provisions on mental health care, which reads:

> A prisoner shall be provided with psychological or psychiatric treatment if a physician or other health care provider, exercising ordinary skill and care at the time of observation, concludes with reasonable medical certainty:
>
> (1)    that the prisoner's symptoms evidence a serious mental illness or injury;
>
> (2)    that such mental illness or injury is curable or may be substantially alleviated; and,
>
> (3)    that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial.  The right to treatment is, of course, limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable.

This is too slender a contractual reed upon which to fashion the expansive relief requested by the Plaintiffs.  The record is devoid of testimony or other evidence linking the particulars of Plaintiffs' requested relief to a supposed breach of this provision of the Consent Decree.  Accordingly, Plaintiffs have failed to meet their burden of proving by a preponderance of the evidence a breach of the mental health provisions of the Consent Decree.

This conclusion in no way gives Defendants license to ignore the mental health care needs of prisoners in their custody – whether within the shrinking *Hadix* class or not.  Defendants are always subject to this constitutional requirement, and injured plaintiffs may enforce their

_____

[1]Plaintiffs have alluded on occasion to Section B.5, concerning inmate screening, though they have not explicitly tied claims for relief to this section of the Consent Decree.  In any event, the proofs show that Defendants have inmate screening in place, and that they continue to work on refinements and improvements in the screening protocols.  Accordingly, the proofs do not support a basis for extended relief tied to this section of the Consent Decree.

rights in appropriate individual or class actions.  But this nearly 30-year-old case and 26-year-old consent decree is not a roving commission for this Court to address mental health care issues in the *Hadix* facilities of the Michigan Department of Corrections.  The Court's power is limited, in the first instance, by the agreement the parties crafted for themselves 26 years ago.  As the *Hadix* class shrinks in size and scope, it is all the more important for the Court and the parties to honor this limit.

### 2.      Deliberate Indifference

Even if Plaintiffs had been able to meet their burden of proving a breach of the Consent Decree, the Court would find on this record that the Plaintiffs did not establish systematic deliberate indifference by Defendants to the serious mental health needs of the remaining *Hadix* prisoners.  The evidence shows that Defendants have actively worked to improve the quality of mental health on a systemic level, not recklessly and systematically disregarded mental health concerns of *Hadix* prisoners.  This is not to say that the mental health care in the *Hadix* facilities is ideal, or even as good as it might be.  It is not the role of the Court, however, to impose upon a State the best possible practices as a matter of constitutional law.  Rather, the Court must limit its intervention to situations of proven deliberate indifference.

### a.      Testimony of Dr. Metzner; Bridge Order

The Court finds credible the report and testimony of Dr. Metzner, Defendants' expert in psychiatry.  In preparing his report, Dr. Metzner reviewed a wide range of documents material to the Court's November 2006 and May 2007 orders; visited Hadix facilities; met with key mental health, medical and administrative staff; observed mental health rounds; attended a case management meeting.  (Def.s' Trial Ex. C at 1-3.)  Dr. Metzner also consulted with Defendants

as they revised their mental health care plan to respond to the Court's orders.  He is well-acquainted with the Court's concerns.  Dr. Metzner's report describes substantial improvements in Defendants' provision of mental health care.  For example, Dr. Metzner observes that Defendants have enhanced supervision of psychologists and have explicitly tasked a fully-licensed supervising psychologist to help coordinate communications among the Psychological Services Unit (PSU), Department of Community Health, Corrections Mental Health Program, and Department of Corrections medical staff.  (Def.s' Trial Ex. C at 8.)  He also notes that Defendants have increased mental health care staffing.  (*Id.* at 8-10.)  Dr. Metzner opines that Defendants' plan satisfactorily addresses the Court's stated concerns, and the Court agrees.

In particular, Plaintiffs have emphasized risks presented by sudden discontinuations of psychotropic medication for prisoners coming into a *Hadix* facility.  Defendants have responded to this concern by implementing a medication bridge order designed to minimize interruptions in inmates' psychotropic medications.  (Def.s' Trial Ex. A.)  The Bridge Order requires that each prisoner taking psychiatric medications when he arrives in a *Hadix* facility continues to receive those medications at least until an appropriate mental health practitioner has examined him and determined whether the medications remain necessary.)  The preserved testimony of Diana Childers describes her efforts to see that her son would continue to receive medication following his incarceration.  Ms. Childers indicated that a policy akin to the Bridge Order would have been helpful under the circumstances her son experienced.  All parties appear to agree that the Bridge Order is a significant step forward in improving mental health care in *Hadix* facilities.  The Bridge Order promises a meaningful reduction in abrupt, potentially dangerous interruptions in psychiatric medications.

The Court recognizes that Plaintiffs do not believe the Bridge Order is sufficient to address medication issues.  In particular, Plaintiffs introduced evidence suggesting that some prisoners elect to end psychotropic medication after a consultation with a mental health professional, and that some prisoners have their medication terminated or modified after further examination.  The Court finds that this evidence does not establish systematic deliberate indifference to the serious mental health needs of the *Hadix* class.  At most, this evidence identifies possible limited cases of questionable diagnosis or treatment.  But that does not amount to deliberate indifference under the Eighth Amendment.  The Bridge Order ensures that psychotropic medication will continue at least until a mental health professional has an opportunity to make a professional judgment of the prisoner patient's needs.

### b. Mr. Baker, SMHU Rounds and Professional Supervision; Craig Crawford

The Court finds credible the testimony of Jared Baker, a limited license psychologist who conducted rounds in the SMHU over a period of several months.  Mr. Baker's on-the-ground experience and practical perspective offer especially valuable insight into the provision of mental health care in the SMHU.  Mr. Baker described receiving meaningful supervision throughout his rounding experience.  His direct supervisor, Dr. Gartland, a fully-licensed Ph.D., accompanied him on rounds in the SMHU for the first week or two, showing him how to conduct rounds.  (Tr. Vol. III, docket # 2788, at 454.)  Dr. Gartland conducted monthly team meetings and was available to answer questions both in those meetings and informally.  (*Id.* at 453, 490.)  In addition, Dr. Gartland's immediate supervisor, Dr. Walker, observed Mr. Baker's rounding, and

Dr. Walker's supervisor, Dr. Straeske, met with Mr. Baker to discuss rounding protocol.  (*Id.* at 453-54.)

Mr. Baker described to the Court a careful rounding process that began each day with his checking several sources for current information about the inmates for whom he would be caring. (*Id.* at 454-55.)  In addition to reviewing available written evaluations of the individuals in the caseload he was assigned, he checked for messages from unit nurses about inmates who might need intervention, and he checked with the officers in the SMHU about the officers' own observations.  (*Id*. at 455.)  He also asked the officers about specific behaviors of inmates in his care, including, for example, "whether or not they have...taken showers, whether or not they have taken their meals...[a]ny odd or bizarre behavior that may identify mental illness in any way." (*Id.* at 456.)  Mr. Baker described prompt and confidential evaluations of inmates newly-assigned to the SMHU.  (*Id.* at 456-57.)  He remembered details about individual patients that someone offering perfunctory care would not have recalled.  It was evident that he had come to know his prisoner patients well, and he showed evident care and concern for the inmates about whom he testified.

The Court also finds credible the testimony of Craig Crawford, Unit Chief for the Outpatient Mental Health Team.  Mr. Crawford received questions about particular inmates through both direct and cross-examination.  His responses reflected a degree of knowledge and concern that went well beyond mere trial preparation.  Like Mr. Baker, he remembered details about his patients only a person deeply committed to his patients would have recalled.  It was clear that he knew well the inmates for whom he cared.  The Court also observed that Mr. Crawford demonstrated genuine warmth and concern for inmates in his care, particularly those

suffering from seemingly intractable combinations of mental and physical problems.  Regardless

of whether Mr. Crawford, or any other mental health professional always made exactly the best

possible call, Mr. Crawford's testimony showed the very opposite of deliberate indifference.

Caring for the mentally ill in a prison setting is a truly difficult undertaking.  Mental

health care and medical providers, as well as other MDOC staff, must balance a variety of

competing concerns under challenging and at times dangerous conditions.  The instances of

forced medication discussed at trial illustrate the tangle of demands those responsible for sick

inmates confront.  In such cases, mental health care and medical providers, along with other

MDOC staff, must balance serious medical need with the right of a person, incarcerated or

otherwise, to make choices about his health, either on his own or through a duly appointed

representative.  The Court heard argument from the Plaintiffs concerning, for example, a

terminally ill inmate on whom Defendants declined to force life-prolonging treatment because

the inmate emphatically and repeatedly refused it.  (*See* Pl.s' Trial Ex. 86; *see also* Tr. Vol. VII,

docket # 2840, at 1095.)  Plaintiffs claim Defendants were deliberately indifferent to this

inmate's mental health and medical needs because they did not force the inmate to accept the

unwanted treatment.  A guardian appointed by the state court for this inmate – the inmate's own

son – agreed that treatment should not be provided, and supported the inmate's decision to refuse

treatment.  (*See* Pl.s' Trial Ex. 86.)  Plaintiffs apparently believe Defendants should have

triggered an internal administrative procedure to override the informed decision of the inmate

and his court-appointed guardian, and to force the unwanted treatment on the unwilling inmate.

The Court finds Plaintiffs' attempt to use this case as an illustration of alleged deliberate

indifference entirely misguided.  This situation points not to deliberate indifference, but to the

difficulty and delicacy of the determinations mental health care, medical providers and other MDOC staff have to make.  It also illustrates the thoughtful and sensitive balancing of these concerns by the Defendants, the very opposite of deliberate indifference.

      **c.**      **Plaintiffs' Experts**

The Court finds Plaintiff's expert in psychiatry, Dr. Kupers, polished, well-informed and credible in many respects.  However, his testimony is ultimately largely beside the point, in the Court's view.  Dr. Kupers identified many things the Defendants could do better.  Indeed, Dr. Kupers often appeared to be an advocate for "best practices" care, which is laudable and sensible, but quite different than showing deliberate indifference.  Indeed, when pressed by the Court on this point, the most Dr. Kupers could ultimately conclude was that there exists some unquantifiable risk of future harm if Defendants fail to adopt his recommendations.  (Tr. Vol. II , docket # 2787, at 422-25.)  But this falls far short of the deliberate indifference standard.  The Court heard in Dr. Kupers's testimony further evidence of the complexity of caring for the mentally ill in prison, but not evidence of deliberate indifference.  The Court also notes that Dr. Kupers, in contrast to Defendants' expert, had no real experience in actually making operational decisions within a prison setting.

The Court does not credit at all the testimony of Plaintiff's expert in medicine, Dr. Walden, whose testimony shed absolutely no light on the issues in this case.  Dr. Walden simply walked through various medical records, selectively discussing fragments of patients' experiences without explaining the context.  In almost all cases discussed, he simply concluded with a blanket statement that the care did not amount to best practice, or resulted in a bad outcome.  This ignores the controlling legal standard of deliberate indifference.  Moreover, even

that conclusion rested on a fragmented review of selected records.  It is not possible for the Court to draw any meaningful conclusions from Dr. Walden's testimony.  The testimony lacked coherence and had no persuasive effect.

The Court appreciates the testimony of Dr. Walsh, Plaintiff's expert in psychology and the former administrator of psychological services for the Jackson Clinical Complex.  In his role as administrator, Dr. Walsh was responsible for psychological services delivery at six area prisons and Duane Waters Hospital.  Dr. Walsh's testimony, though sincere and helpful, is not especially germane to the present situation.  His testimony tended to focus on the practices and protocols that existed under his leadership and subsequent changes in those practices and protocols.  His testimony offered much more insight into the past than into the current situation.  Moreover, like Dr. Kupers, his testimony focused more on Defendants' alleged failure to adopt "best practices," not on alleged systematic, deliberate indifference.  The Court could not base any finding of deliberate indifference on the testimony of Dr. Walsh.

### d.    Use of SMHU

Plaintiffs argued throughout the hearings that the Defendants are using the SMHU improperly as a holding facility for the mentally ill.  The Court rejects this argument.  That some of the inmates in the SMHU suffer from mental illness further demonstrates the challenges of managing a prison.  Dr. Kupers testified that mentally ill inmates often have difficulty following formal prison rules.  (Tr. Vol. II, docket # 2787, at 250 ("[P]risoners with mental illness...have trouble conforming their behavior to what is expected.  They get into disciplinary trouble."))  Prisoners who do not obey those rules typically receive tickets for misconduct.  Jared Baker testified that it is rare for prisoners to be housed in the SHMU other than for major misconduct:

"Most of the individuals that are placed [in the SMHU] are placed there for custody reasons versus safety.  Most of the inmates are only there for what are considered major tickets at the institution."  (Tr. Vol. III, docket # 2788, at 473.)  It is not surprising that some of the inmates who receive misconduct tickets and are moved to the SMHU also have mental illness.  Moving an unruly inmate to the SMHU after his misconduct, whether that inmate has mental illness or not, is not the same as using the SMHU as a holding place for the mentally ill.  It reflects a practical security decision, not deliberate indifference, particularly when Defendants have satisfied the Court, as previously noted, that they are making adequate health care rounds in the SMHU.

### 3.     Conclusion

Based on its consideration of the entire trial record, the Court finds that Plaintiffs have failed to establish their case by a preponderance of the evidence.  In particular, Plaintiffs have not established that Defendants failed to comply with the Court's November 2006 preliminary injunction in any way that would support ongoing relief.  Plaintiffs also have not demonstrated a violation of the mental health provisions of the Consent Decree.  Nor have Plaintiffs demonstrated systematic deliberate indifference to the serious mental health care needs of the shrinking *Hadix* class.  The Court will enter a separate order implementing this decision.

## II.  Termination of Injunctive Relief as to JMF

The Court's approval of Defendants' August Transfer Plan (docket # 2593) became effective  on October 17, 2007.  (*See* Revised Opinion, docket # 2624, at 15).  Following the approval of the plan, Defendants moved all prisoners from the Southern Michigan Correctional Facility (JMF) and closed the facility.  (Def.s' Mot. to Terminate Injunctive Relief Regarding the

Southern Michigan Correctional Facility, docket # 2666, Ex. 1, Aff. of Patricia Caruso at ¶ 2.)

Defendants intend the closure to be permanent.  (*Id.*)  Defendants have moved that the Court

terminate injunctive relief regarding JMF, and Plaintiffs raised no objection.  (*Id.* at 4; Pl.s' Resp.

to Def.s' Mot. to Terminate Injunctive Relief Regarding the Southern Michigan Correctional

Facility (JMF), docket # 2671.)

The Court delayed approval of the motion, waiting to see whether any problems arose in

connection with the implementation of the Transfer Plan.  In addition, the Court was mindful that

termination of the injunctive relief regarding JMF had potential to radically shrink the *Hadix*

class, perhaps to the point of undermining the continuing viability of the action as a class action.

The Court did not want to take such potentially significant action without awaiting word from the

Court of Appeals on the most recent round of appeals.  Now that the Court of Appeals has ruled

on the latest appeals, and now that the parties have had more than enough time to assess any

potential systematic problems with implementation of the transfer plan, the Court is prepared to

grant the relief.  Nothing in the record suggests a systemic problem with implementation of the

Transfer Plan.   And nothing of record suggests that the State has any intention of re-opening

JMF.  Indeed, Plaintiff do not oppose the relief.  Accordingly, it is appropriate now to terminate

injunctive relief in this case as to JMF, and the Court will by separate order grant Defendants'

motion to do so.

### III.   Motion to Terminate Injunctive Relief as to RRF

Defendants have also moved to terminate injunctive relief as to the Dialysis Unit now at

the Ryan Correctional Facility (RRF).  The Dialysis Unit has a unique history within the *Hadix*

litigation.  In approximately 2001, Defendants contracted with a nephrologist, Dr. Middlebrook,

24

to establish and operate a dialysis center for MDOC prisoners.  (Def.s' Mot. to Terminate Injunctive Relief Regarding Ryan Correctional Facility's (RRF) Dialysis Unit, docket # 2667, at ¶ 2.)  Dr. Middlebrook established the Dialysis Unit at RRF, using equipment he owned.  (*Id.*)  In approximately 2003, when Defendants were still using a concentration model for health care, Defendants asked Dr. Middlebrook to move the Dialysis Unit to JMF, and he agreed.  (*Id.* at ¶ 3.)  Before the move, the Dialysis Unit had not been treated as a *Hadix* facility.  After the move, because JMF was part of the SPSM-CC and a *Hadix* facility, the Dialysis Unit too became part of the SPSM-CC and a *Hadix* facility.

Early in 2007, as part of an overall cost-cutting plan, Defendants decided to close JMF and shift from a concentration to a dispersal model of health care.  At Defendants' request, Dr. Middlebrook agreed to move the Dialysis Unit back to RRF.  Before the Dialysis Unit moved, Defendants submitted a plan to transfer the Dialysis Center and dialysis prisoners to RRF.  The Court conditionally approved the plan on June 5, 2007.  (Order of June 5, 2007, docket # 2465.)  In approving the plan, the Court specified that its exercise of jurisdiction over RRF extended no further than the care and treatment of patients of the Dialysis Unit.  (*Id.* at 2.)  Defendants now posit that the Dialysis Unit is outside of the class definition and no longer a *Hadix* facility.

Because the Dialysis Unit has moved from JMF, which was part of the SPSM-CC, to RRF, which is not part of the SPSM-CC, it is a *Hadix* facility only if it provides support services to a *Hadix* facility.  The Sixth Circuit recently considered a similar, though not identical, situation in this litigation.  *See Hadix v. Caruso*, 297 Fed. Appx. 504 (6th Cir. 2008).  In connection with fire safety improvements, Defendants had permanently closed Block 8, part of the original SPSM-CC, and moved the prisoners formerly housed there to Parnall Units A and B,

25

outside of the original SPSM-CC.  *Id.* at 505-06.  The Court terminated injunctive relief over

Units A and B, reasoning that the units were neither part of the original SPSM-CC nor providing

support services to a *Hadix* facility.  *Id.* at 505-06.  The Sixth Circuit affirmed, noting that Units

A and B provided not a single support service to any existing *Hadix* facility and that there was no

risk that the transfers to Units A and B were a ruse to shrink the *Hadix* class.  *Id.* at 506-07.  The

Sixth Circuit explicitly rejected Plaintiffs' argument that Units A and B were support facilities in

that they replaced the functions of an original *Hadix* cellblock:  "How can one facility provide

'support services' unless there is another facility to support?"  *Id.* at 506.  The Sixth Circuit also

pointed out that "'monitoring outside the SPSM-CC does not apply to transfers based on security

or safety concerns or for other administrative reasons, but applies only to *Hadix* prisoners who

are sent outside the confines of SPSM-CC temporarily for the purpose of receiving . . . care, with

the anticipation that they will return to the SPSM-CC once treatment is complete.'"  *Id.* at 506-07

(citing *Hadix v. Johnson*, Nos. 93-1551, 93-1555, 93-1559, 93-1560, 93-1642, 93-1643, 1995

WL 559372, at * 8 (6th Cir. Sept. 20, 1995)).

Plaintiffs emphasize that in *Hadix v. Johnson*, 367 F.3d 513 (6th Cir. 2004), the Sixth

Circuit upheld the Court's determination that Blocks 1 and 2 of Egeler Correctional Facility were

Hadix support facilities, even though those Blocks were not within the original walls of the

SPSM-CC and prisoners in Blocks 1 and 2 were not expected to be transferred to another *Hadix*

facility.  (*See* Pl.s' Opp. to Def.s' Mot. to Terminate Injunctive Relief Regarding Ryan

Correctional Facility's Dialysis Unit, docket # 2677, at 5-7.)  Plaintiffs made the same argument

in their appeal of the Court's decision to terminate injunctive relief as to Units A and B.  The

Sixth Circuit panel rejected Plaintiffs' argument.  *Hadix v. Caruso*, 297 Fed. Appx. 504, 507

(6th Cir. 2008). It distinguished the earlier decision, pointing out that in the earlier case, Defendants had not contested the Court's finding that Blocks 1 and 2 were delivering support services, and observing that Blocks 1 and 2 of Egeler provided support services to Duane Waters Hospital (DWH), itself a *Hadix* support facility. (*Id.*)

The Dialysis Unit differs from Units A and B in that it does provide a unique service. But does it provide this service in support of any *Hadix* facility, particularly in light of the closure of JMF? The record suggests that the *Hadix* prisoners requiring dialysis have been transferred to RRF. (*See* Order of June 5, 2007, docket 2465, (Approving transfer of dialysis patients to RRF).) In opposing Defendants' motion, Plaintiffs have not argued that the Dialysis Unit is a Hadix support facility. Rather, they have analogized to Egeler Blocks 1 and 2 and emphasized deep concern about the conditions of the care provided in the Dialysis Unit. For the same reasons the Sixth Circuit applied in distinguishing Units A and B from Blocks 1 and 2, the Dialysis Unit is also distinguishable. There is no indication in the record that the Dialysis Unit supports any *Hadix* facility. There is also no indication in the record that Defendants have moved the Dialysis Unit for any improper reason. Rather, Defendants appear to have moved the Dialysis Unit as part of an overall plan to reduce costs while providing appropriate care. A move for such an administrative reason is perfectly acceptable.

Because the Dialysis Unit is neither part of the SPSM-CC nor a *Hadix* support facility, it lies beyond the Consent Decree. Accordingly, the Court will by separate order grant Defendants' motion to terminate injunctive relief as to the Dialysis Unit. The Court appreciates Plaintiffs' discussion of health care issues in the Dialysis Unit. However, the standard of care is a separate issue the Court cannot reach in this case unless it finds that the Dialysis Unit is a *Hadix* facility.

Correction of any constitutional violations associated with the provision of care in the Dialysis Unit must be pursued through new, separate litigation.

## IV.  Office of Independent Medical Monitor

By Order of December 7, 2006, in the aftermath of the death of T.S., the Court expanded the role and power of the Associate Medical Monitor in the case, Dr. Robert Cohen.  (Order, docket # 2233, at 56.)  Among other things, the Order increased Dr. Cohen's staff by at least three and required Defendants to provide office space to Dr. Cohen and his new staff at a *Hadix* facility.  (*Id*. at 58-59.)   Defendants appealed the Court's Order, and the Sixth Circuit remanded the appeal.  In its decision, the Sixth Circuit panel noted that "the closure of JMF will likely diminish the Medical Monitor's role given that it will have far fewer Hadix prisoners to monitor after the closing of that facility."  *Hadix v. Caruso*, 248 Fed. Appx. 678, 682-83 (6th Cir., Sept. 21, 2007).  The panel also commented that removing Units A and B from the reach of the consent decree would also reduce the role of the medical monitor.  (*Id.* at 682.)  The panel described an apparent contradiction between the Court's March and September 2007 opinions. (*Id.* at 682-83)  It observed that in the March decision, the court authorized the medical monitor to review complaints of former *Hadix* prisoners alleging inappropriate medical care in non-Hadix facilities to which they had been transferred and, if necessary, to order them returned to a Hadix facility, while the Court's September decision suggested that empowering the medical monitor to do so might exceed the scope of the Consent Decree.  (*Id.*)  The panel remanded the appeal "to give the district court an opportunity to address the point and to consider whether recent developments make it necessary for the court to alter the Medical Monitor's authority and mandate."  (*Id.* at 683.)

28

At the time the Court authorized the Medical Monitor to hear complaints from former Hadix prisoners, there was no court-approved Transfer Plan in place. Until the Court could satisfy itself that Defendants had submitted an appropriate transfer plan, the Court was reluctant to permit transfers without continued monitoring. Even after approving Defendants' August Transfer Plan, the Court delayed granting Defendants' unopposed motion to terminate injunctive relief as to JMF, waiting to make sure the transfers occurred as the Transfer Plan contemplated. The Court has seen no indication that the implementation of the Transfer Plan has not succeeded. Accordingly, the Court has terminated prospective relief as to JMF and RRF.

The closure of JMF and the removal of RRF and Units A and B from the reach of the Consent Decree reduce considerably the extent of the Medical Monitor's duties. In addition, the Court's findings and conclusions rejecting ongoing, or new mental health relief eliminate the original basis for expanding the Monitor's duties. The Medical Monitor's role should shrink accordingly. It is now appropriate to scale back the Medical Monitor's role at least to the contours it held before the Court's December 7, 2006 order expanding it. The Court will enter a separate order returning the Office of the Medical Monitor to the size and scope of authority it had before December 7, 2006.

### V.  Remaining Hadix Facilities

In light of the closure of JMF, it is not entirely clear what, if any, *Hadix* facilities remain, and how many, if any, *Hadix* class members remain. Defendants have essentially argued that there is no primary facility left to support and that therefore, the class has disappeared. Plaintiffs have disputed this claim. The Court will schedule a status conference to address with the parties

how best to proceed on this issue, as well as any other matter addressing the future trajectory of this litigation.


                                         /s/ Robert J. Jonker
                                    ROBERT J. JONKER
                                UNITED STATES DISTRICT JUDGE
Dated:  March 31, 2009