UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EVERETT HADIX, *et al.*,

       Plaintiffs,

                    CASE NO. 4:92-CV-110

v.

                    HON. ROBERT J. JONKER

PATRICIA CARUSO, *et al.*,

       Defendants.

_____/

## OPINION

### A.    Introduction and Overview

This prisoner civil rights case spans approximately thirty-five years. It began in 1980 when twenty-three inmates filed suit in the Eastern District of Michigan to protest conditions of confinement at the State Prison of Southern Michigan – Central Complex ("SPSM-CC"). In 1981, the Court certified the class, defined as "all prisoners who are, or will be, confined at the [SPSM-CC]." In May, 1985, the Court approved a proposed Consent Decree encompassing a range of confinement issues such as sanitation, health care, safety, overcrowding, and security. At that time, the Court foresaw likely structural changes at the SPSM-CC, and so when it approved the Consent Decree, the Court explicitly clarified that "the facility at issue in this lawsuit, [the SPSM-CC], including the Reception and Guidance Center, shall be defined as 'all areas within the walls of . . . the [SPSM-CC] at the time this cause commenced and all the areas which will supply support services under the provisions of this Consent Judgment, e.g. food service and Boiler Plant

operations.'"  (Order Accepting Consent J., docket # 213, *Hadix v. Johnson*, CA No. 80-73581).
Under the Consent Decree, the Court retained jurisdiction to enforce the terms of the judgment.  *Id.*

The "likely structural changes" the Court foresaw occurred, resulting in fundamental changes
in the size and nature of the *Hadix* class.  Indeed, the operation and function of SPSM-CC today is
very different than at the time of the Consent Decree.  As a result, the *Hadix* class has become much
smaller and more transient.  Previously, the *Hadix* class comprised mainly prisoners housed long-
term in the SPSM-CC, but very few long-term housing blocks remain.  Now the class consists
primarily of prisoners housed temporarily in the Reception and Guidance Center ("RGC") before
moving to the correctional facilities where they will be housed longer-term.[1]  Beyond the prisoners
housed temporarily at RGC, the *Hadix* class consists only of prisoners hospitalized in Duane Waters
Hospital ("DWH") and prisoners housed in C-Unit, which is the step-down unit for DWH.

These changes at SPSM-CC itself, as well as market changes in the delivery of health care
outside of prison, highlight a difficulty built into decades-long constitutional litigation over structural
reform.  Litigation is an important vehicle for vindicating constitutional rights, and this litigation has
been in many ways indispensable in driving improvements necessary to bring SPSM-CC into
compliance with constitutional requirements.  But litigation is a blunt and slow-moving instrument.
It cannot keep up with changes both inside and outside the walls of a prison subject to a consent
decree entered over thirty years ago.  This is certainly true after three decades of supervision of

---

[1]When a *Hadix* prisoner moves to a non-*Hadix* facility, he is no longer in the *Hadix* class.
*Hadix v. Caruso*, No. 4:92-CV-110, 2009 WL 891709 at *1 (W.D. Mich., March 31, 2009) (*aff'd*
*Hadix v. Caruso*, 420 F. App'x 480 (6th Cir. 2011)).  This opinion also summarizes other changes
to the *Hadix* class over the years.  *Id.*

SPSM-CC, particularly over generally-worded health care provisions crafted long before fundamental structural changes in the market for health care services generally.

The Prison Litigation Reform Act ("PLRA") addresses this structural problem by ensuring that prospective injunctive relief ends, unless Plaintiffs can demonstrate an ongoing consent decree violation of constitutional magnitude.  The only open provisions of the Consent Decree in this case after thirty-five years of litigation are those dealing with a variety of health care issues.  After reviewing the evidence in this case, the Court finds that Plaintiffs have failed to demonstrate ongoing Consent Decree violations of constitutional magnitude.  Accordingly, the Court is terminating ongoing injunctive relief over the medical provisions of the Consent Decree.  Because this terminates the only still open provisions of the Consent Decree, this has the effect of terminating all federal supervision over the *Hadix* facilities and the *Hadix* class, and of bringing this case to an end.  Of course, all prisoners – whether part of the *Hadix* class or not – continue to enjoy the constitutional protection against deliberate indifference by their jailors to their serious medical needs, and the State of Michigan remains bound to provide medical care that meets the constitutional standard.  But going forward, that constitutional standard can be enforced in individual cases that raise the issue. The Court finds no basis for further federal supervision under the *Hadix* Consent Decree.

**B.     Consent Decree and Orders for Prospective Relief**

This Court has previously terminated federal supervision over all aspects of the *Hadix* Consent Decree other than five subsections concerning medical care at *Hadix* facilities.  These subsections address  medical screening before transfer to another facility; a sick call access plan; professional staffing; a chronic disease plan; and health records.  Plaintiffs assert that several orders entered in this case between 1993 and 2007 on various issues related to health care also remain open

3

and continue to require  Defendants to provide prospective relief.  These orders comprise: (1) Order

of March 26, 1993 (docket # 142), based on the provision concerning a chronic disease plan; (2)

Order of July 25, 1994 (docket # 405), based on the provision concerning access to healthcare; (3)

Order of November 18, 1996 (docket # 822), based on the provisions concerning medical screening

before transfer and a chronic disease plan; and (4) Permanent Injunction of December 7, 2006

(docket # 2234), based on the provisions concerning health records; professional staffing; and access

to health care.  Defendants disagree and move for termination of prospective relief under the open

Consent Decree subsections.  The Court conducted a bench trial to address the dispute.

### C.    Evidence Presented at Trial

At trial, the Court heard extensive evidence from the parties.  Plaintiffs' witnesses included:

Karen Elizabeth Saylor, M.D., an expert in medicine in the correctional setting, and *Hadix* class

members Edward Alexander, Jr.; John Legree (*de bene esse*); Richard Girard (*de bene esse*); William

Ross (*de bene esse*); Keith Boyette (*de bene esse*); Louis Ransom (*de bene esse*); George Billups

(*de bene esse*); James Tennant (*de bene esse*); Michael White (*de bene esse*); and Charles Richard

Culp, Jr.  Defense witnesses included: Erin Elizabeth Orlebeke, M.D., the Chief Medical Officer for

Corizon Health, Inc. ("Corizon")[2] in Michigan; Lynn Marie Larson, D.O., a physician at DWH; Mark

Boomershine, P.A., a physician's assistant at RGC; Emmanuelle Genna, physical therapist; Janak

Bhavsar, M.D.; Heidi Elizabeth Washington, Warden; Heidi Lee Reilly, R.N.; Nathanial Abraham

Neusbaum, R.N., Acting Director of Nursing at DWH; Judy L. Crisenberry, R.N., Acting Unit

Manager at RGC; Melissa M. Schulz, R.N.; Maxine Evelyn Collard, R.N., Nursing and Medical

---

[2]The MDOC contracts with Corizon or its related entity, Quality Correctional Care of Michigan, PC (also referred to in this Opinion as "Corizon"), for the provision of medical care in the MDOC system.

Assistant Supervisor in C-Unit; Elizabeth Solomon, Regional Health Information Manager for the MDOC; Chad Jeremy Zawitz, M.D., an expert in medicine in the correctional setting; Matthew John Reeves, Ph.D., expert in statistical analysis; Wenjiang Fu, Ph.D., expert in statistical analysis; Courtney Ann Wetzel, R.N., Manager of Nursing at DWH; Carol Marie Griffes, R.N., Acting Director of DWH; Penny Lynn Crapser, Pharmacy Assistant; Leslie Jones, Records Administrator; and Lisa Lanette Paquette, Medical Record Supervisor at RGC.

The parties also introduced numerous exhibits into evidence, including Plaintiffs' Exhibits 1-8; 11-12; 15-21; 23-27; 29-30; 32; 34A and B - 41A and B; and 42, and including Defendants' Exhibits A-E; G-Z; AA-EE; GG-UU; WW 2-6, 9-12, 14-16, 18, 21, 22; and XX.  The parties submitted additional materials with supplemental briefing.  The parties' exhibits encompass a broad range of materials, including curriculum vitae of exert witnesses; expert reports; standing orders; intake questionnaires; NCCH guidelines; NextGen templates; Corizon collaboration/supervision guidelines; selected kites; critical incident reports; medication incident reports; Transfer Assessment Screen; kite audits; policy directives; operating procedures; and select patient records.

### D.    Legal Standards

The Prison Litigation Reform Act ("PLRA") strictly limits the Court's ability to grant prospective relief concerning prisoner conditions.  The Court may grant such relief only after finding an ongoing violation of a constitutional or other Federal right, and the relief must be narrowly tailored.  *See* 18 U.S.C. § 3626(a)(1) ("Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff (or plaintiffs)").  The Sixth Circuit has emphasized that

the relevant inquiry is *not* whether the defendants are in compliance with the consent decree; instead, pursuant to the PLRA, the district court must determine if the consent decree is currently necessary. To fulfill its statutory duty, the district court must make written findings as to whether 'prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that prospective relief is narrowly drawn and the least intrusive means to correct the violation.' § 3626(b)(3). If the Court finds that the current conditions at the SPSM-CC do not violate the Constitution, then it should terminate the consent decree, regardless of whether the objectives of the consent decree have been achieved. If, on the other hand the court finds that constitutional violations persist, then it should retain jurisdiction to enforce compliance with the consent decree, provided that the prospective relief set forth in the decree is necessary, narrowly drawn, and the least intrusive means to correct the violations.

*Hadix v. Caruso*, 420 F. App'x 480, 485 (6th Cir. 2011) (quoting *Hadix v. Johnson*, 228 F.3d 662, 673 (6th Cir. 2000) (emphasis in original)).

To demonstrate a claim of constitutional proportions concerning the open provisions of the Consent Decree, Plaintiffs must show by a preponderance of the evidence systemic deliberate indifference to *Hadix* prisoners' serious medical needs. *See Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (*en banc*) ("[P]roperly stated, the [constitutional] right at issue is [a prisoner's] right not to have his serious medical needs treated with deliberate indifference.") (citing *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976)). A claim of deliberate indifference under the Eighth Amendment has two components, one objective and one subjective. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The objective component requires the plaintiff to show that the medical need at issue is sufficiently serious. *Id.*, citing *Farmer*, 511 U.S. at 834. The subjective component requires the plaintiff to show that a prison official being sued "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he disregarded that risk." *Id.* (citing *Farmer*,

511 U.S. at 837). "A plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Id.* (citing *Estelle*, 429 U.S. at 106). However, "a plaintiff need not show that the prison official acted 'for the very purpose of causing harm or with knowledge that harm will result.'" *Id*. (quoting *Farmer*, 511 U.S. at 835). Rather, the subjective element of deliberate indifference is the equivalent of reckless disregard of a substantial risk of serious harm. *Id.* (citing *Farmer*, 511 U.S. at 836). A court may infer from circumstantial evidence that a prison official had the requisite knowledge. *Id.* (citing *Farmer*, 511 U.S. at 842).

### E.   Findings of Fact and Conclusions of Law Regarding Open Consent Decree Provisions

In making its findings of fact, the Court relies on its observations of witnesses in open court, and on the analytical points cited in its discussion. The Court notes that medical care in the *Hadix* facilities occurs in a demanding environment involving thousands of interactions with patients. Elizabeth Solomon, Regional Health Information Manager for the MDOC, testified that her review of the NextGen electronic medical records for prisoners in the *Hadix* facilities in the six-month period between August 2012 and March 2013 reflected 211,000 "patient encounters." The same records show that between August 2012 and February 2013, a total of approximately 42,000 prescriptions for prisoners in the *Hadix* facilities were filled. Based on this and other similar information in the record, the Court emphasizes that its focus is on the overall system of medical care provided to the *Hadix* class. Providing this medical care is a big and complex task. Evidence of individual, anecdotal problems is certainly proper and helpful to the Court in assessing how the systems are working. But a system on this scale can never be perfect, whether inside or outside of prison. The focus of the Court is on determining whether at the system level, there is any

demonstrated, ongoing need for federal Consent Decree supervision to ensure constitutional compliance.

### 1.     Medical Evaluation before Transfer

Section II.A.3.b of the Consent Decree provides, in its entirety:

> Prior to transfer to another facility or other substantial travel, each inmate shall continue to be evaluated by qualified health care personnel to assess suitability for travel or institutional reassignment.

The preponderance of the evidence presented at trial amply demonstrates that Defendants have implemented a process that satisfies the requirements of this subsection, and the Court so finds as a matter of fact. The preponderance of the evidence does not support a finding of systemic deliberate indifference in the transfer evaluation process. There is no ongoing constitutional violation, and therefore no basis for ongoing prospective relief under this subsection.

### A.     *RGC*

RGC's function is to receive all newly-committed adult male felons from all of Michigan's counties and, among other things, determine how they will be placed within the greater MDOC system. RGC operates as a maximum security prison. At any one time, approximately 1100 - 1150 prisoners are housed at RGC. The average length of stay at RGC is 30 - 45 days. Typically a minimum of 20 prisoners go through intake each day, and the number is often higher, ranging from 20 - 80. Defendants' expert, Dr. Zawitz, works in a similar environment. Since 2004 Dr. Zawitz has been a practicing physician at the Cook County Jail in Chicago, which is among the largest single site urban correctional facilities in the United States, with a daily census from approximately 8,000 - 11,000 detainees. His experience at the Cook County Jail offers particular insight into the

provision of medical care in correctional setting with a large and transient population, and the Court finds his testimony particularly credible.

MDOC policy requires that each prisoner have a medical examination as part of the intake process, and that each prisoner have a second medical examination – a health clearance physical – before transfer from RGC to another facility. The preponderance of the evidence presented at trial, including without limitation the testimony of Dr. Zawitz, demonstrates that intake screening typically occurs within hours after an inmate's arrival at RGC. On a typical day, a supervising nurse and up to three additional nurses staff the screening area and perform the evaluations. The screening area is in close physical proximity to staff physicians and other medical providers. Intake evaluations include, among other things, taking vital signs and weight; obtaining consent for laboratory testing; reviewing the inmate's medical history; initiation of tuberculosis testing; and instruction to the inmate on how to complete a kite form. Nurses conducting the screening use a template medical history form available on NextGen[3] in taking medical histories, and they document inmates' medical problems in the NextGen problem list. There was no evidence at trial that arriving inmates do not receive an intake physical. Plaintiffs argue that the intake physical should include more specific questioning of inmates, but the Court finds nothing that rises to the level of systemic deliberate indifference in the intake process.

Nor does the evidence reveal systemic constitutional deficiencies in the health clearance process for transferring prisoners. MDOC policy requires that each prisoner have a health clearance physical performed in person by a medical provider before transfer to another facility. Evidence

---

[3]NextGen is a shorthand reference to the electronic medical record program used throughout the Michigan prison system, including the *Hadix* facilities.

presented at trial, including without limitation the testimony of Dr. Janak Bhavsar, a physician at RGC, reflects that the health clearance physical involves, among other things, taking a complete medical history, including family history and social history that would affect overall health; a full physical examination; and a review of laboratory tests. The purpose of the physical to ensure that the prisoner can be transferred safely from a medical perspective.

After a medical provider conducts the health clearance physical, a nurse completes a transfer assessment screen detailing the prisoner's health conditions. Heidi Reilly, R.N., who is part of the medical staff at RGC, testified that she routinely completes such transfer assessment screens and described in detail the process she and other nurses follow to do this. She explained that once the medical provider has completed a health clearance physical and updated the medical record, a nurse collects the file. The nurse reviews the file and assigns it a code reflecting whether a prisoner may be transferred safely and what particular conditions a receiving facility would have to satisfy for the prisoner to be housed there given the prisoner's medical needs. For example, a file might be assigned a code reflecting that the prisoner needs to be assigned to a facility within 50 miles of a prison hospital such as Duane Waters due to a particular medical condition, or that there are no medical restrictions on where the prisoner may be housed, or that the prisoner may not be transferred at that time. The nurse checks records for the prisoner's chronic care requirements; restricted medications; mental health issues; and certain laboratory tests and disclosures. He or she then updates a transfer assessment screen accordingly. Other parts of the transfer assessment screen populate automatically with information already in the records. The nurse then checks a print preview of the Transfer Assessment Screen for accuracy and completeness; locks the document; puts the document in the chart; and takes a copy to the medical records department.

10

Testimony at trial, including that of Lisa Paquette, health information manager at RGC, reflects that the health information managers complete data entry on a daily basis for all of the inmates who have been cleared for transfer. They review the transfer assessment screen against the resources of the facility to which the prisoner is being transferred, and if the facility does not have resources to provide appropriate medical care to the prisoner, he will remain at RGC pending transfer to a facility that does have such resources.

Plaintiffs contend it would be preferable for the intake examination to include more specific questions regarding potential disabilities. Plaintiffs acknowledge that the intake examination includes inquiry regarding disability. The degree of specificity of the inquiry does not support a finding of deliberate indifference. Plaintiffs also object to the transfer assessment process in place based on Dr. Saylor's report that she found incomplete information and other mistakes in some of the individual transfer assessment screens she reviewed. This is not the same as finding systemic deliberate indifference in the transfer assessment process. The Court finds by a preponderance of the evidence that even though mistakes sometimes occur in completing the forms, there is nothing that amounts to systemic deliberate indifference.

B.     *DWH and C-Unit*

Because DWH and C-Unit are medical facilities, inmates are not transferred out of them other than through a medical evaluation process. The Court finds no evidence establishing that prisoners are transferred out of DWH and C-Unit with a transfer process that shows systemic deliberate indifference to their serious medical needs.

11

C.    *Summary*

The MDOC has in place a system for intake; health clearance physicals; and transfer assessment that satisfies the requirements of the Consent Decree and the Constitution. Accordingly, Consent Decree Section II.A.3.b must be closed.

**2.    Access to Health Care**

Section II.A.4.a of the Consent Decree provides, in its entirety:

Within 60 days from the date of the entry of the Judgment in this matter, the Department will submit a plan by which all inmates will be afforded daily access on each weekday to a sick call register. Any inmate who registers for sick call shall within 24 hours receive an appointment to be seen by medical staff within a reasonable time given the particular medical complaint, except those registering on a Friday may receive appointments on the following Monday. Inmates shall be afforded direct access to a register, which health care staff then collect.

The Department's plan for direct access to health care must provide at least equivalent daily access on weekdays for inmates in segregation units (administrative, punitive, protective). While the procedure may differ for such inmates, the access may be no less.

The Department's plan shall make adequate provisions to assure that inmates will be transported as needed from housing or other areas to the health care facility.

In a case where a correctional officer suggests that an inmate might be seriously mentally ill, the Department will provide immediate access to professional mental health staff.

The Department's plan shall provide for implementation within 90 days after its adoption or approval.

The preponderance of the evidence presented at trial demonstrates that Defendants have implemented processes to ensure the kind of prompt access to medical attention this subsection requires, and the Court so finds as a matter of fact. The preponderance of the evidence does not support a finding of systemic deliberate indifference in the medical access processes. There is no

12

ongoing constitutional violation, and therefore no basis for ongoing prospective relief under this subsection.

The processes for requesting medical attention differ among the three *Hadix* facilities. RGC uses a kite system. Nurse Heidi Reilly testified regarding the kite process at RGC. On a daily basis, kites are gathered from the cell blocks and brought to the medical area, where they are date-stamped. A registered nurse reviews and groups the kites into categories such as medical, dental, mental health, and optical. The medical kites are triaged. If a medical kite concerns a condition requiring an examination, a nurse conducts the initial exam and brings in another medical provider as needed. Melissa Schulz, R.N., who also works at RGC, testified that the nurse would typically examine the prisoner either the day the kite was received or the next business day, but if the kite described an emergent condition, the prisoner would be seen the same day. Maxine Collard, who supervises nurses and medical assistants in C-Unit, described a similar kite process. In C-Unit, Custody delivers kites to Healthcare. If the kite describes an urgent or emergent situation, the kiting prisoner sees a physician or physician assistant either in C-Unit or in the emergency room at DWH the same day. If the condition is not urgent or emergent, the patient is evaluated by a registered nurse the next day.

Courtney Wetzel, manager of nursing at DWH, testified that nurses at DWH make daily rounds. She also explained that as one nursing shift ends and another begins, the nurses at DWH meet to discuss each patient's particular condition and treatment, and they complete a nursing worksheet that amounts to a status report on each patient. Daily rounding and close collaboration between nurses obviate to some extent the need for kites in DWH. Dr. Lynn Larson, one of the physicians employed by Corizon and assigned to DWH, also testified that each unit in DWH

13

maintains a "doctor board" on which nurses regularly list patient concerns with the priority of each concern. Dr. Larson testified that in her experience, these boards offer an efficient mechanism for her quickly to assess and respond to patient needs in an acute care setting. She testified that she considers doctor boards preferable to kites in an acute care setting such as DWH, while she considers kites more efficient in a non-emergent setting such as RGC. Ms. Wetzel also described the physician boards, explaining that non-emergent issues are noted there and that the physicians can check the boards readily. Mr. Neusbaum, acting assistant director of nursing at DWH, testified that the standard practice in DWH and C-Unit is to respond to non-emergent medical kites within 24 hours and examine prisoners with non-emergent kites within 48 hours.

Judy Crisenberry, Acting Health Unit Manager at RGC testified that she conducts audits of the kite process to make sure that staff are following the established protocols. Mr. Neusbaum testified, and Ms. Griffes confirmed, that he and Ms. Griffes also conduct such audits for DWH and C-Unit. An audit process assists in identifying and correcting any problems in the health care delivery system.

Plaintiffs argue that Defendants have not satisfied the requirements of the Consent Decree regarding access to healthcare, but the evidence provided is, in the Court's view, too limited and anecdotal to support a finding of systemic deliberate indifference. Plaintiffs' expert, Dr. Saylor, identifies isolated instances in which she disagrees with the response provided to kites. Plaintiffs also contend that Defendants have failed to comply with the access to healthcare requirements because Defendants' written policy does not require responses to kites within 24 hours. But fundamentally, the Consent Decree calls for prompt access to care, and a preponderance of the evidence at trial reflected that the kite and doctor board systems in place provide that access. That

14

not every kite receives a response within 24 hours does not amount to constitutional deliberate indifference.

The MDOC has in place a system for access to healthcare that satisfies the requirements of the Consent Decree and the Constitution. Accordingly, Section II.A.4.a must be closed.

### 3. Professional Staff

Section II.A.5.a of the Consent Decree provides, in its entirety:

> Professional staff are responsible to provide adequate medical care to meet each inmate's serious medical needs. The physicians are the health authority in all cases requiring medical judgment. Physicians shall assure continued, appropriate supervision and direction of all health care. To accomplish this supervision, the physician will meet appropriate contemporary professional standards for supervision, including appropriate use of standing orders and protocols. Dental staffs are to be professionally supervised by dentists.

The preponderance of the evidence presented at trial demonstrates that the professional staffing and supervision requirements this subsection establishes have been satisfied, and the Court so finds as a matter of fact. The preponderance of the evidence does not support a finding of systemic deliberate indifference in medical supervision and staffing in the *Hadix* facilities. There is no ongoing constitutional violation, and therefore no basis for ongoing prospective relief under this subsection.

### A. Adequacy of Staffing

Dr. Orlebeke, the chief medical officer for Corizon in Michigan, testified that she has ultimate oversight responsibility for all the medical providers at the *Hadix* facilities. "Medical providers" in this context are physicians (M.D. and D.O.), physician assistants (P.A.), and nurse practitioners (N.P.). On weekdays, there are six or seven medical providers at DWH; six medical providers at RGC; and one medical provider at C-Unit. Twenty-four hours a day, seven days a week, a physician is present in the emergency room at DWH. (*Id.*)

15

During his time at RGC, Dr. Zawitz observed the use of "surge staffing" due to an atypically heavy intake volume of over 100 inmates.  He noted that there were a total of two physicians, three physician assistants, and two nurse practitioners assigned to RGC.  Medical and nursing supervision was available at all times.  Dr. Zawitz pointed out that "[t]he Cook County Jail processes 3-10 times as many inmates on any given day but actually has fewer [medical providers] available than the Hadix site."[4]  Based on all he observed, he opined that the medical staffing at RGC was sufficient.  Dr. Zawitz also observed appropriate staffing at C-Unit.  He noted that routine staffing included at least three nurses present at all times, plus a medication-pass nurse.  Routine staffing also included one physician for four 10-hour shifts weekly, and a physician assistant covering non-chronic care appointments one day a week.  An emergency room physician at DWH was available at all times.

Evidence at trial reflected appropriate use of standing orders and protocols at RGC.  Dr. Zawitz found that medical staff followed standing orders for a variety of common medical conditions, such as heart disease, asthma, and thyroid imbalances, as well as for chronic diseases.  Dr. Zawitz observed that all of the medical providers were aware of these standing orders and most knew the requirements of the standing orders from memory.

### B.     Adequacy of Supervision

Dr. Orlebeke testified that all mid-level providers are supervised by physicians, regardless of whether the mid-level provider is identified as the primary medical provider.   Each mid-level provider has a "collaboration agreement" with his or her supervising physician detailing the physician's expectations and framework appropriate care.  Dr. Larson noted that a physician is

---

[4]Defs.' Ex. PP, Zawitz report, p. 11.

always involved in each patient's care.  Dr. Larson testified that Dr. Orlebeke is her supervising physician and that she and the other physicians have peer reviews twice a year.

Mark Boomershine, P.A., testified that he has worked as a P.A. at RGC since 1982.  A licensed physician with whom he works in close proximity and sees "almost daily" supervises him. All the medical providers share responsibility for every patient, but the physicians have final responsibility.  Mr. Boomershine's supervising physician conducts at least ten reviews of Mr. Boomershine's casework each month, and Dr. Orlebeke reviews him annually.

As manager of nursing at DWH, Courtney Wetzel manages the nursing staff.  She testified that she provides direct supervision to the nursing staff and provides direct patient care from time to time.  She reassigns members of the nursing team as patient needs shift to maintain appropriate coverage.

Dr. Saylor, Plaintiff's expert, acknowledges that there are adequate numbers of medical staff at the *Hadix* facilities.  Plaintiffs contend that professional reviews should occur more frequently. Plaintiffs also argue that physician assistants and nursing staff should be supervised more closely. But Plaintiffs have not shown any systemic deliberate indifference linked to staffing and supervision in the *Hadix* facilities.

The preponderance of the evidence at trial reflects a system of consistent and adequate medical staffing and supervision that satisfies the Consent Decree and the Constitution. Accordingly, Section II.A.5.a of the Consent Decree must be closed.

### 4.     Chronic Disease Plan

Section II.A.7 of the Consent Decree provides, in its entirety:

> Within 120 days of the entry of the Judgment in this matter, the Department will submit a professionally designed plan to provide for systematic follow-up care for inmates with chronic disease.  Said plan shall be implemented within 120 days after approval or adoption.

The preponderance of the evidence presented at trial demonstrates that Defendants have implemented a process that satisfies the requirements of this subsection, and the Court so finds as a matter of fact.  The preponderance of the evidence does not support a finding of systemic deliberate indifference in the process for providing follow-up medical care for inmates with chronic diseases. There is no ongoing constitutional violation, and therefore no basis for ongoing prospective relief under this subsection.

The Court finds particularly persuasive testimony from Drs. Orlebeke, Zawitz, and Larson. Dr. Orlebeke testified that the medical guidelines the National Commission on Correctional Healthcare ("NCCH") promulgates regarding chronic care establish the protocol required for chronic care in the *Hadix* facilities.  Under this protocol, patients with chronic illnesses are categorized in three groups based on how well-controlled their illnesses are.  Medical providers are expected to see patients whose chronic illnesses are in "good" control at least once every six months; patients whose chronic illnesses are in "fair control" at least once every three months; and patients whose chronic illnesses are in "poor" control at least once a month.  Dr. Larson testified that nurses see extended care patients daily and that physicians see them at least monthly.  Mr. Boomershine testified that he uses the NCCH guidelines to assess the degree of control and time frames for responding to chronic illnesses.  Dr. Zawitz observed at RGC that medical providers routinely followed the chronic care

guidelines, which included enrollment in a chronic care clinic to ensure regular examinations based on the degree of control of disease. He found copies of the guidelines readily available at RGC, C-Unit, and DWH. In discussions with medical providers at the *Hadix* facilities, he found all were familiar with the chronic care guidelines. Dr. Zawitz found that when chronic care appointments are scheduled in NextGen, they remain active in the NextGen record so that if a prisoner is transferred before an appointment occurs, medical staff at the new site would have notice of the appointment. The appointment would also be noted on the transfer assessment screen.

Plaintiffs point to instances in which chronically ill prisoners were not scheduled for follow-up appointments automatically. Plaintiffs also object that the some of the NCCH guidelines in use at the *Hadix* facilities date back to 2001 and should be updated, and Plaintiffs argue that the NCCH guidelines should be adopted as the formal policy of the MDOC for the treatment of the chronically ill. None of these arguments supports a finding of deliberate indifference in connection with chronic disease care in the *Hadix* facilities.

The preponderance of the evidence at trial reflects a system of chronic disease care that satisfies the Consent Decree and the Constitution. Accordingly, Section II.A.7 of the Consent Decree must be closed.

### 5.	Problem-Oriented Health Records

Section II.A.11 of the Consent Decree provides, in its entirety:

> Health records are maintained in accord with the Modified Problem-Oriented Health Records format. Within one year of the entry of Judgment in this matter, the Department will take appropriate measures to assure that this medical record keeping procedure has been and continues to be fully implemented.

The preponderance of the evidence presented at trial demonstrates the well-established use of problem-oriented medical records at the *Hadix* facilities.   Defendants have implemented a process that satisfies the requirements of this subsection, and the Court so finds as a matter of fact.   The preponderance of the evidence does not support a finding of systemic deliberate indifference in the use and maintenance of problem-oriented medical records.   There is no ongoing constitutional violation, and therefore no basis for ongoing prospective relief under this subsection.

The Court bases its findings on, among other evidence presented at trial, testimony from Dr. Orlebeke, Mr. Boomershine, and Ms. Solomon.   Dr. Orlebeke testified that in her opinion, the NextGen electronic medical record, which has been used in the *Hadix* facilities since 2010, is a problem-oriented medical record.   Mr. Boomershine testified that he can readily access a patient's problem list in the patient's NextGen medical record to ascertain the prisoner's medical history quickly.   Elizabeth Solomon, Regional Manager of Health Information Services for the MDOC, supervises medical records staff throughout the region.   She testified that she believes NextGen is a problem-oriented medical system.   She elaborated that its main organizing component is a diagnosis tab containing all the past diagnoses for the patient, including both chronic and non-chronic problems.

Plaintiffs object that the NextGen medical record system is cumbersome and inefficient. Even accepting this as true, NextGen remains a problem-oriented medical system that captures inmates medical data, and Plaintiffs have not shown systemic deliberate indifference regarding a problem-oriented medical system.

The preponderance of the evidence at trial reflects that the MDOC has in place a problem-oriented medical records system that satisfies the Consent Decree and the Constitution. Accordingly, Section II.A.11 of the Consent Decree must be closed.

## F.      Orders for Prospective Relief

Each of the four orders Plaintiffs contend require ongoing prospective relief (docket ## 142 405, 822, 2334) addressed specific issues at specific times. The purpose of each order is to ensure compliance with the Consent Decree and the Constitution. Two of the orders are over twenty years old. One is nineteen years old. The most recent is nearly a decade old. All are subject to the ongoing requirements of the PLRA. No one is contending that Defendants are in contempt of any of the orders. There was no sign at trial that Defendants are in contempt of any of the orders. To the contrary, the evidence at trial reflects that Defendants are functionally, if not literally, in compliance with all of the orders. To the extent Defendants are not in literal compliance with any of the orders, the Court finds as a matter of fact that Defendants are not acting in a way that shows deliberate indifference or contempt. Accordingly, to the extent the orders remain open and require prospective relief, the orders must be closed.

## Conclusion

Over the course of thirty-plus years, this litigation has brought about critical improvements in conditions at the SPSM-CC. The litigation has served an important purpose and achieved valuable results. The objectives of the Consent Decree have been realized. The Court finds no ongoing constitutional violation requiring that the still-open provisions of the Consent Decree, and the related Orders also discussed in this Opinion, remain open. Accordingly, the Court will

terminate ongoing injunctive relief under the provisions of the Consent Decree and Orders at issue.

This has the effect of bringing the case to an end.

Dated: _____September 29, 2015_____        /s/ Robert J. Jonker_____
                                             ROBERT J. JONKER
                                             CHIEF UNITED STATES DISTRICT JUDGE